### In re TELESERVICES GROUP, INC., Debtor.

### Marcia R. Meoli, Trustee, Plaintiff,

v.

### The Huntington National Bank, Defendant.

Bankruptcy No. HG 05–00690.
Adversary No. 07–80037.

United States Bankruptcy Court, W.D. Michigan.

March 17, 2011.

Douglas A. Donnell, Esq., and John E. Anding, Esq., Grand Rapids, MI, for Plaintiff.

Robert S. Hertzberg, Esq., Detroit, MI, Laurence Z. Shiekman, Esq., and Frank H. Griffin, IV, Esq., Philadelphia, PA, for Defendant.

## OPINION RE: BIFURCATED ISSUES

JEFFREY R. HUGHES, Bankruptcy Judge.

Trustee Marcia Meoli has sued The Huntington National Bank ("Huntington") to recover over $73 million[1] in fraudulent transfers Huntington allegedly received either directly from Teleservices Group, Inc. ("Teleservices") itself or indirectly through a related company, Cyberco Holdings, Inc.[2] This opinion addresses most, but not all, of the remaining factual and legal issues raised in this complicated case.[3]

---

1. *See* Brief in Support of Trustee's Motion for Summary Judgment, Ex. A [DN 355] (hereinafter "Trustee Brief, May 26, 2010").

2. Teleservices Group, Inc. and Cyberco Holdings, Inc. were related companies with a common owner. Cyberco Holdings also operated under a number of assumed names, including CyberNET Group and Cybernet Engineering. Cyberco Holdings, Inc. shall be referred to in this opinion as "Cyberco."

3. Although Trustee seeks only the recovery of fraudulent transfers made by Teleservices, this adversary proceeding became entangled with the Cyberco bankruptcy proceeding through Huntington's motions to substantively consolidate the two Chapter 7 cases. Huntington contended that it was entitled to that relief as a matter of equity, which prompted both Chapter 7 trustees to assert that Huntington had unclean hands. Given that Huntington itself was claiming good faith

## JURISDICTION

The court has jurisdiction to hear this adversary proceeding. 28 U.S.C. §§ 1334 and 157(b)(1). *See also* W.D. Mich. LCivR 83.2. The issue raised is also a core matter. 28 U.S.C. § 157(b)(2)(H). Therefore, the findings of fact and conclusions of law set forth in this opinion [4] are appealable pursuant to 28 U.S.C. § 158.

## ASSESSING HUNTINGTON'S GOOD FAITH

Although Huntington has raised a number of issues in this adversary proceeding, the mainstay of its defense has been that it received all of the transfers from Teleservices in good faith. Indeed, this case presents the odd situation of Huntington asserting its good faith under Section 548(c) [5] with respect to some of the transfers and its good faith under Section 550(b)(1) with respect to other transfers. Therefore, it is appropriate to offer even before a discussion of the underlying facts some insight

as to the court's conclusions concerning this admittedly illusive concept.

■ Recent case law strongly favors an objective approach to assessing a transferee's good faith under either section. This court, though, has determined that testing either Section 548(c) or Section 550(b)(1) good faith is in fact subjective, with the focus being upon traditional notions of honesty and integrity. In many ways, this conclusion should seem obvious. If the person accepting the transfer is able to establish his innocence vis-a-vis the debtor's fraudulent motives, a trier of fact would be hard pressed to still decide that he had taken in bad faith. If, though, that same person had actually participated in the deception, then it would be just as easy to conclude that his involvement in the transaction had been dishonest—i.e., not in good faith.

■ However, a transferee's honesty with respect to the fraud being perpetrated encompasses more than just complicity,

as its primary defense to the Teleservices adversary proceeding and given that it and the unclean hands defense would likely turn on many of the same facts, the substantive consolidation motions and the Teleservices adversary proceeding were consolidated. The two defenses, as well as a number of other issues, were then separated from the rest of the dispute for early trial. *Cf.* Fed. R. Bankr.P. 7042 and Fed.R.Civ.P. 42. However, the need for a bifurcated trial became less apparent when the court eliminated the unclean hands defense just before trial.

Nonetheless, the trial proceeded as planned, with proofs being taken only with respect to the issues relegated to the first portion of the bifurcated proceeding. It took place over twelve days. Fifteen witnesses testified and the testimony of ten other witnesses was offered through nine excerpted deposition transcripts and one declaration. Numerous exhibits were also admitted.

The court has already denied Huntington's motions for substantive consolidation. *See In re Cyberco Holdings, Inc.,* 431 B.R. 404

(Bankr.W.D.Mich.2010). Therefore, this opinion addresses only the issues raised at trial concerning the Teleservices adversary proceeding. This opinion also includes a summary of the court's dispositive pretrial rulings for context. And finally, the opinion identifies what remains to be decided along with some discussion in those instances where the record to date already includes a considerable amount of relevant evidence. However, the court will not dispose of any of these remaining issues until they are properly before it.

4. *Cf.* Fed. R. Bankr.P. 7052 and Fed.R.Civ.P. 52.

5. 11 U.S.C. § 548(c). Teleservices' petition pre-dates the October 17, 2005 effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub.L.No. 109–8, § 1501(b)(1), 119 Stat. 23. Unless otherwise indicated, all citations in this opinion to the Bankruptcy Code will be to the Bankruptcy Code as written prior to the BAPCPA amendments.

for the transferee's mere awareness of the debtor's fraudulent intent would also cause his taking to be in bad faith. But a transferee is no more likely to admit that he knew of the debtor's fraudulent purpose at the time of receipt than would the debtor himself admit that he had harbored such designs. Courts have for centuries used the so-called badges of fraud to assess a debtor's fraudulent intent. Should not, then, the same badges be relevant when the issue turns to determining whether the transferee himself was aware of any fraud?

■ Unfortunately, while the debtor's own fraud can be established simply through the existence of enough badges, a transferee's related good faith is also a function of his awareness of those badges. A question, then, inevitably arises as to what, if any, duty does the transferee have to investigate should some but not enough badges come to his attention at a particular point in time? Moreover, there is also the issue of retroactivity. If, for example, the transferee's investigation of a particular badge later leads him to the discovery of enough other badges to make him aware of the debtor's fraudulent intent, should the transfer previously received now be deemed to have been taken in bad faith? This latter question is especially important when the targeted transferee continued to receive transfers after the first suspicion arose, as is the case in this instance.

Questions like these have led this court to the further conclusion that a procedural component must be added to the good faith analysis whenever anything more than the simplest of fraudulent transfers is involved. That is, a court must in many cases assess not only whether the transferee conducted himself honestly and with integrity regarding the receipt of any particular transfer. The court must often assess as well whether the transferee conducted himself honestly and with integrity

in addressing the receipt of a series of fraudulent transfers as a succession of badges evidencing that intent came to the transferee's attention.

■ And finally, this court recognizes that it is not the trustee who must prove the transferee's bad faith in accepting the transfer. Instead, it is the transferee who must establish that he had acted in good faith. Should, then, the transferee's response to suspicions at any time fall short of an honest effort, the transferee would necessarily lose the ability to claim good faith going forward. But it follows as well that such a lapse should not negate what had been up to that point a good faith effort to investigate the recipient's suspicions concerning transfers already received. In other words, the transferee should be able to keep whatever he has received up to the point in time when either (1) he became aware of (or turned a blind eye to) enough badges of fraud to no longer be in good faith, or (2) his attempts to ferret out additional badges no longer represented an honest effort on his part.

In sum, Huntington's success in professing its good faith under the facts presented will depend upon whether Huntington has convinced this court that it honestly remained unaware of Teleservices' fraud for more than a year notwithstanding its growing suspicions. The court will now address those facts.

### FACTS

Huntington is a regional bank with its headquarters in Columbus, Ohio. Cyberco, which also went by CyberNET and CyberNET Group, had a short but tumultuous lending relationship with Huntington. It lasted only from September 2002 to October 2004.

Huntington administered the Cyberco loan through its West Michigan offices.

Kelly Hutchings was the account officer and Cal Hekman her immediate boss. Both were members of the region's commercial lending group. John Irwin was the group's leader.

Irwin in turn reported to Jim Dunlap, Huntington's regional president. Other senior members of the West Michigan management team were John Kalb, the region's credit officer, Steve George, the region's special assets officer, and Larry Rodriguez, the region's security officer. And finally, there was Gail White. Although White was not in the commercial lending group, she became intimately involved in the loan because of suspicions she had about both Cyberco and the large transfers it was receiving from another member of the Cyberco family—Teleservices.

Kalb and George each had a counterpart in Columbus. Larry Hoover was the senior credit officer for all of Huntington's loans. Michael Cross oversaw all of the regional special asset groups. Hoover and Cross, as well as others in Columbus, expected Kalb in particular to keep them informed about Cyberco once it was placed on Huntington's criticized asset list.

The loan closed in September 2002. It was a typical commercial loan, with a revolving line of credit based upon Cyberco's receivables, a term note, and some letters of credit. Like many commercial loans, it was collateralized by all of Cyberco's assets, including Cyberco's substantial accounts receivable. Huntington had intended to monitor those receivables through a lockbox. However, what Huntington discovered about a year into the relationship was that Cyberco was instead receiving most of its cash through large and regular transfers from Teleservices. No one at Huntington recognized that name. Cyberco answered Huntington's inquiries by explaining, untruthfully as it turned out, that

Teleservices was a related company and that it was merely collecting Cyberco's own receivables on Cyberco's behalf. In truth, the transferred funds were actually the proceeds of a fraud that Cyberco and Teleservices together were perpetrating on unsuspecting equipment finance companies.

The Teleservices funds were being deposited into Cyberco's Huntington accounts. Huntington swept those accounts every day and then replenished them as needed through the line of credit. As a consequence, millions of dollars more than what Huntington was actually owed flowed through its hands. These additional amounts, together with the paydown of Huntington's own loan, represent what the Teleservices trustee now seeks to recover.

It was White who inadvertently discovered the Teleservices transfers in the fall of 2003. Although Huntington did not learn of the lie until much later, the relationship was already strained enough at that time to convince Huntington that Cyberco should leave the bank. Here is a brief chronology of subsequent events:

January 2004—Cyberco was asked to find a new lender.

April 2004—Cyberco was given a second ninety-day extension to accomplish this exit strategy.

Summer 2004—Cyberco did not find a new lender but instead began paying down the Huntington loan with even more funds received from Teleservices.

Fall 2004—Huntington was repaid the remaining Cyberco balance with checks from Teleservices made payable directly to it.

This adversary proceeding, then, can be summarized in so many paragraphs. However, the details unfold like a tragic play, with Kalb, White, Rodriguez, and

George each having a part.[6] Through all of them is revealed both Huntington's good faith and its turning a blind eye. The story also shows how a seemingly insignificant decision can lead to enormous loss. But most of all, it speaks of Huntington's misplaced trust in an unscrupulous con man—Barton Watson.

*The Set–Up*

The story is best told by turning first to March 2004. Many months had passed since Gail White had begun investigating Cyberco and the Teleservices transfers.[7] Her previous meetings with Kalb had not met with much success. All he kept telling her was to keep on digging. This time, though, she was sure she could convince him of Cyberco's fraud.[8]

Cyberco had started rather modestly in the late 1980s.[9] However, by 2002, Cyberco was holding itself out as a fast growing, tech savvy company.

> With its world headquarters based in Grand Rapids, Michigan, CyberNET is the internationally recognized front-runner in the design, deployment and operation of information technology infrastructures necessary to put mission-critical corporate data into the hands of users.

Huntington's 2002 Shareholder Report.[10]

Cyberco's previous lender had been in Chicago. However, according to Cyberco, the relationship soured after a much larger bank had acquired it. Cyberco also wanted a more locally oriented lender.[11] Huntington was ecstatic.

> A global technology leader like the CyberNET Group can do business with any bank it chooses. Why it chose Huntington goes to the heart of the essential partnership concept.

Huntington's 2002 Shareholder Report.[12]

Huntington immediately replaced Cyberco's existing line of credit with its own line. It then increased the line within months. Huntington also financed various equipment acquisitions and issued letters of credit. By the time of White's March 2004 meeting with Kalb, Cyberco owed Huntington over $16 million.[13]

White had been only vaguely aware of Cyberco prior to September 2003. However, it happened that she alone had the authority late one Friday afternoon to look at a returned check that Cyberco had deposited a few days before. The payor was a company called Teleservices. White had to decide whether to continue crediting Cyberco's account for the $2.3 million deposit; otherwise, checks that Cyberco itself had written would begin to bounce. White chose not to extend the credit.[14]

---

6. Huntington also agrees that Kalb, White and George were important actors. Def. Huntington Nat'l Bank Post–Tr. Memo., 59 (hereinafter "Huntington Post–Tr. Memo"). Huntington and the court differ only as to Rodriguez's importance.

7. White at 206–07, 220, 227, Nov. 5, 2009 [DN 290].

8. White at 217, 235, Nov. 5, 2009 [DN 290]; White at 50–51, Nov. 6, 2009 [DN 291]; Kalb at 196–97, 265–70, 279, 282, Dec. 14, 2009 [DN 274]; Kalb at 11, 13–14, 34, Dec. 15, 2009 [DN 271].

9. Horton at 26, Jan. 4, 2010 [DN 295].

10. Trustee Ex. 30.

11. Hekman at 87, Nov. 5, 2009 [DN 290]; *see also* Horton at 58, Jan. 4, 2010 [DN 295]. James Horton was the second in command at Cyberco. He was also one of Watson's co-conspirators.

12. Trustee Ex. 30.

13. Trustee Ex. 23 at 8; Trustee Ex. 46 at 3–5.

14. White at 206–07, Nov. 5, 2009 [DN 290].

This was not the first time that Cyberco had been significantly overdrawn on its accounts. An overdraft had previously occurred in December 2002 and another had occurred in February 2003. Moreover, Cyberco had requested two "hard holds" within the last six months.[15] Therefore, Huntington decided that a meeting with Barton Watson, Cyberco's chairman and CEO, was in order.[16]

Watson was extremely intelligent and well heeled. His office was opulent. He drove exotic cars, drank fine wines, and jetted about the world. Watson even had an exclusive "Black Card."[17] But Watson was also a bully. He intimidated others with his intellect and lifestyle. And like all bullies, he had a temper. Those who crossed Watson risked incurring his immediate wrath.[18]

Huntington and Watson met on October 2, 2003. Kelly Hutchings, the Cyberco account officer, and Cal Hekman, who was Hutchings' boss, both attended. White was also asked to come along. What had prompted her invitation was White's discovery that the returned Teleservices check was only the most recent in a series of Teleservices checks, all in large amounts, that Cyberco had begun depositing a few months earlier.[19] Neither Hutchings nor Hekman was aware of any of these transfers. Nor did they know anything about the company. Therefore, Teleservices was added to the agenda and White became involved.[20]

Watson explained at the meeting that Teleservices was a new addition to the Cyberco family that was not yet operational. Its purpose, he said, would be to oversee internal finances for all of Cyberco's far flung operations, including the collection of Cyberco's receivables. He indicated that Teleservices would be providing help desk services to third party customers as well.[21]

Watson's explanation satisfied Hekman and Hutchings, at least for the moment.

15. Hutchings at 99–102, 110, Dec. 15, 2009 [DN 271]; Trustee Exs. 31, 35, 43. A "hard hold" involved Huntington shutting down the automated clearing house service that it provided in connection with Cyberco's deposit accounts. Cyberco had requested the hold in each instance based upon a pretended fear that its electronic accounting systems had been compromised. Each hold worked to Cyberco's advantage by temporarily delaying the clearing of deposits made into the account. Getschow at 12–15, Dec. 16, 2009 [DN 272] (Getschow supervised the region's treasury department).

16. Hutchings at 117–18, Dec. 15, 2009 [DN 271]; Getschow at 14–15, Dec. 16, 2009 [DN 272]; Trustee Ex. 208; Hunt. Ex. 109.

17. Hekman at 84, 89, Nov. 5, 2009 [DN 290]; Dunten at 57–61, Dec. 16, 2009 [DN 272]; Horton at 48–49, 66, Jan. 4, 2010 [DN 295]; Trustee Ex. 44; Hunt. Ex. 180 at FBI 00138. American Express offered its Centurion Card, a/k/a the "Black Card," by invitation only in the early 2000s. Even today, eligibility is very restricted. The elite few who are issued a card must pay $2,500 annually after first paying a $5,000 initiation fee.

18. Horton at 11, 66, 78, 92, 97, 106, 132, 154, Jan. 4, 2010 [DN 295]; Kotlarz–Watson Dep., Hunt. Ex. 293 at 11, 22, 25, 27; Mast Dep., Hunt. Ex. 294 at 62–64; Roepke Dep., Hunt. Ex. 295A at 107, 108; Trustee Ex. 101.

19. White also attended the meeting just in case Watson wanted an explanation for why White had not continued to credit Cyberco's account for the returned Teleservices check. White at 212–13, Nov. 5, 2009 [DN 290]; Hutchings at 117–18, Dec. 15, 2009 [DN 271]; Getschow at 14–15, 32, Dec. 16, 2009 [DN 272].

20. White at 212–13, Nov. 5, 2009 [DN 290]; Hutchings at 117–18, Dec. 15, 2009 [DN 271].

21. Hekman at 96, White at 214–15, Nov. 5, 2009 [DN 290]; Hutchings at 118, Dec. 15, 2009 [DN 271]; Getschow at 19, Dec. 16, 2009 [DN 272]; Trustee Exs. 58, 59.

However, White had her doubts. Having the same company provide customer services and also manage funds didn't seem like a logical fit. Moreover, Watson's statement that Teleservices was not yet operational was inconsistent with the fact that Teleservices had already been transferring large amounts to Cyberco during the preceding three months. Indeed, the checks Teleservices had delivered to Cyberco during this interval had been from a sequence of only ten checks. Why wasn't Teleservices also writing more checks to other members of the Cyberco family? [22]

She immediately took her concerns to Kalb. Again, John Kalb was the credit officer for Huntington's West Michigan operations. Not only did he report directly to Dick Witherow in Columbus; he also reported indirectly to Dunlap, the regional president. Kalb's responsibilities included both signing off on new loans proposed by the commercial lending group and assisting the group in its management of existing loans as issues arose. He had both an MBA and a law degree. He also had the reputation of being a worrier, which undoubtedly was a good attribute for someone in his position. [23]

Although White did not work for Kalb, he had in the past assigned her special projects from time to time. [24] Kalb agreed with White that it was worth learning more about Cyberco and Teleservices. Therefore, he encouraged her to look into it further. [25]

White's immediate concern was that the two companies were kiting checks. However, that fear was quickly allayed when Teleservices began making the transfers by wire. [26] Consequently, White focused more and more of her attention upon the lockbox that the parties had established at the outset of the relationship. [27] Huntington had hoped to use the lockbox to monitor what was without question the largest component of its collateral base. Obviously, that purpose was not served if the receivables were being collected by Teleservices instead. [28]

22. Hekman at 98, 102, 173, White at 215–216, Nov. 5, 2009 [DN 290]; White at 19–21, 48, Nov. 6, 2009 [DN 291]; Hutchings at 119, Dec. 15, 2009 [DN 271].

23. Irwin at 245–46, Nov. 4, 2009 [DN 273]; White at 216–17, Nov. 5, 2009 [DN 290]; White at 50–51, Nov. 6, 2009 [DN 291]; Kalb at 179, 183, 199–202, Dec. 14, 2009 [DN 274]; Trustee Ex. 76.

24. White actually was a senior vice president in another department. She managed operations and the administrative assistants within that department. White at 204–06, Nov. 5, 2009 [DN 290]; Kalb at 228–29, Dec. 14, 2009 [DN 274].

25. White at 217, Nov. 5, 2009 [DN 290]; Kalb at 195–96, Dec. 14, 2009 [DN 274].

26. Check kiting is illegal. A kite takes place when a customer uses accounts at different banks to take advantage of the delay between the deposit of a check in one account and its later payment from another. White suspected check kiting because Cyberco's accounts were in Grand Rapids while Teleservices' account was in California. However, Teleservices' switch to wire transfers eliminated check kiting as a possibility because there is no delay between a wired deposit and its payment. White at 219, Nov. 5, 2009 [DN 290]; Hutchings at 198, Dec. 15, 2009 [DN 271]; Trustee Ex. 108.

27. The lockbox arrangement contemplated all of Cyberco's customers directly depositing the receivables due Cyberco into a single account maintained by Huntington. That account was then to be regularly swept in order to reduce the line of credit. In turn, Huntington would meet Cyberco's cash needs through new advances on the same line.

28. Hekman at 118, White at 228, 263–69, Nov. 5, 2009 [DN 290]; Hutchings at 267, Dec. 15, 2009 [DN 271]; Getschow at 22–23, Dec. 16, 2009 [DN 272].

White nonetheless attempted to track Cyberco's receivables. Unfortunately, White had little to work with apart from the reports that Cyberco itself was providing. In fact, White's investigation was limited for the most part to collecting whatever data she could from the bank accounts Cyberco maintained at Huntington. All that she was able to prepare from this data was a spreadsheet that charted the many wire transfers in and out of Cyberco's accounts. Most of the incoming transfers continued to be from Teleservices. As for the outgoing transfers, most were to financial institutions that had funded Cyberco's ongoing purchases of computer equipment either by lease or by loan.[29] What White was able to discern as time progressed was that the transfers in from Teleservices and the transfers out to the financial institutions were both increasing in amount.[30]

White's March 2004 meeting with Kalb was another one of her biweekly updates. She really had not found much to substantiate her suspicions until then. But this was the first time she had a Cyberco receivables aging report and it spoke volumes. Watson had always claimed that Cyberco's customers simply refused to pay their accounts through the lockbox. However, the aging provided to White revealed a virtual who's who of Fortune 500 companies—Boeing, Cargill, and Electronic Data Systems were only three of the many named.[31] It made no sense that customers like these would be uncomfortable remitting their payments to a lockbox. Nor could White understand why a large technology provider like Electronic Data Systems would be a substantial customer of Cyberco when EDS itself would presumably be providing the very same services to its own customers. Therefore, White was convinced now more than ever that Cyberco was at the very least defrauding Huntington by overstating its accounts receivables through the inclusion of fictitious customers.[32]

Although White may have been frustrated with Kalb's response up to that point, Kalb had had his own doubts about Cyberco all along. He, as the regional credit officer, had been involved in the decision-making from the very outset. He knew even then that the computer services business was risky and that there was a tendency in the industry to overstate receivables by prematurely reporting uncompleted projects as fully earned. He was also uneasy because Cyberco had not covered the two overdrafts that had occurred earlier as Huntington's zero tolerance policy required.[33] To the contrary, it

---

29. White also discovered some Cyberco wire transfers involving both China and Pakistan. White understood that both countries were frequently used to launder money. However, White never thought that Cyberco's transactions with those countries were ever large enough in amount or frequency to raise concern. White at 208–11, 218, 220–21, 223–24, Nov. 5, 2009 [DN 290]; White at 24–25, 30–31, 53, Nov. 6, 2009 [DN 291]; Trustee Exs. 94, 209.

30. White at 32–33, Nov. 6, 2009 [DN 291].

31. Trustee Ex. 92. The aging report also showed large account balances due. For example, it indicated that Boeing and EDS each owed Cyberco over one million dollars.

32. White at 217, 224–26, 229–35, Nov. 5, 2009 [DN 290]; White at 28, 51, 55, 75–76, Nov. 6, 2009 [DN 291]; Kalb at 265–70, Dec. 14, 2009 [DN 274]; Kalb at 14, Dec. 15, 2009.

33. Shady customers will use overdrafts as an unconventional means of "borrowing" from a bank. Therefore, Huntington expected its customers to maintain sufficient funds on hand at all times. White at 67, Nov. 6, 2009 [DN 291]; Kalb at 184–85, 189–90, 196, 215–16, 232, 243–44 Dec. 14, 2009 [DN 274]; Kalb at 21, Dec. 15, 2009; Trustee Exs. 32, 36, 61.

was Huntington that had covered the shortfalls through a further increase in Cyberco's line of credit.[34]

There was also the matter of Cyberco's audited financial statements. The loan documents required Cyberco to provide audited statements to Huntington within ninety days of Cyberco's calendar year end. However, it was now March of 2004 and Huntington had yet to receive even Cyberco's 2002 statements. All that it had was Cyberco's repeated promises that they would be forthcoming as soon as its auditors could get a sign off with respect to a sale or merger of one of Cyberco's subsidiaries.[35]

Again, Huntington had already told Cyberco earlier that year that it should find a new bank and Kalb had also been instrumental in that decision. The others involved—i.e., the three commercial loan officers—all attributed the move to Huntington's inability to fully understand Cyberco's business and Huntington's own limitations as a global financier.[36] Kalb, though, had much deeper concerns. Here is how Kalb himself explained the decision to Jim Dunlap, the regional president, after Dunlap's return from vacation:

> John Irwin, Cal Hekman, Kelly Hutchings and I had a meeting relating to Cyberco and despite the "good numbers" the "red flags" continue. It is our joint conclusion that we should exit the account and I give the team [i.e., the

commercial lending group] credit for taking this step despite outward financial performance. If there is one thing that has been clear about recent times it is the heightened risk of financial misinformation (as well as fraud) and we need to be cognizant of that fact as we see these red flags. We will keep you informed as to how we will communicate this exit to the client or if there is another chapter to the saga. Here is hoping we don't lose money in the process.

Jan. 9, 2004 Email.[37]

Kalb referred to these same red flags days later in an email to Witherow, his own boss in Columbus. Particularly telling was Kalb's final comment—"So we have no 'demonstrable' financial reason to be worried but we are anyway." [38]

Kalb, then, was clearly not indifferent to what White had been reporting to him prior to the latest meeting she had scheduled. He too was suspicious of both Cyberco and Watson; perhaps even more so. The problem, though, was that he had nothing more than his suspicions to act upon. White had certainly not found anything concrete up to that point. Nor had his other efforts to investigate uncovered anything. Kalb himself had called Cyberco's attorney after the two overdrafts in early 2003. The attorney's response was "glowing." [39] And, after learning of the transfers from Teleservices, Kalb ordered

---

34. Irwin at 198, Nov. 4, 2009 [DN 273]; Kalb at 234, 247, Dec. 14, 2009 [DN 274]; Kalb at 21, Dec. 15, 2009 [DN 271]; Hutchings at 100, 273–74, Dec. 15, 2009 [DN 271]; Trustee Exs. 31, 86.

35. Hekman at 103, Nov. 5, 2009 [DN 290]; Kalb at 194–95, 204, Dec. 14, 2009 [DN 274]; Hutchings at 122, Dec. 15, 2009 [DN 271]; Trustee Ex. 23 at 17.

36. Irwin at 159–61, 231–33, Nov. 4, 2009 [DN 273]; Hekman at 146–47, Nov. 5, 2009 [DN

290]; Kalb at 198, Dec. 14, 2009 [DN 274]; Hutchings at 126, Dec. 15, 2009 [DN 271].

37. Trustee Ex. 76. Kalb at 200–01, Dec. 14, 2009 [DN 274]; Kalb at 17–20, Dec. 15, 2009 [DN 271]; Trustee Ex. 78.

38. Kalb at 179, Dec. 14, 2009 [DN 274]; Trustee Ex. 78.

39. White at 224, Nov. 5, 2009 [DN 290]; Kalb at 192, Dec. 14, 2009 [DN 274].

a personal background check on Watson. That effort likewise came up clean. As Kalb also reported to Witherow in his January email—"Every time we did additional 'deep dives,' the people and the company always checked out." [40]

Kalb agreed by the end of their March 2004 meeting that White may have finally found something. The aging report did suggest that Cyberco was committing receivables fraud. Therefore, Kalb had White contact Huntington's security department, which ultimately led her to Larry Rodriguez, the region's head of security. Rodriguez was an experienced investigator, having served in that capacity with the Michigan State Police before retiring and joining Huntington. Although he, like Kalb, reported directly to Huntington's corporate headquarters, he by necessity interacted with the rest of West Michigan's senior management, including Dunlap and Kalb. [41]

Rodriguez immediately reviewed White's file, including her spreadsheets. He then interviewed her a few weeks later. He also did some investigating on his own. It included going through local court records and speaking with an acquaintance at the FBI. The contact told Rodriguez that Cyberco and its principals were under investigation. However, Rodriguez was not provided with any details. [42]

It took Rodriguez about a month to get to this point. He agreed with White that it was unlikely that Cyberco and Teleservices were kiting checks because the transfers were by wire and all in one direction. He had also decided by this time that it really didn't matter to Huntington whether Cyberco was overstating its receivables or not so long as Cyberco continued with the exit plan of finding a new lender. And finally, Rodriguez figured that the FBI's own investigation would uncover anything else that might be untoward at Cyberco. [43]

Therefore, Rodriguez closed his file, at least until something further turned up. He did report back to Richard Harp, Huntington's director of security. Beyond that, though, he did little else. In particular, he never spoke with either Kalb or White about what he had discovered in the court records. [44]

It was not as though Kalb and White had lost interest. White continued to add to her spreadsheets whatever information she could concerning the Teleservices deposits and Cyberco's own cash disbursements. She also, with Huntington's approval, cooperated with the FBI as it later extended its investigation to reviewing Huntington's files and interviewing bank personnel. [45]

As for Kalb, he remained interested in the progress of Cyberco's anticipated exit.

---

**40.** Kalb at 197, Dec. 14, 2009 [DN 274]; Hutchings at 123–24, Dec. 15, 2009 [DN 271]; Trustee Ex. 78.

**41.** White at 234–37, Nov. 5, 2009 [DN 290]; White at 75–76, 80–81, Nov. 6, 2009 [DN 291]; Kalb at 205–06, Dec. 14, 2009 [DN 274]; Rodriguez at 7–9, 19–20, 29, 36, 48, 102, 148, Dec. 14, 2009 [DN 274]; Trustee Exs. 108, 134.

**42.** White at 67, Nov. 6, 2009 [DN 291]; Rodriguez at 14–18, 23–26, 28, 29–31, 65, 74–77, 105, 128–29, 130–31, 133, 140, Dec. 14, 2009 [DN 274]; Trustee Ex. 220.

**43.** Rodriguez at 28–29, 41–42, 111, 135, 136, Dec. 14, 2009 [DN 274]; Trustee Ex. 108.

**44.** Rodriguez at 9, 14, 17–21, 28–31, 34, 36–37, 77–80, 83, 88, 90, 121, 135, 139–40, 145–46, 155–56, 158–59, Dec. 14, 2009 [DN 274]; Trustee Exs. 104, 105, 108, 109, 134, 143.

**45.** White at 245–47, 252–56, Nov. 5, 2009 [DN 290]; White at 21, 60–62, 119–20, 133, Nov. 6, 2009 [DN 291]; Trustee Ex. 222.

The failure to provide audited financials for 2002 and now 2003 continued to be a concern even though Kalb, like everyone else, hoped that Cyberco would soon be gone. Questions about Teleservices also remained. James Horton, who was Cyberco's second in command, had finally answered an inquiry that Hutchings had made months earlier. Horton's memo did include some additional information about Teleservices. However, this time Cyberco's explanation was that Teleservices was an existing company that Krista Kotlarz, Watson's wife, had owned some time ago and that Cyberco was now in the process of re-acquiring to provide outsourcing services in the Philippines.[46]

But that was it. Still lacking were answers to what had piqued Huntington's curiosity in the first place—the millions of dollars that Teleservices was continuing to transfer to Cyberco and the related under-utilization of the lockbox. Also lacking was any further information about Teleservices becoming Cyberco's finance arm. To the contrary, Horton mentioned in the same memo that a new holding company was being formed to provide treasury services to Cyberco and its affiliates.[47]

Nor was Kalb content to leave the accounts receivable investigation to corporate security. Hutchings and he had both agreed with White's suggestion that Huntington itself send account verifications to customers selected from the February aging. Therefore, a receivables audit was added as a condition for any further extension of the line of credit, which was now scheduled to expire on April 30, 2004.

Watson, however, hit the roof when he learned of this requirement. He made it absolutely clear that no one from Huntington was to speak with any of Cyberco's customers.[48] In Watson's words, he was "appalled that anyone would even suggest such an action since customers would of course smell a rat of some kind."[49]

Watson did suggest a compromise. What he proposed, and what Huntington ultimately agreed to, was for Grant Thornton, an internationally recognized accounting firm, to conduct an independent audit through its Hong Kong office. Grant Thornton issued its report in early May, which coincided with Rodriguez's decision to close his investigation. The report indicated that Grant Thornton had received a 100% response to the sampling of customers it had selected from Cyberco's posted receivables. The report further indicated that all but one response confirmed the balances stated and that the one deviation was insignificant.[50]

Kalb also learned at about the same time that the FBI had served the bank with subpoenas as part of its own investigation of Cyberco. Kalb assumed that the investigation involved tax problems, which was not something to get too alarmed about. Nonetheless, he did attempt to follow up with Rodriguez. But Rodriguez was tightlipped. Moreover, when Kalb suggested that Watson himself be confronted, he was persuaded not to on the basis that it would impede the FBI's investigation. Kalb was instead encouraged to

46. Kalb at 214–15, Dec. 14, 2009 [DN 274]; Kalb at 58–63, 71, Dec. 15, 2009 [DN 271]; Hutchings at 231–32, Dec. 15, 2009 [DN 271]; Trustee Exs. 98, 107, 108, 109, 113, 143.

47. Hutchings at 233, Dec. 15, 2009 [DN 271]; Trustee Exs. 98, 107.

48. Kalb at 206–07, Dec. 14, 2009 [DN 274]; Kalb at 40–44, Hutchings at 136–38, Dec. 15, 2009 [DN 271]; Trustee Exs. 96, 101, 103.

49. Trustee Ex. 101.

50. Kalb at 43–44, Hutchings at 138, 152, Dec. 15, 2009 [DN 271]; Trustee Ex. 121.

continue as if all was normal with Cyberco.[51]

Normal meant that Kalb signed off on another ninety-day extension of Cyberco's line of credit, this time to August 1. Although finding a new lender continued as the preferred option, Kalb began to prepare for a more aggressive approach. For example, he had already begun speaking with Steve George, the head of the region's special asset group. As its leader, George would frequently offer advice concerning problem loans and, in appropriate circumstances, his group would actually assume responsibility for a particularly troublesome account. George himself had had considerable experience in both commercial lending and commercial credit before becoming a special assets officer in the late 1980s.[52]

Kalb shared with George the same misgivings that he had shared with Dunlap and Witherow months before—that something did not seem quite right about Cyberco. In particular, he was bothered by Cyberco's continued inability to provide audited financial statements and the general unfavorable direction in which the account was heading. Kalb, though, conceded once again that he himself had not come across anything to give substance to his suspicions.[53]

After looking at the file, George met with both Hutchings and Hekman, the two

loan officers most familiar with the account. He spoke with White as well. His reaction to what he found was the same as Rodriguez's. That is, it was unlikely that there was check kiting because the deposits were by wire and receivables fraud was not a concern so long as Cyberco would be soon ending the relationship. Therefore, George saw no reason not to extend the line of credit another ninety days.[54] George did, though, agree with Kalb that there was enough to Kalb's concerns to warrant downgrading the credit to "9" so that George and his group could begin monitoring the Cyberco account as well.[55]

Although the extension's purpose was to provide more time to find a new lender, it became clearer and clearer as the new deadline approached that Cyberco was not going to secure replacement financing. In fact, by mid-July Cyberco had already on its own reduced the line of credit from $13 million to $7.5 million. Hutchings also reported on July 28 Horton's delivery of a $1.5 million Teleservices check made payable directly to Huntington and Horton's promised delivery of two more checks in short order to cover the rest of what was owed.[56]

Huntington welcomed the news. However, George and Kalb had their doubts. George felt that the "sticky" part of the payoff was still to come. As for Kalb, he

51. Kalb at 211, Dec. 14, 2009 [DN 274]; Kalb at 51–52, 55–56, Dec. 15, 2009 [DN 271].

52. George at 69–75, 79–81, Dec. 16, 2009 [DN 272]; Trustee Ex. 117.

53. George at 79–81, 191–92, Dec. 16, 2009 [DN 272].

54. George at 79–86, 90–94, 164–67, Dec. 16, 2009 [DN 272]; Rodriguez at 28–29, 136, Dec. 14, 2009 [DN 274]; Trustee Ex. 230.

55. Huntington rated the quality of its loans on a scale of one to twelve with "1" being the

best. It had already downgraded the Cyberco loan from "5" to "8" in January, just after Cyberco was asked to leave. Trustee Exs. 67, 81, 111. The loan was downgraded again in April because Huntington's policy only permitted the special assets group to get involved with loans rated at "9" or worse. George at 79–81, 94, Dec. 16, 2009 [DN 272].

56. George at 193–94, Dec. 16, 2009 [DN 272]; Trustee Exs. 134, 136.

cautioned Cross and Hoover[57] to "keep your fingers crossed."[58]

George's and Kalb's comments proved prophetic, for Cyberco did not pay down the remaining loan balance by early August as Horton had promised. Instead, the three checks that Huntington did receive from Teleservices in August totalled only $950,000. Of course, by this time the line of credit was well past due and Huntington no longer had any intention of giving Cyberco a further extension. Therefore, on September 2, 2004, Huntington formally demanded that Cyberco repay all amounts then outstanding, which at that point was just over $6 million.[59]

Huntington thereafter received five more checks from Teleservices over the next two months, with the largest also being the last. That check cleared on October 29, 2004. George, who by then had assumed full responsibility for collection of the Cyberco debt, reported the last check had paid in full all of Cyberco's direct obligations with Huntington and that only a $600,000 letter of credit remained. Kalb's response was "All I can say is 'whew'!!"[60]

*The Fraud*

The FBI raided Cyberco's offices later that year. What the FBI had uncovered was a massive fraud that far exceeded anything that White had imagined.

Cyberco had actually started as a legitimate business and Cyberco still had some real customers in 2002 when it lured Huntington into its web. However, by that time, Watson was resorting more and more to fraud to generate Cyberco's revenues. Indeed, virtually all of its revenue was attributable to fraud when Cyberco finally collapsed in late 2004.[61]

Watson's scheme was as simple as it was brazen.[62] He sought out banks, leasing companies, and other similar institutions on the pretext that Cyberco needed more computer equipment for its rapidly growing global business. However, Cyberco never acquired any of the equipment for which it had received funding. Rather, Watson would represent that Teleservices was Cyberco's source for the desired equipment and, as a consequence, the finance companies would forward the necessary funds to Teleservices on the mistaken belief that Teleservices had something to sell. Watson would then have Teleservices issue false invoices and other documents to evidence the supposed transaction. As for Cyberco, Watson packed its computer room with both real and fake servers. He then swapped serial numbers among those servers in order to deceive his victims whenever a collateral audit was attempted.[63]

---

57. Again, Michael Cross and Larry Hoover were members of Huntington's senior management in Columbus. Kalb was reporting to them in particular because Cyberco had been put on Huntington's criticized asset list earlier that year. Hoover Depo., Trustee Ex. 262D at 10–11, 14–15; Cross Depo., Trustee Ex. 263D at 9, 62–64, 68; Trustee Ex. 137.

58. Trustee Ex. 136.

59. Trustee Exs. 137, 140, 211.

60. Trustee Exs. 152, 153, 211.

61. Horton at 28–29, 46–47, 66, Jan. 4, 2010 [DN 295]; Trustee Ex. 266D.

62. Watson did not testify because he took his life shortly after the fraud was revealed. Witnesses who were familiar with Watson nonetheless *identified him as the scheme's* mastermind. For convenience, the court will only refer to Watson as the perpetrator of the fraud even though others, including Horton, actively assisted him in the endeavor.

63. Horton at 31, 37–38, 42–44, 47, Jan. 4, 2010 [DN 295]. In hindsight, Watson's success at fooling so many sophisticated lenders seems unbelievable. For example, only a third to one-half of the servers on site were real. The rest were empty boxes with flash-

Teleservices, of course, did not keep its ill-gotten gains. Rather, it funneled them back to Cyberco and Cyberco in turn used what it received: (1) to perpetuate the fraud by making payments on the many promissory notes and leases Cyberco had signed in connection with prior nonexistent purchases; and (2) to pay Cyberco's other operating expenses, including the handsome salaries and expense accounts of Watson and his fellow cheats. Of course, Watson accomplished this by depositing the transfers from Teleservices into Cyberco's Huntington accounts and Huntington in turn was regularly sweeping those accounts and the re-advancing as part of the cash management service it provided to Cyberco. Consequently, millions and millions of dollars passed through Huntington even though Cyberco's actual indebtedness to Huntington was considerably less.[64]

Huntington was no less a victim of Watson's schemes.[65] For example, Watson neglected to mention during the courtship that Cyberco's prior bank had in fact asked it to leave. Moreover, all of the financial information Cyberco had been providing to it, including the accounts receivable reports, was false. Indeed, Watson duped both Grant Thornton and Huntington in connection with the April 2004 receivables audit by providing Grant Thornton with fake responses prepared by his cohorts.[66]

It also turned out that Watson had a past. As already indicated, one of Kalb's "deep dives" had been to verify Watson's background. The report had come back clean but only because Watson had provided a false social security number. What Huntington discovered a few months later was that Watson was, among other things, (1) a former stockbroker who had been permanently blacklisted by the National Association of Securities Dealers; (2) someone who had previously confessed to a civil judgment for bank fraud in Michigan and an earlier fraud in California; and (3) a convicted felon who had actually served three years during the 1980s for a fraud-related crime. Moreover, it was Rodriguez, the region's chief of security, who first discovered that Watson "was not a very trustworthy person."[67] Remember, as part of his assignment to investigate Cyberco's possible fraud, Rodriguez had visited the county court in April to examine its files. What he found was pending litigation against Cyberco that both revealed and documented Watson's fraudulent past.[68]

Rodriguez clearly understood the significance of his discovery, for he immediately informed the FBI about what he had

---

ing lights. Indeed, reports are that the room in which everything was crammed was not sufficiently air conditioned to draw off the heat that would have been generated had all of the servers been in fact operational. As for the serial numbers, Watson simply used off-the-shelf label making software to print out bogus serial number tags that could be pulled off and reattached as the need arose.

**64.** Horton at 31, 51, 76, 107–08, 120, Jan. 4, 2010 [DN 295]; Roepke Depo., Hunt. Ex. 295A at 75–81.

**65.** Some of the leasing companies accused Huntington of aiding and abetting Cyberco's

fraud. However, the district court summarily dismissed that count in separate litigation that has paralleled this proceeding. *See El Camino Resources, Ltd. v. Huntington Nat'l Bank,* 722 F.Supp.2d 875 (W.D.Mich.2010).

**66.** Horton at 76–78, 87–88, Jan. 4, 2010 [DN 295].

**67.** Rodriguez at 30, 140–145, Kalb at 197, Dec. 14, 2009 [DN 274]; Trustee Ex. 220.

**68.** Rodriguez at 30, 140–145, Dec. 14, 2009 [DN 274]; Trustee Ex. 220.

learned.[69] Yet Rodriguez never provided this information to Kalb. Indeed, Kalb recalls Rodriguez as being reluctant to share any information with him when Kalb did make the effort to ask.[70]

One, then, can only wonder how Kalb or, for that matter, anyone who was privy to Watson's recent "clean" background check would have responded in April or any time afterwards had Rodriguez disclosed Watson's true past. That Watson was an accomplished con man would presumably have been damning in and of itself. However, Rodriguez's discovery, if it had been shared with Kalb, would have also established without any question that Watson had intentionally deceived Huntington only months before by providing a false social security number in connection with the background check. And with this revelation would presumably have also come the realization that Kalb's instincts had been correct all along—that there was reason to doubt anything that Watson had been telling Huntington about Cyberco and, just as important, about Teleservices. Put simply, had Rodriguez not withheld from Kalb Watson's fraudulent past, Kalb and others at Huntington would have undoubtedly concluded that absolutely nothing at Cyberco could be accepted at face value, including the increasingly suspicious story of who Teleservices was and why it was transferring huge amounts of money to Cyberco.

*The Bankruptcy Proceedings*

Creditors of Cyberco commenced an involuntary Chapter 7 proceeding against it shortly after the FBI's raid and only days after a state court had ordered a receiver to take control of both entities. The receiver did not oppose the Cyberco petition. Moreover, the receiver himself filed a voluntary Chapter 7 petition on behalf of Teleservices a month later.

Trustee Meoli[71] has commenced this adversary proceeding on the theory that Huntington received millions of dollars in fraudulent transfers from Teleservices. Included are the nine Teleservices checks delivered directly to Huntington during the last half of 2004. Trustee asserts that these transfers, which total $7,395,283.04, were both actually and constructively fraudulent under Section 548. Trustee further contends that the much larger amounts that Teleservices was depositing into Cyberco's Huntington accounts throughout the entire scam are both avoidable as fraudulent transfers to Cyberco and then recoverable from Huntington as a subsequent transferee under Section 550(a)(2). By Trustee's current reckoning, these indirect transfers to Huntington total another $65,640,146.53.[72]

## DISCUSSION

*Direct Transfers—Trustee's Prima Facie Case*

Section 548 of the Bankruptcy Code empowers the trustee to avoid transfers that have been fraudulently made and Section 550 in turn permits the trustee to recover the avoided transfer from the transferee

---

69. Rodriguez at 30–31, 140–145, Dec. 14, 2009 [DN 274]; Trustee Exs. 220, 228B. Rodriguez also believes he shared his discovery with Richard Harp, Huntington's director of corporate security. In addition, George recalls Rodriguez telling him sometime later about Watson's conviction. Rodriguez at 158–59, Dec. 14, 2009 [DN 274]; George at 187, Dec. 16, 2009 [DN 272].

70. Kalb at 212–13, Dec. 14, 2009 [DN 274].

71. Thomas Richardson had originally been appointed as the trustee for both the Cyberco and the Teleservices bankruptcy estates. However, Meoli replaced Richardson as the Teleservices' trustee on August 3, 2007.

72. Trustee Brief, May 26, 2010, Ex. A.

when appropriate. Like its counterpart under similar state schemes, Section 548(a) provides that a transfer of the debtor's property may be avoided if the debtor made it with the actual intent to hinder, delay, or defraud his creditors. 11 U.S.C. § 548(a)(1)(A). That subsection further provides that a transfer of the debtor's property may also be avoided if (1) it was made while the debtor was insolvent; and (2) the debtor received less than a reasonably equivalent value in exchange. 11 U.S.C. § 548(a)(1)(B). Debtors who make fraudulent transfers of the latter type are said to have had a constructive intent to defraud their creditors.

This court reaffirms [73] that the nine checks that Teleservices delivered directly to Huntington between July and October, 2004, are all actually fraudulent transfers under Section 548(a)(1)(A). Granted, Teleservices had not legitimately come by any of what it then transferred. Teleservices, in reality, was nothing more than a corporate shell through which the monies fraudulently procured would be then funneled almost immediately to Cyberco or, in these nine instances, to Huntington, Cyberco's creditor.[74] Teleservices had no officers or employees and its only assets were a few bank accounts.

Nonetheless, Teleservices was at all times a corporation recognized under Delaware law.[75] As such, Teleservices was capable of owning property, including money held on deposit with a bank. Nor does it make a difference that defrauded finance companies were the source of these deposits. Ownership might have been a question had Teleservices taken the money at gunpoint instead. However, in this instance all of the victims' money had been willingly transferred to Teleservices, albeit under false pretenses. Consequently, Teleservices would have obtained under the law a sufficient interest in what it had stolen in order to have made a cognizable Section 548(a) transfer of its property when it then used the purloined funds to pay off the remainder of Cyberco's debt to Huntington. *Cf. Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922, 929 (6th Cir. 2000) ("[A]n individual commits the crime of false pretenses when he fraudulently convinces another to part with *both* possession of and title to property. In such a situation, the offender obtains voidable title to the property.") (emphasis in original).

The court also finds that Teleservices intended at the very least to hinder

---

73. The court has already determined in conjunction with Trustee's July 10, 2009 motion for summary judgment that all nine of the direct transfers from Teleservices to Huntington were avoidable under Section 548(a). *Cf.* Sept. 25, 2009 Bench Opinion [DN 175]. The findings herein simply supplement that prior determination.

74. In fact, Watson financed the final paydown of Huntington's debt through additional fraudulent computer equipment purchases. Specifically, Teleservices' bank records indicate that twelve different equipment finance companies transferred over $35 million into Teleservices' Silicon Valley bank account during the same interval that Teleservices was writing the over $7 million in checks to Huntington.

75. It came to this court's attention in conjunction with a pretrial motion that the State of Delaware, which is where Teleservices was incorporated, issued a certificate in March 2004 that Teleservices was no longer in existence. The reason given in the certificate was that Teleservices had failed to pay taxes associated with its incorporation. However, the court concluded that Teleservices' existence had not terminated notwithstanding the certificate's declaration to the contrary. ·*Cf.* Sept. 25, 2009 Bench Opinion [DN 175]. Moreover, the court now reaffirms that Teleservices existed as a legally recognized entity up to at least January 21, 2005, which is the date Teleservices' bankruptcy was commenced.

or delay its own creditors when it made these direct transfers to Huntington. Teleservices was, of course, unusual because it had no creditors in the traditional sense. Nonetheless, each of its victims had a right to repayment that arose immediately upon being bilked. Moreover, Teleservices had no other source of revenue. Therefore, Teleservices' decision to use the funds it had stolen to repay Cyberco's indebtedness to Huntington would have without question hindered those claimants' rights.[76]

*Direct Transfers—Huntington's Section 548(c) Value Defense*

■ Huntington has not seriously contested the fraudulent nature of Teleservices' direct transfers to it. Huntington instead has focused on the affirmative defense that Section 548(c) provides.

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c).

This court has already addressed whether Huntington had given Teleservices "val-

ue" within the meaning of this subsection in conjunction with Trustee's prior motion for summary judgment.[77] Trustee had asserted in her motion that Huntington could not have given value to Teleservices in exchange for the direct transfers it had received from Teleservices because Teleservices had no lending relationship with Huntington. If anyone had received value, she argued, it was Cyberco.

"Value," for purposes of Section 548, means:

> [P]roperty, or satisfaction or securing of **a present or antecedent debt of the debtor,** but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor. . . .

11 U.S.C. § 548(d)(2)(A) (emphasis added). On its face, Teleservices' payment of a debt other than its own to Huntington does not seem like a way for Huntington to have given value to Teleservices in exchange. However, this court concluded that Teleservices would have also received value if, as Huntington was asserting, Teleservices was Cyberco's alter ego.[78] In other words, if Huntington could establish that Teleservices, as Cyberco's alter ego, should also be held accountable for Cyberco's obligations, then the paydowns by Teleservices to Huntington would have provided value to Teleservices as well through the reduction of this corresponding claim against it.[79]

*Section 544(b) Avoidance of Underlying Transfers.*

**76.** Trustee has pled in the alternative that all of the transfers are also avoidable under Section 544(b) and the applicable Michigan fraudulent transfer laws, they being Mich. Comp. Laws § 566.31 *et seq.* This alternative theory is largely irrelevant since most of the targeted transfers are clearly covered under Section 548(a). However, a few are not because they occurred outside the one year limit then imposed by that section. *See infra* n.92. These remaining transfers are addressed later in this opinion. *See infra Indirect Transfers—*

**77.** Sept. 25, 2009 Bench Opinion [DN 175].

**78.** *Id.* at 46.

**79.** Although "value" under Section 548(d)(2)(A) is described in terms of satisfying debt as opposed to a claim, "debt" is defined elsewhere in the Code as meaning "liability on a claim," and "claim," in turn, includes a

Most, but not all, factors support the conclusion that Teleservices was the alter ego or an instrumentality of Cyberco. Again, Teleservices had no officers, directors, or employees and its only apparent assets were some bank accounts. Indeed, Teleservices was able to fulfill its part in Watson's scheme only through Cyberco's executives assuming fictitious names and then pretending to speak on Teleservices' behalf. On the other hand, not all facts favor Huntington. For example, Teleservices' affairs, as limited and as devious as they may have been, were for the most part distinct from those of Cyberco. This is not a situation where the affairs of Cyberco and Teleservices became so intertwined that it was impossible to distinguish one from the other. Indeed, the scam depended upon Teleservices being perceived as an unrelated vendor of computer equipment. Moreover, whatever Teleservices stole from its victims flowed, for the most part, in a one-way direction from its account to Cyberco's account, never to return. It was not until the waning months of both Cyberco's and Teleservices' existence that Cyberco began to transfer some monies back to Teleservices' account.

■ However, even if the court were to conclude that Teleservices was in fact Cyberco's alter ego, Michigan law is clear that the doctrine is to be applied only to avoid an injustice.[80] Unfortunately for Huntington, the doctrine's application in this instance would in fact result in an injustice. Huntington's problem is that Teleservices' only source of revenue was the money it was grifting from the various finance companies through sales of non-existent computer equipment. For Huntington, then, to use this theory to keep what had been stolen from another would not be just. It would be unjust. Therefore, Huntington's application of the alter ego doctrine to establish value between Teleservices and it under Section 548(c) was suspect.[81]

The court, though, granted Trustee's motion for summary judgment only in part because there remained some tracing issues concerning the Section 548(c) value defense. The court, based upon the uncontested record at that time, was able to conclude that the first check that Huntington received directly from Teleservices was attributable entirely to monies stolen from finance companies. However, the court was unable to reach the same conclusion with respect to the remaining eight checks because either Cyberco or related entities had by then begun redepositing monies into Teleservices' account. Consequently, there was at least a possibility that some of the amounts Huntington received through the remaining eight checks were traceable to a source other than the victimized finance companies.[82]

---

"right to payment." 11 U.S.C. § 101(5)(A), (12).

**80.** *Paul v. Univ. Motor Sales Co.,* 283 Mich. 587, 602–03, 278 N.W. 714, 720–21 (1938); *Bitar v. Wakim,* 456 Mich. 428, 431, 572 N.W.2d 191, 192 (1998). *See also Spartan Tube and Steel, Inc. v. Himmelspach (In re RCS Engineered Prods. Co., Inc.),* 102 F.3d 223, 226 (6th Cir.1996).

The court recognizes that Delaware law might ultimately dictate Teleservices' status as Cyberco's alter ego because Teleservices was incorporated in Delaware. However, Delaware courts, like Michigan courts, apply the alter ego doctrine only to avoid an injustice. *Pauley Petroleum Inc. v. Cont'l Oil Co.,* 43 Del.Ch. 516, 521, 239 A.2d 629, 633 (1968); *Alberto v. Diversified Grp., Inc.,* 55 F.3d 201, 205–06 (5th Cir.1995) (citing *Pauley Petroleum* ).

**81.** Sept. 25, 2009 Bench Opinion at 83 [DN 175].

**82.** *Id.* at 84–87.

Both parties offered expert testimony concerning the tracing issue at the ensuing trial. Moreover, this court has already evaluated that testimony in conjunction with deciding Huntington's motions for substantive consolidation which were tried at the same time. Its conclusion was that all of the amounts associated with the eight remaining checks were attributable to only monies that had been stolen from various equipment finance companies. *Cyberco*, 431 B.R. at 434–35.

Therefore, for these reasons, the court now makes the final determination that Huntington's alter ego argument must fail with respect to all nine of the checks it received from Teleservices because of the resulting injustice that would be wrought. Consequently, Huntington's Section 548(c) defense to Trustee's avoidance of the nine direct transfers as fraudulent under Section 548(a) must fail because the transfers received were not in exchange for value given to Teleservices.[83]

*Direct Transfers—Huntington's Section 548(c) Good Faith Defense*

The court is not required to make any further determination with respect to Huntington's Section 548(c) defense because its two elements are in the disjunctive. Nonetheless, the court concludes that Huntington has also failed to establish its good faith regarding the receipt of the

nine Teleservices checks. The court, though, will defer giving its reasons until later in this opinion when it also considers Huntington's good faith under Section 550(b)(1).[84]

*Direct Transfers—Huntington's Section 550(a)(1) Liability*

■ Section 548 provides only for the avoidance of the targeted transfer and, in some situations, avoidance is enough. *Suhar v. Burns (In re Burns)*, 322 F.3d 421, 427–28 (6th Cir.2003). If, for example, the fraudulent transfer had been a mortgage, avoidance of the lien would be sufficient. If, though, the transfer had been jewelry, Section 550 complements the avoidance by also providing for the ordered return of the jewelry or, when appropriate, the payment of its value.[85]

Section 550(b), like Section 548(c), provides an affirmative defense. However, that defense is not available to initial transferees and Huntington was clearly the initial transferee of the nine Teleservices checks. *Cf.* 11 U.S.C. § 550(b). Therefore, Huntington must account to Trustee for the $7,395,283.04 it received as a result of these now avoided transfers.

*Indirect Transfers—Cyberco as a Necessary Party*

■ The indirect transfers that Trustee also wishes to avoid and recover adds another $65,640,146.53 to her claim.[86] As

---

83. Sept. 25, 2009 Bench Opinion at 84–87.

84. *See infra Assessing Huntington's Section 548(c) and Section 550(b)(1) Good Faith.*

85. Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
 (1) the initial transferee of such transfer of the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.
11 U.S.C. § 550(a).

86. Trustee's amended complaint alleges the amount of the indirect fraudulent transfers to be only $43,763,321.50. However, Trustee's pending motion for summary judgment regarding the remaining issues to be decided seeks the recovery of this much larger amount. *See* Trustee Brief, May 26, 2010, Ex. A.

just noted, Section 548 and Section 550 are separate Code provisions that provide different forms of relief. Indeed, the relief afforded by Section 550 is available only if the pertinent transfer is first avoided under Section 548 or one of the other avoidance sections it references.[87]

Huntington focused upon this distinction in a prior motion for summary judgment. It argued that Trustee's attempt to recover the indirect transfers to Huntington as a subsequent transferee under Section 550 was procedurally deficient because Trustee had failed first to avoid under Sections 548 or 544(b) the initial transfers from Teleservices to Cyberco. Moreover, Huntington contended that Trustee was no longer capable of avoiding these underlying transfers because the applicable statute of limitations under Section 546 had already run for bringing this separate action against Cyberco.

This court, though, did not grant Huntington's motion.[88] It agreed with Huntington that the initial transfers from Teleservices to Cyberco had to be first avoided before any recovery could be had against it under Section 550(a). However, the court further determined that Trustee could accomplish that avoidance with Huntington

as the named defendant as opposed to Cyberco. In other words, Huntington was just as capable as Cyberco in asserting under Section 548 that the transfers Cyberco had received from Teleservices were not actually or constructively fraudulent.[89] Moreover, this court was satisfied that Trustee's amended complaint was sufficiently pled to put Huntington on notice that she was seeking as relief not only a recovery from Huntington under Section 550 but also an avoidance of the underlying transfers from Teleservices to Cyberco under Sections 548(a) and 544(b).

*Indirect Transfers—Section 548(a) Avoidance of Underlying Transfers*

Whether Teleservices had the requisite intent, either actual or constructive, under Section 548(a) was not specifically at issue in connection with this portion of the bifurcated trial concerning the indirect transfers. Therefore, a further evidentiary hearing may be required before this court can make final findings as to this aspect of Trustee's indirect transfer claims against Huntington.[90] Nonetheless, it is fair to say at this point in time that the proofs already offered overwhelmingly support the conclusion that all of the underlying transfers by Teleservices to Cyberco's

---

**87.** Section 550(a) specifically states that a trustee may seek a recovery only:

[t]o the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(b) of this title. . . .

*See also Harrison v. Brent Towing Co., Inc. (In re H & S Transp. Co., Inc.),* 939 F.2d 355, 359 (6th Cir.1991).

**88.** October 7, 2009 Bench Opinion [DN 202].

**89.** Indeed, if Huntington were claiming good faith as a later transferee under Section 550(b)(2), it would not be successful unless it also was able to establish the Section 550(b)(1) credentials of some transferee further up the chain. That is, the Section 550(b)(2) defense is conditioned upon the claimant also establishing that some earlier transferee met the more restrictive require-

ments of the Section 550(b)(1) defense. But if this is so, then the court sees no reason why Huntington, in defending against Trustee's Section 550 recovery against it, is not capable of also substituting for Cyberco in order to challenge the avoidability of the transfer itself under Section 548(a). After all, Huntington's stake in the outcome is certainly much greater than that of the now defunct Cyberco.

**90.** The court says "may" because, as already noted, Trustee has filed a new motion for summary judgment and she contends in that motion that there remains no genuine issue of fact with respect to the Section 548(a) elements vis-a-vis Teleservices' transfers to Cyberco.

Huntington accounts were made with both the actual and the constructive intent to defraud required under Section 548(a).[91]

*Indirect Transfers—Section 544(b) Avoidance of Underlying Transfers*

As with the direct transfers, Trustee has offered the alternative theory that the underlying transfers from Teleservices to Cyberco are avoidable under Section 544(b) and its incorporation of Michigan's own fraudulent transfer laws. Although most of the indirect transfers that Trustee seeks to recover fall within the one year avoidance period then permitted by Section 548,[92] some do not.[93] Therefore, Trustee must rely on this alternative theory with respect to these few remaining transfers. Moreover, the court will not make a final determination as to whether these transfers are avoidable under this theory until that issue is properly before it at some later date. However, the court does note at this point that the requirements for avoiding fraudulent transfers under Michigan's version of the Uniform Fraudulent Transfer Act[94] are similar to the requirements of Section 548(a). As such, the proofs already offered strongly suggest that the few transfers to Cyberco that Trustee will have to avoid under Section 544(b) were fraudulent as well.[95]

*Indirect Transfers—Cyberco's Section 548(c) and MCL Section 566.38 Defenses*

It does not appear that Section 548(c) is available to a subsequent transferee like Huntington when defending against a recovery under Section 550(a).[96] In any event, the proofs offered to date overwhelmingly suggest that Cyberco neither gave value in exchange nor was Cyberco in good faith with respect to the fraudulent transfers that Cyberco itself was receiving from Teleservices. The same is true with respect to the defense that would be afforded to Cyberco under MICH. COMP. LAWS § 566.38(1)[97] vis-a-vis the few indirect

---

**91.** The court recognizes Huntington's insistence throughout this proceeding that Teleservices was a ruse and that all of the transfers actually were from Cyberco. It has argued this position through various applications of the alter ego doctrine and as part of its separate motions for substantive consolidation. This court, though, has consistently rejected Huntington's position. *See Cyberco*, 431 B.R. 404 and Sept. 25, 2009 Bench Opinion at 84–87 [DN 175].

**92.** Section 548, as currently enacted, permits the trustee to avoid fraudulent transfers made within two years preceding the commencement of the case. *See* 11 U.S.C. § 548(a)(1). However, Teleservices' petition was filed prior to the amendment that extended the avoidance period to two years. *See supra* n. 5. As a consequence, Trustee's Section 548 claim is limited to only the one year avoidance period previously provided under that section. *Gordon v. Kinney (In re Gallagher)*, 417 B.R. 677, 682 (Bankr.W.D.N.Y.2009); *Pereira v. Grecogas Ltd. (In re Saba Enters., Inc.)*, 421 B.R. 626, 640 n. 11 (Bankr.S.D.N.Y.2009).

**93.** Of the eighty-one indirect transfers totaling $65,640,146.53, thirteen of those transfers allegedly occurred more than a year before Teleservices' petition. These thirteen transfers total $11,761,034.56. *Cf.* Trustee's Brief, May 26, 2010, Ex. A.

**94.** MICH. COMP. LAWS § 566.31, *et seq.*

**95.** *See, e.g.,* MICH. COMP. LAWS § 566.34. Of course, Trustee will also have to establish Section 544(b)(1)'s separate requirement that the Teleservices estate has at least one unsecured creditor whose claim was in existence at the time of these earlier transfers.

**96.** Section 550(a) limits recovery only "**to the extent** a transfer is avoided under section . . . 548. . . ." (emphasis added). But avoidance occurs under subpart (a) of Section 548, not subpart (c). Indeed, subpart (c) does not even *speak of* avoidance. Rather, it addresses only the circumstances under which the initial transferee will be awarded a lien in the transfer already avoided under subpart (a).

**97.** A transfer or obligation is not voidable under . . . [§ 566.34] . . . *against a person who took in good faith and for a reasonably*

transfers that would have to be avoided under Section 544(b) and Michigan's fraudulent transfer laws. Nonetheless, the court will not at this time make a final determination on these issues since they too were to be deferred to a later date under the order to bifurcate the trial.

*Indirect Transfers—Section 550(a) Recovery—Initial or Subsequent Transferee* [98]

■■■ Trustee argued in opposition to Huntington's unsuccessful motion for summary judgment that Huntington, not Cyberco, was in fact the initial transferee of even the indirect transfers. She based her contention upon Huntington, as Cyberco's depository bank, being the entity that actually received each wire transfer that Teleservices initiated. Of course, treating Huntington as the initial transferee would have eliminated its eligibility for the Section 550(b)(1) defense and would have brought Section 548(c) into play instead. [99]

The court at this time reaffirms its rejection of this argument. [100] Suffice it to say here that as tempting as it may be to treat wire transfers and checks as the transfer being avoided, wire transfers and checks are simply devices to facilitate the actual transfer—that is, whatever the debtor desires the intended recipient to receive. Or, to put it differently, if, as clearly was the case, Teleservices intended to transfer value to Cyberco, it should make no difference under either Section 548 or Section 550 whether Teleservices fulfilled that intention by wire transfer, check, or bales of one dollar bills delivered in a dump truck. In every event, Cyberco, as opposed to the facilitating entities, should be treated as the initial recipient of the transfer to be avoided. [101]

*Indirect Transfers—Tracing Issues*

Tracing of the indirect transfers is another issue not yet addressed. While Huntington concedes that whatever Teleservices transferred into Cyberco's accounts was subject to setoff, Huntington does not agree that all such deposits were in fact then setoff. Huntington contends instead that at least some of these amounts were spent by Cyberco before any setoff took place. [102]

As with other issues remaining to be tried, the court will defer decision on the tracing issue at this time. However, the

equivalent value or against any subsequent transferee or obligee.
MICH. COMP. LAWS § 566.38(1).

**98.** Although avoidance of the indirect transfers made outside the one-year period must be accomplished through Section 544(b) and Michigan's fraudulent transfer laws, recovery of any transfer avoided thereunder is governed by Section 550, as opposed to its state law counterpart. 11 U.S.C. § 550(a). *See also Suhar v. Burns (In re Burns)*, 322 F.3d 421 (6th Cir.2003).

**99.** Although Trustee did not realize it then, this argument actually favors Huntington. *See infra* n. 251.

**100.** *Cf.* Oct. 7, 2009 Bench Opinion [DN 202].

**101.** *Cf. First Independence Capital Corp. v. Merrill Lynch Bus. Fin. Servs. Inc. (In re First Independence Capital Corp.)*, 181 Fed.Appx. 524 (6th Cir.2006). In *First Independence,* owners of the corporate debtor wrote checks payable to Merrill Lynch and then deposited them in their own Merrill Lynch brokerage account. The bankruptcy court concluded that Merrill Lynch was a subsequent transferee of those checks, with the owners/depositors presumably being the initial transferees. Neither party appealed that determination.

**102.** White testified that the Teleservices wire transfers were being deposited into the account upon which Cyberco wrote its own checks. White at 263, Nov. 5, 2009 [DN 290]. Therefore, Cyberco checks that cleared the account on the same day that a Teleservices wire transfer was credited would have presumably reduced the amount that Huntington then swept from the account at the end of the day.

court will note at this juncture that Trustee may not in the end have to trace these deposits because the deposits themselves may have constituted the actual transfers to Huntington. Consider a slightly different scenario of the initial transferee receiving the fraudulent transfer in cash and then depositing that cash with its bank. In concept, the deposit is a second transfer. That is, the initial transferee would have relinquished both possession and ownership of the cash to another party, albeit the other party here would also be bound with respect to that transfer to honor the terms of the agreement previously reached concerning the administration of such deposits.

If, though, deposited cash constitutes a second transfer, the analysis should be no different if the same result is accomplished through a check or a wire transfer. Consequently, it would certainly appear that the proper approach whenever checks or wire transfers are involved is to treat whoever is intended by the debtor to actually receive the value of whatever the debtor has to transfer as the initial transferee and to then treat the depositing bank as a subsequent transferee. The depositing bank in turn would presumably be protected in most, but not all instances, by the Section 550(b)(1) defense.[103]

However, the court, in making this observation, has tread into a very confusing area concerning the interpretation of Section 550(a).[104] Moreover, neither Trustee nor Huntington has had an opportunity to brief this particular issue. Therefore, the court leaves the matter open for further consideration whenever tracing is formally presented for final disposition by this court.

*Indirect Transfers—Huntington's Section 550(b)(1) Value Defense*

 As already discussed, Section 550(b) shields subsequent recipients of an avoided fraudulent transfer in a manner that is similar to the protection Section 548(c) affords to the initial transferee of the same avoided transfer. Specifically, Section 550(b)(1) offers an absolute defense to any subsequent transferee provided he took the transfer (1) for value, including satisfaction of antecedent debt; (2) in good faith; and (3) without knowledge of the voidability of the transfer avoided. 11 U.S.C. § 550(b)(1).[105]

With respect to value, the court finds that Huntington did give value in exchange for whatever setoffs it took against the deposits in Cyberco's accounts. Granted, the value given in each instance was the reduction of antecedent debt owed to

---

**103.** *See supra* n. 101. *First Independence* also addressed Merrill Lynch's successful Section 550(b)(1) defense as the recipient of checks the corporate debtor's owners had deposited into their Merrill Lynch account. 181 Fed. Appx. 524. Value was clearly exchanged because of the debtor-creditor relationship created between Merrill Lynch and its account holders. As for *First Independence's* conclusions concerning Merrill Lynch's good faith and lack of knowledge, they are discussed in detail later in this opinion. *See infra Nordic Village and First Independence.*

**104.** That Huntington's security interest attached to each Teleservices transfer as it was

deposited and that Huntington had setoff rights as well confuses Huntington's Section 550(a) transferee status even more. *Cf. Richardson v. Huntington Nat'l Bank (In re Cyberco Holdings, Inc.)*, 382 B.R. 118, 133–35 (Bankr.W.D.Mich.2008).

**105.** Indeed, if the targeted transferee himself took from a subsequent transferee who himself qualified under Section 550(b)(1), the targeted transferee would not even have to establish value or lack of knowledge. Only his good faith would be required. *Compare* 11 U.S.C. § 550(b)(2). *See also infra Huntington's Section 550(b)(1) Knowledge.*

Huntington by Cyberco, not Teleservices. However, unlike the comparable definition given for "value" in Section 548(d)(2)(A), Section 550(b)(1) "value" is indifferent as to the recipient of the value. Indeed, the Section 550(b)(1) defense would only rarely be available if value had to be exchanged with the debtor given that the subsequent transfer likely would not have involved him. *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 897 (7th Cir. 1988); 5 *Collier on Bankruptcy* ¶ 550.03[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2010).

### Direct and Indirect Transfers—The Section 548(c) and Section 550(b) Good Faith Defense

Most courts begin their discussion concerning Section 548(c) or Section 550(b) good faith with the observation that it is a vague concept that defies precise definition.[106] Almost as many courts have also said that good faith must be decided on a case-by-case basis.[107] Nonetheless, the clear trend since the Code's adoption has been towards an objective interpretation of good faith.[108] *M & L Business Machine*[109] is illustrative:

**106.** *Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978, 984 (1st Cir.1983) ("[G]ood faith requirement ... [under 548(c)] ... is not susceptible of precise definition"); *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1355 (8th Cir.1995) (citing *Roco*); *Hayes v. Palm Seedlings Partners–A (In re Agri. Research and Tech. Grp., Inc.)*, 916 F.2d 528, 536 (9th Cir.1990) (citing *Roco*); *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 659 (Bankr.M.D.Fla. 2002) ("Good faith is not a precise, defined term."); *Helms v. Roti (In re Roti)*, 271 B.R. 281, 295–96 (Bankr.N.D.Ill.2002); *Woods & Erickson, LLP v. Leonard (In re AVI, Inc.)*, 389 B.R. 721, 736 (9th Cir. BAP 2008) (citing *Agri. Research, Sherman*).

**107.** *Sherman*, 67 F.3d at 1355 (citing *Roco*); *Slone v. Lassiter (In re Grove–Merritt)*, 406 B.R. 778, 810 (Bankr.S.D.Ohio 2009) (citing *Roco, Sherman*); *Coleman v. Home Sav. Ass'n (In re Coleman)*, 21 B.R. 832, 836 (Bankr.Tex. 1982); *Eder v. Queen City Grain, Inc. (In re Queen City Grain, Inc.)*, 51 B.R. 722, 728 (Bankr.Ohio 1985); *Gallant v. Kanterman (In re Kanterman)*, 97 B.R. 768, 779 (Bankr. S.D.N.Y.1989); *CCEC Asset Mgmt. Corp. v. Chemical Bank (In re Consol. Capital Equities Corp.)*, 175 B.R. 629, 637 (Bankr.N.D.Tex. 1994); *Dev. Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 797 (Bankr.S.D.Fla.2000); *Gold v. Laines (In re Laines)*, 352 B.R. 397, 406 (Bankr.E.D.Va.2005) (citing *Sherman, Roco, Grove–Merritt*); *Doeling v. Grueneich (In re Grueneich)*, 400 B.R. 688, 693 (8th Cir. BAP 2009) (citing *Sherman*).

**108.** Courts applying an objective standard of good faith under Section 548(c) are: *Hayes v.*

*Palm Seedlings Partners–A (In re Agri. Research and Tech. Group, Inc.)*, 916 F.2d 528, 535–35 (9th Cir.1990) (analyzing good faith under Hawaii's Uniform Fraudulent Transfer Act, with analogies made to Section 548(c)); *Sherman*, 67 F.3d at 1355 (citing *Agri. Research* and *Bonded Fin.*); *Jobin v. McKay (In re M & L Bus. Mach., Co., Inc.)*, 84 F.3d 1330, 1338 (10th Cir.1996) (citing *Agri. Research*); *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 230 B.R. 546, 592 (Bankr.W.D.Tenn. 1999) (*rev'd on other grounds*, 277 F.3d 838 (6th Cir.2002) (citing *Sherman and M & L Bus. Mach.*); *Kaler v. McLaren (In re McLaren)*, 236 B.R. 882, 902 (Bankr.D.N.D.1999) (citing *Sherman and M & L Bus. Mach.*); *Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 878 (Bankr.N.D.Ill.2000) (citing *M & L Bus. Mach.*); *Helms v. Roti (In re Roti)*, 271 B.R. 281, 296 (Bankr.N.D.Ill. 2002) (citing *Sherman, M & L Bus. Mach.*); *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 659 (Bankr. M.D.Fla.2002) (citing *M & L Bus. Mach.* and others); *Soule' v. Alliot (In re Tiger Petroleum Co.)*, 319 B.R. 225, 235–36 (Bankr.N.D.Okla. 2004) (citing *M & L Bus. Mach.*); *Dobin v. Hill (In re Hill)*, 342 B.R. 183, 203 (Bankr. D.N.J.2006) (citing *Sherman*); *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 359 B.R. 510, 523–24 (Bankr.S.D.N.Y. 2007) (citing *Agri. Research*); *Leonard v. Coolidge (In re Nat'l Audit Def. Network)*, 367 B.R. 207, 224 (Bankr.D.Nev.2007) (citing *Agri. Research*), *Sherman, M & L Bus. Mach.*); *Bowers and Merena Auctions, LLC v. Lull (In re Lull)*, 386 B.R. 261, 271 (Bankr.D.Hawai'i 2008) (citing *Agri. Research*); *Bayou Accredited Fund, LLC v. Redwood Growth Partners (In*

[G]ood faith under § 548(c) should be measured objectively and that "if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a *diligent* inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent."

84 F.3d at 1338 (citations omitted) (emphasis in original).[110]

An objective approach, though, draws attention away from what has traditionally distinguished good faith from bad faith. For example, in *Bayou Group*,[111] the court recognized that good faith has customarily involved a moral judgment. "In common parlance," *Bayou Group* observed " 'good faith' ... denotes a conformity with accepted standards of integrity, trust and good conduct...." 396 B.R. at 847. On

---

re Bayou Group, LLC), 396 B.R. 810, 844–45 (Bankr.S.D.N.Y.2008) (citing *Agri. Research, Sherman, M & L Bus. Mach.*, and others); *Slone v. Lassiter (In re Grove–Merritt)*, 406 B.R. 778, 810 (Bankr.S.D.Ohio 2009) (citing *Sherman* ) (Section 548(c)); *Strauss v. Isaacks (In re Supinger)*, No. 08–4238, 2009 WL 3254462, at *5 (Bankr.W.D.Mo.2009); *Official Comm. of Unsecured Creditors v. Citicorp N. Am., Inc. (In re TOUSA, Inc.)*, 422 B.R. 783, 869 (Bankr.S.D.Fla.2009) (citing *Sherman, M & L Bus. Mach.*).

Courts applying an objective standard of good faith under Section 550(b) are: *Bonded Fin.*, 838 F.2d at 897–98; *Woods & Erickson, LLP v. Leonard (In re AVI, Inc.)*, 389 B.R. 721, 736 (9th Cir. BAP 2008) (citing *Agri. Research, M & L Bus. Mach., Sherman* ); *Gallant v. Kanterman (In re Kanterman)*, 97 B.R. 768, 779 (Bankr.S.D.N.Y.1989) (citing *Bonded Fin.*); *Lustig v. Hickey (In re Hickey)*, 168 B.R. 840, 848–49 (Bankr.W.D.N.Y.1994) (citing *Bonded Fin.* and others); *Tavenner v. Smoot (In re Smoot)*, 265 B.R. 128, 140 (Bankr. E.D.Va.1999) (citing *Bonded Fin.* and others); *Gold v. Laines (In re Laines)*, 352 B.R. 397, 406 (Bankr.E.D.Va.2005) (citing *Agri. Research, Sherman* and others); *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.)*, 340 B.R. 180, 208 (Bankr. S.D.N.Y.2006) (citing *M & L Bus. Mach.*); *Riske v. David Austin Seitz Irrevocable Trust (In re Seitz)*, 400 B.R. 707, 721 (Bankr. E.D.Mo.2008) (citing *Sherman* ); *CLC Creditors' Grantor Trust v. Howard Sav. Bank (In re Commercial Loan Corp.)*, 396 B.R. 730, 744–45 (Bankr.N.D.Ill.2008) (citing *Bonded Fin.*).

And courts applying an objective standard of good faith under both Sections 548(c) and 550(b) are: *Doeling v. Grueneich (In re Grueneich)*, 400 B.R. 688, 693 (8th Cir. BAP 2009) (citing *Agri. Research* ); *Dev. Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 797–98 (Bankr.S.D.Fla.

2000) (citing *Agri. Research, M & L Bus. Mach.* and others).

**109.** *Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*, 84 F.3d 1330, 1338 (10th Cir.1996).

**110.** However, a few courts have eschewed this approach and have instead given good faith its traditional meaning. For example, in *Drake v. Peeples (In re Topgallant Group, Inc.)*, No. 91–4142, 1996 WL 33366594 (Bankr. S.D.Ga.1996), the court observed that while the concept of good faith may appear in the Code in a number of different contexts, it "always means about the same thing: fair dealing without evil intent." *Id.* at *20. It therefore concluded that:

"[T]he good faith exception of 550(b)(1) was intended for those situations in which a bad faith transferee materially assists in, or in fact enables, the transferring of funds which can not then be recovered, and who derives some demonstrable benefit thereby."

*Id.* (quoting *Friedman v. Vinas (In re Trauger)*, 109 B.R. 502, 505 (Bankr.S.D.Fla.1989)). Likewise, *Sisti v. Cahill (In re Colonial Realty Co.)* quoted with approval this passage from Collier:

"[G]ood faith requires an arm's length transaction, as well as the following three factors: (i) an honest belief in the propriety of the activities in question; (ii) no intent to take unconscionable advantage of others; and (iii) no intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others."

210 B.R. 921, 923 (Bankr.D.Conn.1997) (citations omitted).

**111.** *Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group, LLC)*, 396 B.R. 810, 847 (Bankr.S.D.N.Y. 2008) *rev'd in part*, 439 B.R. 284 (S.D.N.Y. 2010).

the other hand, it noted that bad faith implies conduct that typically would be described as "wrongful, improper or legally or ethically deplorable...." *Id.* The court also offered "dishonesty," "deceit," and "intent to harm" as additional terms an ordinary person might use to describe bad faith. *Id.*

But with this said, *Bayou Group* declared that Section 548(c) good faith is "somewhat different" from a layman's understanding. 396 B.R. at 847. According to it, Section 548(c) "is not a punitive provision designed to punish the transferee, but is instead an equitable provision that places the transferee in the same position as other similarly situated creditors who did not receive fraudulent conveyances." *Id.* at 827. *Bayou Group* reasoned, then, that a transferee's lack of Section 548(c) good faith "does not necessarily entail a finding ... that he was guilty of any sort of *mala fides* or otherwise deserving of opprobrium." *Id.* at 848. Rather, the test

of a transferee's Section 548(c) good faith is to be an objective one based upon inquiry notice.

Thus, it is important for the trier of fact to understand that the test for good faith under Section 548(c) is not whether the defendant was guilty of any sort of bad faith in requesting and receiving the transfer. The test is whether the defendant requested redemption after learning of a "red flag" which, under an "objective" standard, should have put the defendant on "inquiry notice" of some infirmity in Bayou or the integrity of its management.

*Bayou Group*, 396 B.R. at 848.[112]

This same reasoning—i.e., that Section 548(c) is "somewhat different"[113]—underlies the many other recent decisions that have strayed from traditional notions of good faith in interpreting Section 548(c) and the related Section 550(b).[114]

---

**112.** Not surprisingly, Trustee has incorporated *Bayou's* red flag metaphor to highlight the various events that she contends should have compelled Huntington to conduct a more diligent inquiry. *See, e.g., infra* n.165.

**113.** *Bayou Group*, 396 B.R. at 847.

**114.** Two Sixth Circuit decisions mention Section 548(c) and Section 550(b)(1) good faith. *IRS v. Nordic Village, Inc. (In re Nordic Village, Inc.)*, 915 F.2d 1049 (6th Cir.1990), *rev'd on other grounds*, 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) and *First Independence Capital Corp. v. Merrill Lynch Bus. Fin. Servs. Inc. (In re First Independence Capital Corp.)*, 181 Fed.Appx. 524 (6th Cir.2006). *Nordic Village* suggests, but only briefly, that a subjective approach is to be used. "It is not apparent from the facts that the IRS had actual notice-that it did not accept the check in good faith...." 915 F.2d at 1056. On the other hand, *First Independence,* which is the later decision, questioned whether *Nordic Village* was definitive. *"Even if* 'good faith' under Section 550(b) means a lack of actual notice or, as First Independence also con-

tends, a lack of illicit intent...." (emphasis added). 181 Fed.Appx. at 528.

As for Sixth Circuit cases that have discussed good faith in other bankruptcy contexts, they suggest that the Sixth Circuit continues to embrace the more traditional notions of honesty and integrity.
(1) Interpreting good faith purchaser under Section 363(m):
> [T]he debtor must demonstrate that there was fraud or collusion between the purchaser and the seller or the other bidders, or that the purchaser's actions constituted an attempt to take grossly unfair advantage of other bidders. The good-faith requirement "speaks to the integrity of [the purchaser's] conduct in the course of the sale proceedings."

*Made In Detroit, Inc. v. Official Comm. of Unsecured Creditors of Made In Detroit, Inc. (In re Made In Detroit, Inc.)*, 414 F.3d 576, 581 (6th Cir.2005).
(2) Interpreting good faith voting under Section 1126(e):
> In *Young v. Higbee Co.*, 324 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890 (1945), the Supreme Court analyzed the good-faith re-

Convention, then, would have this court also abandon familiar good faith concepts like "honesty" and "integrity"[115] for the new, morally indifferent standard that *Bayou Group* and other courts have embraced. However, the court submits that this objective approach is not well grounded in the law. Rather, its current popularity reflects only the inertia of a seminal case—*In re Agricultural Research*[116]—that has been cited again and again without the benefit of reflection.[117] What is lacking in

quirement under the predecessor statute to § 1126(e), and concluded that its purpose was to prevent the use of "obstructive tactics and hold-up techniques," which would in turn give some creditors an unfair advantage over other creditors in the confirmation process. *Id.*

*255 Park Plaza Assos. Ltd. P'ship v. Conn. Gen. Life Ins. Co. (In re 255 Park Plaza Assocs. Ltd. P'ship)*, 100 F.3d 1214, 1219 (6th Cir.1996). (3) Interpreting good faith extension of credit under Section 364(e):

> Even if section 364(e) applies, as we have held, appellant contends that it does not protect the Banks in this case because they did not extend credit in good faith. The Bankruptcy Code does not attempt to define the term "good faith." The definition most often used is that of the Uniform Commercial Code at section 1–201(19): "Good faith means honesty in fact in the conduct or transaction concerned."

*Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. of Escanaba (In re Ellingsen MacLean Oil Co., Inc.)*, 834 F.2d 599, 605 (6th Cir.1987). (4) Interpreting implied good faith vis-a-vis Section 707(b) abuse:

> In determining whether to apply § 707(b) to an individual debtor, then, a court should ascertain from the totality of the circumstances whether he is merely seeking an advantage over his creditors, or instead is "honest," in the sense that his relationship with his creditors has been marked by essentially honorable and undeceptive dealings....

*In re Krohn*, 886 F.2d 123, 126 (6th Cir.1989). (5) Interpreting implied good faith vis-a-vis Section 707(a) dismissal:

> In an effort to offer some guidelines, this circuit has cautioned that dismissal for lack of good faith "should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct or gross negligence."

*Mich. Nat'l Bank v. Charfoos (In re Charfoos)*, 979 F.2d 390, 393 (6th Cir.1992) (citations omitted). *See also Indus. Ins. Servs., Inc. v. Zick (In re Zick)*, 931 F.2d 1124, 1129 (6th Cir.1991). (6) Interpreting Section 1325(a)(3) good faith:

> We should not allow a debtor to obtain money, services or products from a seller by larceny, fraud or other forms of dishonesty and then keep his gain by filing a Chapter 13 petition within a few days of the wrong. To allow the debtor to profit from his own wrong in this way through the Chapter 13 process runs the risk of turning otherwise honest consumers and shopkeepers into knaves.

*Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 432 (6th Cir.1982). *See also Metro Empls. Credit Union v. Okoreeh–Baah (In re Okoreeh–Baah)*, 836 F.2d 1030, 1033 (6th Cir.1988).

**115.** *Id.* at 847.

**116.** *Hayes v. Palm Seedlings Partners–A (In re Agri. Research and Tech. Group, Inc.)*, 916 F.2d 528 (9th Cir.1990).

**117.** The court has also described this phenomenon as stamp collecting. *In re Sturgis Iron & Metal Co., Inc.*, 420 B.R. 716, 725–26 (Bankr.W.D.Mich.2009). It derives from the distinction Lord Rutherford made between physics and the rest of the sciences ("All science is either physics or stamp collecting."). The court by no means shares with Lord Rutherford what is perhaps better described as his outright contempt for anyone who was other than a physicist. Collecting and assessing prior decisions is without question important to the administration of the Bankruptcy Code. It gives both insight and perspective. There is also value in the uniformity that follows when one judge defers to what already has been decided by another. Indeed, when the Supreme Court or its circuit court has spoken, a bankruptcy court is obliged to conform. However, with the ex-

the recent case law is any critical analysis of *Agricultural Research*, the Code, or the former Act. Also absent is consideration of three important but uniformly ignored Supreme Court cases—*Coder, Van Iderstine*, and *Dean*.[118]

### Agricultural Research

*Bayou Group* and every other court that has recognized the objective approach to establishing Section 548(c) or Section 550(b) good faith cite *M & L Business Machine*,[119] *Sherman*,[120] or *Agricultural Research*[121] as controlling. *M & L Business Machine* and *Sherman* in turn incorporate this quote from *Agricultural Research* into their own reasons for adopting the approach:

> [C]ourts look to what the transferee objectively 'knew or should have known' in questions of good faith, rather than examining what the transferee actually knew from a subjective standpoint.

*Agri. Research*, 916 F.2d at 535–36.[122]

Therefore, it is fair to treat *Agricultural Research* as the authoritative source for this relatively recent departure from tradiional notions of good faith.[123] However,

---

ception of such binding decisions, deference must still leave room for critical thought.

**118.** Trustee and Huntington also overlooked *Coder, Van Iderstine*, and *Dean* in their post-trial briefing.

**119.** *Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*, 84 F.3d 1330 (10th Cir.1996).

**120.** *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348 (8th Cir.1995).

**121.** *Hayes v. Palm Seedlings Partners–A (In re Agri. Research and Tech. Group, Inc.)*, 916 F.2d 528 (9th Cir.1990).

**122.** *See M & L Bus. Mach.*, 84 F.3d at 1336; *Sherman*, 67 F.3d at 1355. Numerous other cases adopting the objective approach have also relied upon this same quote. Among the courts citing to *Agri. Research* with respect to Section 548(c) are: *Kaler v. McLaren (In re McLaren)*, 236 B.R. 882, 902 (Bankr.D.N.D. 1999); *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 659 (Bankr.M.D.Fla.2002); *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 359 B.R. 510, 523–24 (Bankr.S.D.N.Y.2007); *Leonard v. Coolidge (In re Nat'l Audit Def. Network)*, 367 B.R. 207, 224 (Bankr.D.Nev. 2007); *Bowers and Merena Auctions, LLC v. Lull (In re Lull)*, 386 B.R. 261, 271 (Bankr.D.Hawai'i 2008); *Bayou Group*, 396 B.R. at 845.

Other courts citing to *Agri. Research* with respect to Section 550(b) are: *Woods & Erickson, LLP v. Leonard (In re AVI, Inc.)*, 389 B.R. 721, 736 (9th Cir. BAP 2008); *Gold v. Laines (In re Laines)*, 352 B.R. 397, 406 (Bankr. E.D.Va.2005); *Riske v. David Austin Seitz Irrevocable Trust (In re Seitz)*, 400 B.R. 707, 721 (Bankr.E.D.Mo.2008).

And finally, two cases have relied upon *Agri. Research* in interpreting both Sections 548(c) and 550(b): *Doeling v. Grueneich (In re Grueneich)*, 400 B.R. 688, 693 (8th Cir. BAP 2009) and *Dev. Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 797–98 (Bankr.S.D.Fla.2000).

**123.** A few bankruptcy courts had suggested an approach based upon reasonable inquiry even before *Agricultural Research* was decided. *See, e.g., Walker v. Littleton (In re Littleton)*, 82 B.R. 640, 644 (Bankr.S.D.Ga.1988), *rev'd on other grounds*, 888 F.2d 90 (11th Cir.1989) ("[A]ctual knowledge ... or the knowledge it would have obtained if it had made a reasonable investigation ... is sufficient to preclude a finding of good faith...."); *Armstrong v. Ketterling (In re Anchorage Marina, Inc.)*, 93 B.R. 686, 693 (Bankr.D.N.D.1988) ("Transferees are not acting in good faith when they have knowledge sufficient to put them on at least inquiry notice...."); *Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R. 843, 862 (D.Utah 1987); *McColley v. Rosenberg (In re Candor Diamond Corp.)*, 76 B.R. 342, 351 (Bankr. S.D.N.Y.1987); *Williams v. Kidder Skis Int'l (In re Fitzpatrick)*, 73 B.R. 655, 658 (Bankr. W.D.Mo.1985), *aff'd in part and rev'd in part*, 60 B.R. 808 (W.D.Mo.1985); *Sanitary Ice Vending Co., Inc. v. Harris (In re Polar Chips Int'l, Inc.)*, 18 B.R. 480, 484 (Bankr.S.D.Fla. 1982).

However, *Agricultural Research* was the first to specifically adopt an objective stan-

*Agricultural Research* itself offers just four short paragraphs as explanation. Indeed, neither Section 548(c) nor Section 550(b) was even at issue. Rather, the court there was analyzing Hawaii's own fraudulent transfer laws and Section 548 came up only by analogy.

As for the limited analysis *Agricultural Research* does provide, one would have expected references to recent case law or treatises calling for a break with tradition. But there are none. Rather, the two "pronouncements" *Agricultural Research* relied upon come from Supreme Court cases decided way back in the 1800s—*Shauer v. Alterton*, 151 U.S. 607, 14 S.Ct. 442, 38 L.Ed. 286 (1894) and *Harrell v. Beall*, 84 U.S. (17 Wall) 590, 21 L.Ed. 692 (1873). In particular, *Agricultural Research* lifted this quote from *Shauer*:

> "[A transferee's] knowledge or actual notice of circumstances sufficient to put him, as a prudent man, upon inquiry as to whether his brother intended to delay or defraud his creditors ... should be deemed to have notice ... as would invalidate the sale to him."

*Agri. Research*, 916 F.2d at 535 (citing *Shauer*, 151 U.S. at 621, 14 S.Ct. at 446). *Shauer*, though, was no more a bankruptcy case than was *Agricultural Research*. Rather, the Court in that instance was reviewing a fraudulent conveyance under the laws of what was then the Dakota territory.

Granted, the other case cited, *Harrell v. Beall*, did involve fraud in the bankruptcy context. But the entire opinion in *Harrell* is barely more than a page. Moreover, *Harrell* speaks only of the debtor's "bare-

faced fraud," the transferee's "intentionally shut ... eyes to the truth," and the absence of even the "slightest effort" by the transferee to make an inquiry. 84 U.S. (17 Wall) at 591. As such, it is difficult to characterize *Harrell* as having established a standard where the transferee's good faith is to be tested by the inquiries of a reasonably prudent man as opposed to the transferee's own honesty and integrity. To the contrary, *Harrell* seems to be more a harbinger of what is now known as "willful blindness"—i.e., inexcusable avoidance of the obvious.[124]

*Coder, Van Iderstine, and Dean*

*Agricultural Research's* reliance upon *Shauer* and *Harrell* is also suspect because the Supreme Court issued three later opinions that offer considerably more insight as to the role good faith is to play in evaluating a bankruptcy trustee's right to recover transfers once they have been avoided. Each involved allegedly fraudulent transfers made under Section 67e of the former Bankruptcy Act.[125]

The first is *Coder v. Arts*, 213 U.S. 223, 29 S.Ct. 436, 53 L.Ed. 772 (1909). Arts, a banker, was owed a considerable amount of money by the debtor. The debtor in turn granted Arts a mortgage in a large tract of land approximately three months before he was adjudicated a bankrupt. Coder, the bankruptcy trustee, later challenged the mortgage as both a preference and a fraudulent transfer.

The second, *Van Iderstine v. Nat'l Disc. Co.*, 227 U.S. 575, 33 S.Ct. 343, 57 L.Ed. 652 (1913), also involved a transfer claimed to be both a preference and a

---

dard in place of a subjective one. *Agricultural Research* was also the first appellate court to adopt this break from tradition. *Cf. Bayou Group*, 396 B.R. at 847–48.

**124.** *See infra Proving Section 548(c) and Section 550(b)(1) Good Faith.*

**125.** The Bankruptcy Act of 1898, § 67e (11 U.S.C. § 107), Ch. 541, 30 Stat. 544, 564 (1898) (repealed) (hereinafter "Bankruptcy Act 1898, § 67e").

fraudulent conveyance. In that instance, National Discount had received various accounts from the debtor as collateral for an advance made only days before the bankruptcy petition. The trustee, Van Iderstine, asserted that the debtor had intended either to prefer or to defraud his creditors because the proceeds had been used to pay a bank note that the owner's son-in-law had endorsed.

The final case is *Dean v. Davis*, 242 U.S. 438, 37 S.Ct. 130, 61 L.Ed. 419 (1917). As in *Coder*, a debtor farmer owed money to the bank. However, in this case, the debtor's brother-in-law, Dean, rescued him with a loan that debtor secured with both his farm and a country store that he also owned. An involuntary petition was then filed and the trustee ultimately avoided Dean's mortgage as a preference. However, the Court chose instead to consider Dean's appeal on the alternative theory that he had received a fraudulent transfer.

These three cases are instructive because they illustrate during the early development of the bankruptcy laws the fundamental difference between preferences and fraudulent transfers. Indeed, a considerable portion of *Coder* is directed to explaining that difference. It begins with these general observations:

> A consideration of the provisions of the bankruptcy law as to preferences and conveyances shows that there is a wide difference between the two, notwithstanding they are sometimes spoken of in such a way as to confuse the one with the other. A preference, if it have the effect prescribed in § 60, enabling one creditor to obtain a greater portion of the estate than others of the same class, is not necessarily fraudulent. . . . [sic] *In Re Maher*, 144 F. 503–505, it was well said by the district court of Massachusetts:

> 'In a preferential transfer the fraud is constructive or technical, consisting in the infraction of that rule of equal distribution among all creditors which it is the policy of the law to enforce when all cannot be fully paid. In a fraudulent transfer the fraud is actual,—the bankrupt has secured an advantage for himself out of what in law should belong to his creditors, and not to him.'

*Coder*, 213 U.S. at 241, 29 S.Ct. at 443.

*Coder* then observed that the notion of the debtor intending to hinder, delay, or defraud his creditors, which distinguished a fraudulent conveyance from a preference, had to be actual. Moreover, it noted that the concept was not new.

> What is meant when it is required that such conveyances, in order to be set aside, shall be made with the intent on the bankrupt's part to hinder, delay, or defraud creditors? This form of expression is familiar to the law of fraudulent conveyances, and was used at the common law, and in the statute of Elizabeth, and has always been held to require, in order to invalidate a conveyance, that there shall be actual fraud; and it makes no difference that the conveyance was made upon a valuable consideration, if made for the purpose of hindering, delaying, or defrauding creditors. The question of fraud depends upon the motive. The mere fact that one creditor was preferred over another, or that the conveyance might have the effect to secure one creditor and deprive others of the means of obtaining payment, was not sufficient to avoid a conveyance; but it was uniformly recognized that, acting in good faith, a debtor might thus prefer one or more creditors.

*Coder*, 213 U.S. at 242, 29 S.Ct. at 443–44 (citations omitted).

*Van Iderstine* also recognized the difference. It said:

The statute recognizes the difference between the intent to defraud and the intent to prefer, and also the difference between a fraudulent and a preferential conveyance. One is inherently and always vicious; the other innocent and valid, except when made in violation of the express provisions of a statute. One is *malum per se* and the other *malum prohibitum,*—and then only to the extent that it is forbidden. A fraudulent conveyance is void regardless of its date; a preference is valid unless made within the prohibited period. It is therefore not in itself unlawful to prefer, nor fraudulent for one, though insolvent, to borrow in order to use the money in making a preference.

227 U.S. at 582, 33 S.Ct. at 345.[126]

There was, then, an early recognition in both the bankruptcy laws and by the Court that fraudulent transfers should be recovered because the debtor had engaged in a wrongful act whereas preferences were to be recovered simply as a matter of statutory policy—in this case, the legislative desire to treat similarly situated creditors equally. Moreover, this same distinction is evident in the modern Code. On the one hand, Section 548(a)(1)(A) renders voidable any transfer made by the debtor "with actual intent to hinder, delay, or defraud" a creditor. It makes no difference whether value is exchanged or whether the debtor is insolvent. The debtor's intent alone makes the act *"malum per se." Van Iderstine,* 227 U.S. at 582, 33 S.Ct. at 345.

On the other hand, the debtor's intent is completely irrelevant to whether a transfer is avoided under Section 547(b) as a preference. More important to that consideration is the question of whether the creditor receiving the transfer gained an advantage over others. *See, e.g.,* 11 U.S.C. § 547(b)(5). Indeed, the only consideration given to the debtor himself is whether he was insolvent or not at the time the transfer was made. 11 U.S.C. § 547(b)(3).[127]

However, it is the transferee, not the debtor, who is ultimately the target whenever a trustee in fact seeks the recovery of either a fraudulent or a preferential transfer. Consequently, the focus must inevitably turn upon the circumstances under which the recipient of the avoided transfer should return it. What *Coder, Van Iderstine,* and *Dean* establish is that when an actually fraudulent transfer is at issue, the

---

**126.** Black's Law Dictionary does not define *malum per se.* It does, though, define *malum in se:*

> A wrong in itself; an act or case involving illegality from the very nature of the transaction, upon principles of natural, moral, and public law.

*Id.* at 959 (6th ed. 1990).

This definition is consistent with *Van Iderstine's* reference to an inherently vicious act.

**127.** *Collier* draws the same distinction between fraudulent transfers and preferences:

> Fraudulent transfers under section 548 differ greatly from preferences under section 547. In the simplest form, fraudulent transfer law is part of the general debtor-creditor relationship, applicable to all transactions, while preference law holds sway only in bankruptcy. Thus, while fraudulent transfers are generally condemned under the common law and statutory provisions of most states, preferences generally have life only in bankruptcy, and may not be brought by individual creditors outside of bankruptcy. This limitation is consistent with the main purpose of preference law to ensure and [sic] equitable and ratable distribution among creditors in bankruptcy. But this justification has no place outside of bankruptcy: solvent debtors have always had the ability to prefer one creditor over other creditors outside of bankruptcy. No law, however, permits transfers in fraud of creditors.

5 *Collier on Bankruptcy* ¶ 548.01[3][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2010) (footnotes omitted).

recipient's accountability to the estate is to be gauged based upon the same notion that a transfer of this type is *malum per se.*

For example, in *Van Iderstine,* the Court concluded that National Discount could retain its interest in the assigned accounts because it did not have the requisite awareness of the debtor's fraudulent intent.

> The transfer, therefore, was not a preference to the Discount Company, and could not be set aside without proof that it knew that Fellerman [the debtor] not only intended to pay some of his creditors, but to defraud others.

*Van Iderstine,* 227 U.S. at 583, 33 S.Ct. at 345.[128]

But in *Dean,* the Court affirmed the lower court's avoidance of the mortgage granted because the debtor in that instance had intended to defraud his creditors and Dean, the recipient, had been a knowing participant. Indeed, *Dean* equated the absence of such knowledge with good faith.

> The lower courts were justified in concluding that he intended the necessary consequences of his act; that he willingly sacrificed his property and his other creditors to avert a threatened criminal prosecution; **and that Dean, who, knowing the facts, cooperated in the bankrupt's fraudulent purpose, lacked the saving good faith.**

*Dean,* 242 U.S. at 445, 37 S.Ct. at 132 (emphasis added).

In sum, then, these three Supreme Court decisions laid out a fundamental distinction between the recovery of actually fraudulent transfers on the one hand and the recovering of other avoidable transfers on the other hand. The former is *malum per se;* the latter only *malum prohibitum.* Moreover, in drawing this distinction, the Court recognized that the transferee's good faith—i.e., his own behavior regarding the fraud being perpetrated—would be dispositive of whether he would have to return a transfer by the debtor that had been fraudulently intended.

Or, to put it differently, these three cases all stand for the proposition that the *malum per se/malum prohibitum* dichotomy that distinguishes an actually fraudulent transfer from one that is merely preferential carries over to the recipient of the transfer as well. Consequently, the estate's recovery of a preferential transfer has no moral undertones—whether the transferee must return the property received is simply a function of whatever Congress has decided is appropriate. However, when an inherently vicious act like an actually fraudulent transfer is involved (*cf. Van Iderstine,* 227 U.S. at 582, 33 S.Ct. at 345), then whether the recipient knew of the fraud or not becomes crucial, for that knowledge reflects his own honesty and integrity—i.e., his good faith.

### Good Faith Under Former Section 67

*Coder, Van Iderstine,* and *Dean* all interpreted an early version of former Section 67. At that time, the Bankruptcy Act did not include what is commonly known today as a "constructively" fraudulent transfer—i.e., a transfer that can be avoided without a showing of actual intent, provided the transfer was made while the debtor was insolvent and without reasonable consideration being received in ex-

---

**128.** Van Iderstine, the trustee, had argued in the alternative that the assignment of accounts resulted in the debtor preferring National Discount over the debtor's other creditors. The Court, though, rejected Van Iderstine's preference argument because National Discount was not a creditor of the debtor and because it had no relationship with the son-in-law. 227 U.S. at 583, 33 S.Ct. at 345.

change. *Cf.* 11 U.S.C. § 548(a)(1)(B). Rather, Section 67 at that time required the trustee to establish in all instances that the transfer was made "with the intent and purpose on his part to hinder, delay, or defraud his creditors." Bankruptcy Act 1898, § 67e. In turn, the same subsection excepted from recovery of an actually fraudulent transfer "purchasers in good faith and for a present fair consideration."[129]

It is easy, then, to see in this early effort to codify the bankruptcy laws the same notion of *malum per se* that the Court discerned in *Coder, Van Iderstine,* and *Dean.* The recipient of an actually fraudulent transfer had nothing to fear provided he had paid fair consideration and he had taken in good faith. If, though, he had taken with knowledge of the debtor's intent to defraud his creditors, then it made no difference what he had paid, for he was just as culpable as the debtor himself. Or, as the Court concluded in *Dean,* he would have "lacked the saving good faith."[130] Therefore, not only would a transferee taking in bad faith have to return the fraudulently transferred property, he would also forfeit the consideration he had paid.[131] As stated in *Coder*:

[I]t makes no difference that the conveyance was made upon a valuable consideration, if made for the purpose of hindering, delaying, or defrauding creditors. The question of fraud depends upon motive.

213 U.S. at 242, 29 S.Ct. at 443–44.

However, the 1938 Chandler Act, among many other things, amended former Section 67e (which then became Section 67d) to add constructive fraud as an alternative means for avoiding transfers under that section.[132] It also overhauled the corresponding defenses. The revised provision continued to protect a good faith purchaser who had paid fair consideration, albeit "bona fide" and "present fair equivalent value" replaced the former terms. Chandler Act 1938 at § 67d(6). More significant, though, was the addition of a new defense for the transferee who had paid something short of the property's fair equivalent value but who was nonetheless in good faith. What is interesting is that Congress did not use "good faith" to describe this second requirement. It chose the absence of "actual fraudulent intent" instead. *Id.*[133] The question, of course, is why?

---

**129.** Bankruptcy Act 1898, § 67e.

**130.** *Dean,* 242 U.S. at 445, 37 S.Ct. at 132.

**131.** But, as the Court pointed out in *Coder, Van Iderstine,* and *Dean,* what Congress decides regarding the recovery of *malum prohibitum* transfers like a preference is left entirely to its discretion. Unlike actually fraudulent transfers, there are no moral considerations with respect to this type of avoidable transfer. For instance, former Section 60, which is the predecessor to current Section 547, at one time permitted a transferee to retain a preference so long as he did not have "reasonable cause to believe" that the debtor had intended to prefer him. Bankruptcy Act 1898 at § 60b. Reasonable cause, though, falls short of knowledge or willful blindness, which Congress could have just as easily chosen. Moreover, Congress

elected to eliminate this particular exception altogether when it overhauled the former Act in 1938 and it has remained unavailable as a defense ever since. Indeed, whether a transferee today must return a preference turns for the most part upon a purely economic issue—i.e., value exchanged. *See also infra Actually Fraudulent Transfers, Constructively Fraudulent Transfers, and Section 547 Preferences.*

**132.** Chandler Act 1938 at §§ 67(d)(2), (3), (4), Ch. 575, 52 Stat. 875 (1938) (repealed) (hereinafter "Chandler Act 1938").

**133.** The revised defense appeared as subsection (6) to former Section 67d:

(6) A transfer made or an obligation incurred by a debtor adjudged a bankrupt

This court submits that it was the addition of constructive fraud as an alternative to actual fraud that prompted the change. As already noted, only actual fraudulent transfers were avoidable under former Section 67e prior to the Chandler Act. Therefore, recovering a fraudulent transfer was a relatively straight forward issue. Either the transferee was aware of the debtor's fraud and, as a result, took in bad faith, or he was not aware of the fraud, and took in good faith. If it also happened that the bad faith transferee had given consideration as well, that was just too bad. The law had no sympathy for conduct that was *malum per se.*

A constructively fraudulent transfer, though, is not *malum per se* because, by definition, it does not require the debtor to have engaged in what *Van Iderstine* early on described as inherently vicious behavior. 227 U.S. at 582, 33 S.Ct. at 345. Indeed, a constructively fraudulent transfer involves no ill will on the part of the debtor. All that is required is the debtor's insolvency and an absence of reasonably equivalent consideration in exchange. Such a transfer, then, is more akin to a

preference, which, again, is *malum prohibitum.* In other words, constructively fraudulent transfers, like preferences, are not avoidable because they are inherently bad. Rather, they are avoidable only because Congress has prohibited them in order to accomplish a fairer distribution of the debtor's assets.[134]

However, the morally neutral character of this new avoidance power created a problem whenever the consideration paid by the transferee fell short of a reasonably equivalent amount. While a transferee with knowledge of an actually fraudulent transfer might not deserve credit for whatever he had paid to the debtor as part of that fraud, it did not follow that the recipient of a constructively fraudulent transfer should likewise forfeit whatever he had given in exchange to the debtor. Therefore, at the same time Congress expanded the trustee's avoidance powers to include constructively fraudulent transfers it added the proviso that a recipient of such a transfer who gave less than fair consideration would nonetheless receive credit for that consideration provided that the trans-

---

under this Act, which is fraudulent under this subdivision d against creditors of such debtor having claims provable under this Act, shall be null and void against the trustee, except as to a bona-fide purchaser, lienor, or obligee for a present fair equivalent value: *Provided, however,* that such purchaser, lienor, or obligee, who without *actual fraudulent intent* has given a consideration less than fair, as defined in this subdivision d, for such transfer, lien, or obligation, may retain the property, lien, or obligation as security for repayment. Chandler Act 1938, § 67d(6) (emphasis added with respect to "actual fraudulent intent").

**134.** It is worth mentioning again the passage from *Maher* that *Coder* quoted with approval: "In a preferential transfer the fraud is constructive or technical, consisting in the infraction of that rule of equal distribution among all creditors, which it is the policy of the law

to enforce when all cannot be fully paid." *In re Maher*, 144 F. 503, 509 (D.Mass.1906).

Therefore, with all due respect, this court submits that *Bayou Group* was wrong when it equated Section 548(c) good faith with the equitable redistribution that is often the consequence of an avoided transfer. Preferences, unauthorized postpetition transfers, and even constructively fraudulent transfers all fall within this realm. However, actually fraudulent transfers have always been different. Notwithstanding *Bayou Group's* statement to the contrary, a transferee's lack of good faith under Section 548(c) does entail a finding that he was guilty of *"mala fides"* and "deserving of opprobrium." *Cf.* 396 B.R. at 828. Moreover, the absence of good faith in an actually fraudulent transfer is intended to punish the recipient by not only requiring him to return the transfer received but also by requiring him to forfeit whatever consideration he may have paid. *See infra* n.136.

feree himself was "without actual fraudulent intent." [135] In other words, if the avoided transfer was actually fraudulent (i.e., *malum per se*) and the transferee was aware of its fraudulent purpose, then it continued to make no difference whether the recipient paid all or a portion of the property's fair value in exchange. It was forfeited.[136] However, if the transferee was not himself tainted with dishonesty—which might be the case if the debtor's own fraudulent intent was actual but would always be the case if the debtor's fraudulent intent was only constructive—then the transferee would be protected to the extent of the consideration paid.

*Section 548(c) Good Faith*

No further changes were made to the two separate Section 67d defenses until Congress replaced the former Act altogether with the Bankruptcy Code. Current Section 548(c) is different. For example, it no longer includes a provision for transferees who paid a "present fair equivalent value" and another provision for purchasers who had given "consideration less than fair." Rather, Section 548(c) combines the two into the single concept of "value." Similarly, Section 548(c) has eliminated the requirements of "bona fide purchaser" and "without actual fraudulent intent" that had

also appeared in former Section 67d, replacing them instead with "good faith" once again.

However, apart from such streamlining, Section 548(c) affords the same protections as its predecessor. For instance, it continues to assure recipients of constructively fraudulent transfers that they will be credited for whatever consideration may have passed in exchange. Conversely, Section 548(c) includes the same risk of forfeiture in the event the transferee took in bad faith. In short, the *malum per se/malum prohibitum* distinction embodied in former Section 67d(6) continues in Section 548(c).

These last observations, though, assume that Congress, in enacting Section 548(c), intended good faith to still have the same meaning as it did under the former Act. Such an assumption certainly seems warranted. After all, Section 548(c) is not *tabula rasa*. It instead finds roots not only in former Section 67e but also in the early Supreme Court decisions of *Coder, Van Iderstine,* and *Dean.* Moreover, that same Supreme Court now instructs the lower courts again and again to interpret the current Code in a manner that is consistent with prior bankruptcy practice unless Congress has expressly indicated a different intent.[137]

---

**135.** Indeed, this addition under the Chandler Act also improved the lot of good faith recipients of actually fraudulent transfers because the previous law did not protect good faith transferees who had given some consideration but not a "present fair consideration." Bankruptcy Act 1878 at § 67e.

**136.** One ordinarily thinks of an intentionally fraudulent transfer being accomplished through a gift and, of course, forfeiture is not a risk when all that is involved is the gift's return. However, actually fraudulent transfers are not confined to only gifts. For example, a debtor could also perpetrate a fraud upon his creditors by selling a valuable asset—say, his vacation home—for fair value and then hiding the proceeds in an offshore

account. If the purchaser was privy to the scheme (i.e., in bad faith), he not only would have to return the home; he would also lose any claim to the offshore account if it too was recovered.

**137.** *Hamilton v. Lanning,* —— U.S. ——, 130 S.Ct. 2464, 2473, 177 L.Ed.2d 23 (2010); *Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.,* 549 U.S. 443, 454, 127 S.Ct. 1199, 1206–07, 167 L.Ed.2d 178 (2007); *Lamie v. U.S. Trustee,* 540 U.S. 526, 539, 124 S.Ct. 1023, 1033, 157 L.Ed.2d 1024 (2004); *Cohen v. de la Cruz,* 523 U.S. 213, 221, 118 S.Ct. 1212, 1218, 140 L.Ed.2d 341 (1998); *Dewsnup v. Timm,* 502 U.S. 410, 419, 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992); *Pennsylvania Dept. of Pub. Welfare v. Daven-*

Yet *Bayou Group* and other recent decisions claim that Section 548(c) now reflects a modern approach that replaces the traditional notions of honesty and integrity with a new standard involving the objective evaluation of imposed duties of reasonable inquiry. 396 B.R. at 847–48. It is appropriate, then, to look closer at the avoidance powers now granted under the Code to see whether Congress in fact has manifested such an intent. Otherwise, justification for taking this "somewhat different" [138] approach is lacking.

*Actually Fraudulent Transfers, Constructively Fraudulent Transfers, and Section 547 Preferences*

Comparing Section 548(c) with its counterpart, Section 547(c), provides insight. As the Court observed in *Van Iderstine*, preferences are only *malum prohibitum.* 227 U.S. at 582, 33 S.Ct. at 345. Consequently, no moral agenda drives the rationale for recovering a preference. Rather, the requirements for recovery simply reflect whatever else Congress intended to accomplish through Section 547's enactment.

It should come as no surprise, then, that the Section 547(c) defenses give scant attention to the recipient's good faith. [139] After all, the underlying purpose of a preferential recovery is to ensure a more equitable distribution. Consequently, preference law is indifferent to whether the recipient of the preference was aware or not of the inequity created when the preference was made. The value exchanged, though—whether contemporaneous, in the ordinary course, or in the future—is critical.

Consider, now, a constructively fraudulent transfer. It too is *malum prohibitum*—i.e., the debtor's intent is just as irrelevant in determining whether a constructively fraudulent transfer is avoided as it is in determining whether a preferential transfer should be avoided. Consequently, it follows that the recipient's awareness of the debtor's intent should also be irrelevant whenever avoidance is sought under this theory.

Conversely, whether the recipient of a constructively fraudulent transfer gave value should be very relevant, for the underlying purpose of recovering a constructively fraudulent transfer is also to accomplish a more equitable distribution among creditors. [140] Indeed, given the similarities between preferences and constructively fraudulent transfers, the recipient of a constructively fraudulent transfer who gave value should be no less entitled to an offset than should the recipient of a preferential transfer who gave value. The difference between the two defenses lies only in the nature of the value recognized, with Section 548(a)(1)(B) recognizing the satisfac-

*port,* 495 U.S. 552, 563, 110 S.Ct. 2126, 2133, 109 L.Ed.2d 588 (1990); *Midlantic Nat'l Bank v. New Jersey Dept. of Envtl. Prot.,* 474 U.S. 494, 501, 106 S.Ct. 755, 759–60, 88 L.Ed.2d 859 (1986).

**138.** *Id.*

**139.** Good faith (or, more accurately, "bona fide") is an element in only one of the nine Section 547(c) defenses, and then only in the context of payments made by the debtor on account of a domestic support obligation. *Cf.* 11 U.S.C. § 547(c)(7).

**140.** Again, *Bayou Group* recognized the redistributive policy underlying the avoidance of constructively fraudulent transfers when it explained why Section 548(c) should not be punitive. 396 B.R. at 827. What *Bayou Group* missed was (1) that such policy considerations fall to the wayside when actual fraud is involved; and (2) that recipients of actually fraudulent transfers are to be punished through forfeiture of any consideration paid if they were aware of the debtor's fraud—i.e. if they were not in good faith. *See also supra,* n. 136.

tion of antecedent debt as well. *Cf.* 11 U.S.C. § 548(d)(2)(A).

However, while a court will be indifferent to the debtor's intent when only a constructively fraudulent transfer is involved, that is clearly not the case when the debtor is accused under Section 548(a)(1)(A) of actual fraud vis-a-vis his creditors. Indeed, as *Dean* points out, what otherwise might be subject to avoidance as a preference (and, by analogy, a constructively fraudulent transfer) could also be subject to avoidance as an actually fraudulent transfer if the debtor had the requisite fraudulent intent.[141] Adding consideration of the debtor's intent, though, also results in the focus under Section 548(c) shifting away from value exchanged and more towards the recipient's own awareness of the fraud being perpetrated—i.e., the recipient's good faith. If the recipient was aware of the fraud, his bad faith would result in not only the return of the property received, but also the forfeiture of any consideration paid. However, if he was in good faith, then he will be protected from the trustee's avoidance powers under both Sections 548(a)(1)(A) and (B) to the extent value was exchanged. But even then the recipient might still be vulnerable to the transfer's avoidance as a preference if (1) it was made within ninety days; and (2) the value exchanged did not fall within the more restrictive provisions of Section 547(c). *See* 11 U.S.C. § 548(c)

("Except to the extent that a transfer . . . voidable under this section is voidable under section 544, 545, or 547. . . .").

In summary, Sections 548(c) and 547(c) still reflect the same *malum per se/malum prohibitum* dichotomy that the Supreme Court long ago observed in *Coder, Van Iderstine,* and *Dean.* The recipient's good faith is irrelevant when the avoidance is based upon preferential treatment or constructive fraud. If, though, the debtor intended to actually defraud his creditors in making that transfer, then it is the recipient's own honesty and integrity—i.e., his good or bad faith—that will determine how he will fare with the estate.

*Unauthorized Postpetition Transfers and Section 549(c) Good Faith*

Section 549(c) is equally instructive, for, unlike Section 547(c), the defense it provides does require the transferee's good faith. Courts often comment that good faith appears throughout the Code in many different contexts; as such, no precise meaning is possible.[142] Nonetheless, the presumption remains that a word or phrase that appears more than once in a statute is to have the same meaning.[143] Therefore, absent compelling evidence to the contrary, one would expect that Section 548(c) good faith and Section 549(c) good faith should have the same meaning, no matter how imprecise, given that the

---

**141.** *Dean,* 242 U.S. at 444, 37 S.Ct. at 132.

**142.** *See supra* n. 106.

**143.** *Cohen v. de la Cruz,* 523 U.S. 213, 220, 118 S.Ct. 1212, 1217, 140 L.Ed.2d 341 (1998); *Ratzlaf v. U.S.,* 510 U.S. 135, 143, 114 S.Ct. 655, 660, 126 L.Ed.2d 615 (1994); *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 479, 112 S.Ct. 2589, 2596, 120 L.Ed.2d 379 (1992) ("[b]asic canon of statutory construction [is] that identical terms within an Act bear the same meaning."); *Sullivan v. Stroop,* 496 U.S. 478, 484, 110 S.Ct. 2499,

2504, 110 L.Ed.2d 438 (1990); *Sorenson v. Sec'y of Treasury,* 475 U.S. 851, 860, 106 S.Ct. 1600, 1606, 89 L.Ed.2d 855 (1986) ("The normal rule of statutory construction assumes that 'identical words used in different parts of the same act are intended to have the same meaning.' ") (quoting *Helvering v. Stockholms Enskilda Bank,* 293 U.S. 84, 87, 55 S.Ct. 50, 51, 79 L.Ed. 211 (1934), in turn quoting *Atlantic Cleaners & Dyers, Inc. v. U.S.,* 286 U.S. 427, 433, 52 S.Ct. 607, 609, 76 L.Ed. 1204 (1932)).

two subsections are both designed to place limits upon the trustee's avoidance powers.

Section 549, of course, permits the avoidance of certain postpetition transfers. Like a preference and a constructively fraudulent transfer, avoiding a postpetition transfer is morally neutral. All that is relevant is (1) the time of the transfer relative to the petition date; and (2) whether the transfer was authorized or not. A classic example of an avoidable Section 549 transfer is the debtor's postpetition gift of a valuable painting notwithstanding his duty to turn it over to the estate.[144]

What is immediately striking about Section 549(c) is that it apparently protects only those transferees who received a postpetition transfer of real property.

> The trustee may not avoid under subsection (a) of this section a transfer of an interest in real property to a good faith purchaser without knowledge of the commencement of the case and for present fair equivalent value....

11 U.S.C. § 549(c).[145]

The relative who received the painting would have no defense regardless of whether he was aware of the debtor's bankruptcy. Nor would it make any difference whether the relative had given something to the debtor in exchange. The painting would still have to be returned and no credit would be given.[146] Perhaps

this is harsh. However, it is consistent with the notion that the recovery of transfers that are only *malum prohibitum* is left entirely to legislative discretion.

But Section 549(c) is just as remarkable because of what it does require in order for the transferee of the real property to prevail. As might be expected, Section 549(c) requires the transferee to have given value—i.e., that he be a purchaser—just as preferences and constructively fraudulent transfers, which are also *malum prohibitum*, require the exchange of value for a successful defense. Section 549(c), though, also requires the purchaser to be in good faith, where, as also just shown, it is only a factor under Section 548(c) when the transfer is *malum per se*—i.e., when the debtor actually intended to defraud his creditors—and it is for all practical purposes no factor at all under Section 547(c).[147] However, even more surprising is that Section 549(c) adds yet a third requirement—that the transferee must have also taken "without knowledge of the commencement of the case." 11 U.S.C. § 549(c).

What, then, is meant by good faith under Section 549(c) when that subsection, unlike Section 548(c), addresses the transferee's knowledge as a separate element of the defense? As with the rest of the Code, Section 549 provides no definition of good faith. However, the additional require-

---

144. *Cf.* 11 U.S.C. § 521(a)(4) ("A debtor shall ... surrender to the trustee all property of the estate....").

145. Section 549(c) further circumscribes the purchaser's protection under that subsection by putting him on constructive notice of the case's commencement if a copy or notice of the petition had been recorded prior to the property's transfer.

146. But this is the outcome only if the second sentence of Section 549(c) is interpreted as also being limited to real property. An inter-

pretational issue arises because the second sentence, unlike the first, does not make any reference to the type of property transferred. There is, then, at least some room to argue that the first sentence offers a complete defense for certain recipients of real estate transfers and that the second sentence in turn offers something less to all other unknowing good faith purchasers of estate property, whether real or personal.

147. *See supra* n. 131.

ment that the transferee also have no knowledge of the case's commencement narrows the possibilities considerably. One possibility would be to focus only upon the transferee's awareness of whether the transfer received was authorized or not. For example, if the transferee knew, or even suspected, that the debtor was in bankruptcy when the transfer was made, then he, under this definition, would be in bad faith. Of course, the problem with this approach is that Section 549(c) already requires the transferee to be ignorant of the bankruptcy's commencement. It would indeed be a rare circumstance where the transferee would not be aware of the debtor's case yet still be cognizant of the transfer violating bankruptcy law.

A more sensible approach is to simply give Section 549(c) good faith the same meaning as it has for Section 548(c). That is, a transferee will be in bad faith under either Section 548(c) or Section 549(c) if, in connection with receiving the transfer, he was aware that the debtor's purpose was all along to hinder, delay, or defraud his creditors. As already discussed, an unauthorized postpetition transfer, like a preference or a constructively fraudulent transfer, is *malum prohibitum*, not *malum per se*. However, constructively fraudulent transfers, or even preferences,[148] are capable of being actually fraudulent and, therefore, *malum per se*, if the debtor actually intended the transfer to be a fraud upon his creditors as well. Moreover, should the challenged transfer have this additional element, then the transferee's own ignorance of that fraudulent intent—i.e., his good faith—predominates any further consideration of his accountability to the estate for what had been transferred.

The obvious question, then, is: What makes voidable postpetition transfers any different? After all, the Code makes no distinction between pre- and postpetition transfers when the honesty and integrity being tested is not the recipient's, but the debtor's. Specifically, Section 727(a)(2) not only denies the discharge of a debtor who defrauds his creditors through prepetition transfers of his assets; it also denies the debtor his discharge when such transfers occur postpetition. 11 U.S.C. § 727(a)(2)(A) and (B). Put simply, the Code is indifferent to when fraud occurs. It is wrong no matter when it arises and no matter who is involved. Moreover, the Code is even handed in its punishment of the same. Debtors lose their discharge regardless of whether their petitions precede or follow their fraud. It is just as true that prepetition recipients of such transfers who are aware of the fraud—i.e., those who are in bad faith—forfeit under Section 548(c). Does it not follow, then, that recipients of just as fraudulent postpetition transfers should not forfeit as well under the same good faith requirement of Section 549(c)?

In sum, this court concludes that the same *malum per se/malum prohibitum* dichotomy that the Supreme Court recognized many years ago in *Coder, Van Iderstine,* and *Dean* and that is clearly evident in former Section 67 continues to manifest itself in the defenses afforded to the recipients of the various pre- and postpetition transfers now avoidable under the Code. A transferee's good faith—i.e., his honesty and integrity vis-a-vis the transfer made—is not relevant so long as the only purpose served by avoiding the transfer is to ensure equality of distribution. It makes no difference whether the transfer

---

**148.** "A transaction may be invalid both as a preference and a fraudulent transfer." *Dean,*

242 U.S. at 444, 37 S.Ct. at 132.

avoided was a preference, a constructively fraudulent transfer, or an unauthorized postpetition transfer. However, if it was the debtor's fraud that motivated the transfer, whether pre- or postpetition, then its inherent viciousness, as the Court in *Van Iderstine* put it, is just as much a factor today as it was then. Therefore, in these instances, the recipient's own honesty and integrity in accepting that transfer—i.e., his good faith—must be put to the test.

### Section 550(b) Good Faith

■ Section 550 incorporates into a single section the remedial relief that had been provided separately in former Sections 60 and 67. Nonetheless, there remains a clear relationship between that section and the many avoidance powers it now supports. Courts often say that the initial recipient of an avoided transfer is strictly liable for the transfer made given that the protections afforded by Section 550(b) are not available to him.[149] Yet Sections 547, 548, and 549 each offers to the initial transferee its own defense that may well affect any later recovery under Section 550. Or, to put it differently, a recovery under Section 550(a) is possible only "**to the extent** that a transfer is [first] avoided under section . . . 547, 548, 540 . . . ." (emphasis added). It is better, then, to view the defense that Section

550(b) itself provides to subsequent recipients of all transfers, no matter how avoided, as simply a one-size-fits-all substitution for what the former Act had previously provided through the individual avoidance sections themselves.

■ The court makes this observation because good faith also appears as a requirement for subsequent transfers under both subsections (1) and (2) of Section 550(b)[150] and for any transfer under subsection (e).[151] Again, the rules of statutory construction presume that when a term like good faith appears more than once in a statute, it is to have the same meaning throughout.[152] Therefore, while giving good faith definition is a challenge, it is still fair to say that Congress had at least the same concept in mind when it used that term repeatedly in Section 550.[153] It is also appropriate to consider whether Section 550 good faith is the equivalent of the good faith required under Sections 548(c) and 549(c) given that these subsections also relate to the estate's recovery of an avoided transfer vis-a-vis the transfer's initial recipient.

With this in mind, the court submits that the same notions of honesty and integrity underlying Section 548(c) and 549(c) good faith underlies Section 550 good faith. Consider Section 550 itself. As a general proposition, the subsequent

---

**149.** *See, e.g., Taunt v. Hurtado (In re Hurtado),* 342 F.3d 528, 532–33 (6th Cir.2003); *Christy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey),* 130 F.3d 52, 57 (2nd Cir.1997).

**150.** The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in **good faith,** and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate **good faith** transferee of such transferee.

11 U.S.C. § 550(b) (emphasis added).

**151.** A **good faith** transferee from whom the trustee may recover under subsection (a) of this section has a lien on the property recovered to secure the lesser of. . . .

11 U.S.C. § 550(e)(1) (emphasis added).

**152.** *See supra* n. 143.

**153.** *See also infra Huntington's Section 550(b)(1) Knowledge.*

transferee is entitled to a complete defense only if he also received the transfer for value and without knowledge of the transfer's avoidability. Good faith is simply not enough. 11 U.S.C. § 550(b)(1). But good faith alone would be sufficient if the transferee had taken from someone other than the debtor and that other person (1) had also taken in good faith; and (2) had complied as well with the other two Section 550(b)(1) requirements. 11 U.S.C. § 550(b)(2). In other words, so long as someone in the chain of title had all three of these attributes, all that is required of any person thereafter is his good faith. Similarly, Section 550(e) indicates that value and knowledge of avoidability are irrelevant with respect to any transferee, including even an initial transferee, with respect to improvements to the property transferred. All that is required of the transferee in that circumstance is, again, that he be in good faith.

 Logic, then, certainly leads to the conclusion that good faith under Section 550 means something different from both taking for value and, more importantly, taking without knowledge. Indeed, if one compares this subsection with the specific defenses offered to initial transferees under Sections 547(c), 548(c), and 549(c), Section 550(b)(1) most resembles Section 549(c), since that subsection also requires value, good faith, and lack of knowledge. But with that comparison must also come the recognition that the same *malum per se/malum prohibitum* distinction made in *Coder, Van Iderstine*, and *Dean* is also at play here. In other words, knowledge of the avoidability of the transfer under Section 550(b) is just another criterium estab-

lished by Congress to distinguish when a transfer or its equivalent is to be returned to the estate under Section 550. There is no more moral connotation to it here than there is to the recipient of a postpetition transfer having knowledge (or not) of the debtor's petition under Section 549(c) or the recipient of a preference or constructively fraudulent transfer giving value (or not) under Sections 547(c) or 548(c).[154]

 On the other hand, the inherent viciousness that *Van Iderstine* associated with a debtor's actually fraudulent transfer overrides consideration of all else, thereby leaving **ANY** recipient who is aware of the debtor's fraud ineligible for **ANY** protection afforded by Section 550. For instance, it makes no difference that a recipient took from someone who himself was a Section 550(b)(1) good faith purchaser without knowledge if that recipient was himself aware of the debtor's fraud (i.e., if he was in bad faith). The Section 550(b)(2) defense is not available. Similarly, it makes no difference that such a recipient made a valuable improvement to the property transferred. A bad faith recipient is never entitled to the compensatory lien that Section 550(e) otherwise provides to all transferees. Put simply, the interspersion of the good faith requirement throughout Section 550 confirms what *Coder, Van Iderstine*, and *Dean* established a century before—that a recipient of an actually fraudulent transfer who himself is aware of the fraud (i.e., in bad faith) is no less reprehensible than the fraudulent debtor himself. Nor is such transferee any more deserving of the Code's protections whether offered under

154. However, this logic goes only so far, because Section 550(b)(1)'s good faith and without knowledge requirements are redundant when it is an actually fraudulent transfer that is being considered. Indeed, the drafters who added lack of knowledge as a third requirement actually intended good faith and without knowledge to be redundant, at least in a sense. *See infra Huntington's Section 550(b)(1) Knowledge.*

Section 550 or otherwise.[155]

*Proving Section 548(c) and 550(b)(1) Good Faith*

Although both Section 548(c) and Section 550(b) are silent, courts have uniformly treated each as providing an affirmative defense.[156] Huntington, then, must bear the ultimate burden of establishing its good faith in accepting whatever fraudulent transfers Teleservices made to it either directly or indirectly. How, though, does one go about proving ignorance of another's fraud?

Debtors seldom admit that they intended to defraud their creditors. Consequently, courts have relied upon circumstantial evidence, often referred to as "badges of fraud," to establish the requisite intent.[157] The use of such badges dates back to the Statute of Elizabeth.[158] Indeed, the Uniform Fraudulent Transfer Act, which Michigan and other states have adopted, incorporates many of the more common badges into its provisions.

> (2) In determining actual intent . . . consideration may be given, among other factors, to whether 1 or more of the following occurred:
>
> (a) The transfer or obligation was to an insider.
>
> (b) The debtor retained possession or control of the property transferred after the transfer.
>
> (c) The transfer or obligation was disclosed or concealed.
>
> (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
>
> (e) The transfer was of substantially all of the debtor's assets.
>
> (f) The debtor absconded.
>
> (g) The debtor removed or concealed assets.
>
> (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
>
> (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
>
> (j) The transfer occurred shortly before or shortly after a substantial debt was incurred.
>
> (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

MICH. COMP. LAWS § 566.34(2).[159]

 This court concludes that the same badges may also be used to assess

---

**155.** *See also infra* Huntington's Section *550(b)(1) Knowledge.*

**156.** *Nordic Village*, 915 F.2d at 1055–56 (interpreting Section 550); *Wilson v. Don Carman (In re Blazo Corp.)*, 73 F.3d 361 (Table), No. 94–3797, 1995 WL 764130, at *3 (6th Cir.1995) (interpreting Section 548(c)). *See also In re M & L Bus. Mach. Co., Inc.*, 84 F.3d at 1338 (10th Cir.1996) (interpreting Section 548(c)); *Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 799 (5th Cir.2002) (interpreting Section 548(c)). *But see Nordic Village*, 915 F.2d at 1063–64 (Kennedy, J., dissenting).

**157.** 5 *Collier on Bankruptcy* ¶ 548.04[2][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2010).

**158.** *Id.* The Statute of Elizabeth, which was actually titled "An Act Against Fraudulent Deeds, Gifts, Alienations, etc.," was enacted in 1571. Modern efforts such as the Uniform Fraudulent Transfer Act trace their roots to its hoary provisions. Indeed, a few countries, including Australia and Bermuda, still have the Statute of Elizabeth on their books.

**159.** Interestingly, the two elements of a constructively fraudulent transfer, reasonably equivalent consideration and insolvency, are

the recipient's own culpability. If, for instance, the threat of an impending judgment is indicative of the debtor's fraud in making the transfer, awareness of that same threat should be a factor as well in determining the transferee's corresponding good faith in accepting the same. Or, as the Court observed in *Dean*, a lender's awareness that the loan made to an insolvent debtor was to prefer one creditor over the rest would be probative of the lender's own good faith vis-a-vis any mortgage taken.

> The mortgage may be made in the expectation that thereby the debtor will extricate himself from a particular difficulty and be enabled to promote the interest of all other creditors by continuing his business. The lender who makes an advance for that purpose with full knowledge of the facts may be acting in perfect 'good faith.' But where the advance is made to enable the debtor to make a preferential payment with bankruptcy in contemplation, the transaction presents an element upon which fraud may be predicated. . . .

242 U.S. at 444, 37 S.Ct. at 132.[160]

Unfortunately, predicating the transferee's liability upon merely his awareness of such factors complicates the analysis, for a transferee is no more likely to admit his actual knowledge than is a debtor likely to admit his actual intent. Therefore, courts have also long recognized that something short of admitted knowledge will suffice. Willful blindness is the term often used to describe this alternate state of awareness. In fact, *Harrell v. Beall*, the early Supreme Court case cited in *Agricultural Research*, is an excellent example of the concept's application in the context of fraudulent transfers.

> It must suffice to say that we are convinced that the sale to Echols was a barefaced fraud, and that if the appellee did not know it when he purchased of Echols it was because he intentionally shut his eyes to the truth, and that he had such notice and information as made it his duty to inquire further, and that the slightest effort by him in that direction would have discovered the whole fraud.

84 U.S. (17 Wall) at 591.

And the court in *Bayou Group* made the same point much more recently.

> It is well settled that a transferee may not remain willfully ignorant of facts that would cause it to be on notice of a debtor's fraudulent purpose and then put on blinders prior to entering into a transaction with the debtor and claim the benefit of Section 548(c)'s good faith defense.

396 B.R. at 884 (citations omitted).[161]

Including willful blindness as a substitute for actual knowledge, though, adds a

---

also recognized as "badges" of the debtor's actual intent. *Cf.* MICH. COMP. LAWS § 566.34(2)(h) and (i). This is not a coincidence. As already discussed, constructively fraudulent transfers are more akin to preferences than they are to actually fraudulent transfers because of their common indifference to the debtor's intent. However, as observed in *Dean*, a preference by its very nature presents an element upon which fraud may also be predicated. 242 U.S. at 444, 37 S.Ct. at 132. Similarly, while a constructively fraudulent transfer is not, by definition, an actually fraudulent transfer, it nonetheless includes elements—to wit, insolvency and lack of fair consideration in exchange—that are predicates from which actual intent may also be inferred under appropriate circumstances.

**160.** Indeed, the Eighth Circuit used badges of fraud to establish the bank's Section 550(b)(1) knowledge in *Sherman*, 67 F.3d at 1357.

**161.** *See also Huffman v. Commerce Sec. Corp. (In re Harbour)*, 845 F.2d 1254, 1258 (4th Cir.1988); *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 636 (2d Cir.1995); *Sherman*, 67 F.3d at 1355–57; *M & L Bus. Mach.*, 84 F.3d

temporal aspect to the analysis. For example, the recognition that some duty of inquiry is imposed upon the transferee inevitably leads to an evaluation of what the transferee did (or, as is often the case, did not do) when one badge of possible fraud was apparent and other badges were discoverable. There is also the corollary question of whether the transferee's failure to satisfactorily pursue such badges should result in a retroactive application of bad faith to when the first badge was obvious or whether the transferee should be charged with bad faith only from the point when the appropriate inquiry ceased.[162]

These additional considerations have led this court to the further conclusion that a transferee cannot successfully assert good faith under either Section 548(c) or Section 550(b) without also establishing that he conducted himself appropriately as various badges of fraud came to his attention. In fact, it is this aspect of the analysis that lies at the heart of Trustee's insistence that Huntington's good faith must be measured objectively. As Trustee herself states:

> [T]his Court must find that Huntington was on inquiry notice of fraudulent activity, and subsequently did not ever conduct a diligent investigation of its suspicions.

Trustee's Post–Tr. Brief, 49 [DN 311].

Trustee's sweep, though, is much too broad, for it undermines the traditional notions of honesty and integrity that have been associated with the recovery of fraudulent transfers since *Coder, Van Iderstine*, and *Dean*. Trustee has, in many ways, tried this matter as if Huntington should be assessed damages for its negligence. However, the subjective nature of good faith allows for conduct that falls short of what prudence or accepted norm might otherwise expect. The test is not, as Trustee would have it, how well Huntington measured up against what others in the community might have done in its stead. Rather, Huntington's conduct is to be tested based upon its own honesty and integrity—i.e., its good faith—as it became aware of more and more indicators of Teleservices' fraud upon its creditors.

*Field v. Mans*[163] is instructive. At issue there was the level of reliance required under subpart (A) of Section 523(a)(2). That subsection excepts from discharge claims arising from the procurement of money through "false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). Although subpart (B), its counterpart, specifically states that the victim's reliance must be reasonable when written misrepresentations regarding the debtor's financial condition are involved, Section 523(a)(2)(A) is silent. The Court, therefore, was called upon to decide whether the reliance on the other types of misrepresentations covered by subpart (A) also had to be reasonable.

at 1337–38; *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 230 B.R. 546, 592 (Bankr. W.D.Tenn.1999) *(rev'd on other grounds*, 277 F.3d 838 (6th Cir.2002)); *Dev. Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 800 (Bankr. S.D.Fla.2000); *Cuthill v. Greenmark, LLC (In re World Vision Entm't., Inc.)*, 275 B.R. 641, 659 (Bankr.M.D.Fla.2002) (quoting *Model Imperial, Cannon*); *Cuthill v. Kime (In re Evergreen Sec., Ltd.)*, 319 B.R. 245, 254 (Bankr.

M.D.Fla.2003); *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 359 B.R. 510, 524 (Bankr.S.D.N.Y.2007); *Feltman v. Michelman & Robinson, LLP (In re Certified HR Servs. Co.)*, 2009 WL 2913244, at *2 (Bankr.S.D.Fla.2009) (citing *Harbour* ).

**162.** *See infra Retroactivity.*

**163.** 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)

The Court determined that justifiable reliance would suffice for purposes of that subsection notwithstanding the stricter standard of reasonableness under subpart (B). As authority, the Court drew upon the common law to explain the difference between reasonable reliance and reliance that is only justifiable. For example, it quoted this passage from the Restatement of Torts.

"Although the plaintiff's reliance on the misrepresentation must be justifiable ... this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."

*Mans*, 516 U.S. at 70–71, 116 S.Ct. at 444 (quoting RESTATEMENT (SECOND) OF TORTS § 545A, comment b (1976)).

The Court also observed that:

Prosser represents common-law authority as rejecting the reasonable person standard here, stating that "the matter seems to turn upon an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case." Prosser, *supra*, § 108, at 717.

*Id.* at 72, 116 S.Ct. at 444 (quoting W. PROSSER, LAW OF TORTS § 108, at 717 (4th ed. 1971)).

Granted, the issue here is good faith, not justifiable reliance, and the fraud here arises under a statute as opposed to the common law. Nevertheless, *Mans* teaches that when actual fraud is involved, parties affected by that fraud are not to be tested by the standards of the community unless Congress otherwise says so, as it did in Section 523(a)(2)(B). The test instead is a subjective one, with the focus being upon the particulars at hand. Therefore, it is only Huntington's own behavior that is under scrutiny, and then only to the extent needed to compare it to much less demanding good faith standards like "integrity, trust, and good conduct." [164]

*Retroactivity*

■■■■ Trustee takes the position that a transfer is avoidable as fraudulent unless the transferee first conducts a diligent investigation to satisfactorily resolve any suspicion that there may be. Moreover, no time limit seems to be placed upon the investigation's duration. It could be a week, a month, or even a year. Such uncertainty may be tolerable when only a single transfer is at issue. However, a problem does arise when the transferee continues to receive transfers during the pending investigation, for it stands to reason that those transfers must also be returned under Trustee's approach should the investigation finally uncover something untoward.

Although such dragnetting may square with the objective model employed in *Bay-*

---

164. *Bayou Group*, 396 B.R. at 847. This is not to say, though, that objectivity plays no part in assessing either the creditor's justifiable reliance or the transferee's good faith. Objective factors can still be relevant even though the outcome is ultimately to be determined subjectively. As the Court also observed in *Mans:*

[O]ur reading of the Act does not leave reasonableness irrelevant, for the greater

the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact. Naifs may recover, at common law and in bankruptcy, but lots of creditors are not at all naive. The subjectiveness of justifiability cuts both ways, and reasonableness goes to the probability of actual reliance.

516 U.S. at 76, 116 S.Ct. at 446.

*ou Group,* it is at odds with the subjective model that this court concludes must be used instead. Consider, for example, a transferee who starts out honestly enough with his investigation but then later falls short. The transferee without question would cease being in good faith at the moment of his lapse. This court, though, sees no reason why the transferee's presumably good behavior up to that point should also be deemed now in bad faith. Accordingly, this court will not relate back any adverse finding concerning either Section 548(c) or Section 550(b)(1) good faith to an earlier date. Rather, any such finding against Huntington will apply only with respect to transfers received thereafter.

*Assessing Huntington's Section 548(c) and Section 550(b)(1) Good Faith*

Trustee's focus at trial was upon what Huntington did not do as more and more "red flags" appeared. Trustee explained through her expert how a responsible bank would have reacted.[165] She then contrasted that with what she contends was Huntington's failure to follow not only the law but also its own policies and procedures.[166] Trustee even went so far as to accuse Huntington of joining in a silent conspiracy with Cyberco so as to mutually profit at others' expense.

However, this is not a lender liability case. Nor is Huntington before this court to account to others for injuries arising from its alleged misconduct or negligence. And Huntington is most certainly not on trial for its supposed disregard of either the regulatory authorities or its own policies and procedures.

To the contrary, Huntington and Trustee are at odds only because Trustee seeks to recover fraudulent transfers from a transferee who happens to object. As for its good faith defense, Huntington relies largely upon the undeserved trust it placed in Watson during the many months the transfers were being made. Watson, Huntington claims, misled it into believing throughout that time that the suspicious transfers were nothing more than the proceeds of receivables collected by Teleser-

---

165. Trustee offered this summary in her post-trial brief:

It is clear that if Huntington had acted consistently with its duties ... it is likely that it would have discovered (and perhaps did discover) the fraud. For instance, the Trustee's expert set forth specific actions required by prudent banking practices: (1) issue default letters; (2) audit the accounts receivable onsite; (3) contact directly the CPA who was supposedly performing the long overdue 2002 FYE financial audit; (4) place random calls directly to Cyberco clients listed on accounts receivable reports using published telephone records; (5) verify Cyberco's story explaining the reason for large overdrafts (i.e., the Cargill and Lockheed Martin checks); (6) require the use of the lockbox exclusively for Cyberco's accounts receivable; (7) independently investigate Teleservices; (8) refuse to increase the credit limit for Cyberco's line of credit; and (9) perform a full background check, of Cyberco, Teleservices and its principals.

Moreover, Huntington should have been regularly reporting red flags to its AML Department and investigating the circumstances surrounding each red flag to verify the absence of illegal activity, not just according to prudent banking practices, but according to its duties under the BSA.

Trustee Post–Tr. Brief, 53–54 (footnote, citations omitted).

Trustee also attached to her brief as a separate exhibit the various duties Huntington owed under its own policies and procedures. They included a duty to terminate the lending relationship if either criminal or fraudulent behavior is reasonably suspected and a duty to take various affirmative steps where money laundering is suspected. *Id.* at Appx. A.

166. One alleged shortcoming was Huntington's supposed failure to comply with the Bank Secrecy Act. Trustee Post–Tr. Brief, 41–54.

vices on Cyberco's behalf. Or, in Huntington's own words:

> Horton and Watson had successfully conned the bank into believing that Teleservices was a cash management affiliate of Cyberco. As a result the transfers from Teleservices no longer seemed suspicious, even to Gail White: "[I]t appeared they were intercompany deposits and we see that sort of thing all the time."

Huntington Post–Tr. Memo., 84.[167]

Consequently, the question of Huntington's good faith boils down to simply this: Did Huntington ever reach the point where it could no longer legitimately cling to its belief that the Teleservices transfers were only Cyberco's collected receivables? If the answer is no, then Huntington will have established its Section 550(b)(1) good faith. But, if the answer is yes, then it is difficult to comprehend how Huntington could have ever accepted any subsequent transfer from Teleservices without also suspecting with good reason that Teleservices was perpetrating a fraud upon its creditors. Again, Huntington had no lending relationship with Teleservices. Consequently, the transfers from Teleservices to pay Cyberco's debt should have been suspicious from the beginning. *Nordic Village*, 915 F.2d at 1056.[168] Moreover, Watson's explanations had always been vague and even contradictory. Therefore, if the point ever came where Huntington could no longer believe even what Watson was telling it about Teleservices, Huntington could not have continued accepting transfers from Teleservices without also being in bad faith.

As just indicated, Huntington should have been harboring at least some doubts about both Cyberco and Teleservices as early as October 2003. After all, its expectation was that all customer remittances would be deposited into a secure lockbox. But, in less than a year, Cyberco had unilaterally altered that arrangement to one where Huntington had absolutely no ability to monitor receivables. Moreover, Cyberco had not even bothered to inform Huntington of the change. Huntington instead learned of it only because an uncollected Teleservices check caused Cyberco to be overdrawn on its accounts yet again. And finally, when Huntington did confront Watson, his explanation that Teleservices was not yet operational didn't square with the fact that Teleservices had been already transferring substantial amounts to Cyberco for nearly three months.

Would another bank have responded differently? Perhaps. However, this court finds nothing dishonest in how Huntington in fact reacted when White discovered the substantial transfers being deposited from Teleservices. Granted, Huntington had no explanation for why Hutchings or someone else in its lending group failed to detect the transfers earlier. However, once Hutchings did become aware of them, she, along with Hekman, her boss, immediately met with Watson and Watson was quick with an explanation. But even then, Huntington was not satisfied. Rather, Hutchings asked for more information not only about Teleservices, but also about many other matters that concerned her. Moreover, she ordered, at Kalb's suggestion, a background check on Watson.

---

167. *See also* Huntington Post–Tr. Memo., 6, 13, 17–18, 23–26, 34, 47, 59–60, 62, 65–66, 70, 79, 88.

168. *See also* 70 C.J.S. *Payment* § 5 (2010) ("Generally, a person may not lawfully use the funds of another to pay his or her individual debts ....") (citing *Newco Land Co. v. Martin*, 358 Mo. 99, 117, 213 S.W.2d 504, 516 (Mo.1948)).

Huntington's response was by no means perfect. For instance, Watson and his cohorts managed to stall Huntington for months before finally responding to Hutchings' and others' inquiries. Nor were the oft promised audited financials ever produced. However, this court cannot find at any time during the interval between October 2003 and the spring of 2004 that Kalb, for example, ever knew of the fraud actually being perpetrated by Teleservices upon its creditors or that Kalb was otherwise turning a blind eye. In short, nothing in Huntington's conduct during this first interval of roughly six months suggests that Huntington's belief regarding the continuing transfers from Teleservices to Cyberco were anything but the honest belief that they represented the collected proceeds of Cyberco receivables.

This court has picked Kalb for assessing Huntington's good faith under Section 548(c) and Section 550(b)(1) because of his seniority, his experience, and his involvement with the Cyberco account from beginning to end. As already indicated, Kalb had both an MBA and a law degree. He had thirty years of banking experience and he was the region's credit officer. Moreover, when senior management in Columbus began expressing its own concerns about Cyberco, Kalb was involved in keeping it informed.[169] Indeed, Hoover, who was the credit officer for all of Huntington,

expected Kalb to have come to him personally had Kalb ever thought there was a problem with the Teleservices payments.[170]

As for his involvement in the loan's administration, Kalb reviewed the lending package at the outset of the relationship and he participated in the discussions leading up to Huntington's request that Cyberco leave. He signed off as well on the two ninety-day extensions then given Cyberco to find a new lender and he was instrumental in getting George, a loan workout specialist, involved during the final months. And finally, it was Kalb who steered White to corporate security and, in particular, Rodriguez, when White did find something that suggested fraud.[171]

Trustee insists that Kalb was not in good faith because he allowed the relationship with Cyberco to continue notwithstanding the reports he was receiving during his regular meetings with White. Trustee, though, places too much weight upon the information that White was providing, for as White herself admitted, she had little more to go on than her own intuition. Indeed, her first hunch—that Cyberco and Teleservices were kiting checks—proved wrong as soon as Teleservices began making the transfers to Cyberco by wire instead. Likewise, she had little support for her theory that Cyberco was inflating its accounts before White

169. Problem loans were placed in what Huntington called its criticized asset report, which was circulated to all senior management. Michael Cross, the head of Huntington's entire asset group, would then hold quarterly meetings to discuss each problem loan. Hoover, Huntington's chief credit officer, attended these meetings as well. Kalb was responsible for updating the attendees of these meetings regarding the progress being made with Cyberco. Kalb at 179, Dec. 14, 2009 [DN 274]. *See also* Hoover Depo., Trustee Ex. 262D at 10, 14–16, 51–52; Cross Depo., Trustee Ex. 263D at 62–64, 68–70; Trustee Exs. 78, 136.

170. Hoover Depo., Trustee Ex. 262D at 51–52.

171. Huntington agrees that Kalb should be considered as a "face" of Huntington for purposes of evaluating its good faith. He, along with White and George, were "central to the day to day administration of the Cyberco account during the repayment of Cyberco's loan in 2004." Huntington Post–Tr. Memo., 59; *see also* White at 237, Nov. 5.2009 [DN 290]; White at 80–81, Nov. 6, 2009 [DN 291]; Kalb at 184–85, 198, 205–06, 215–16, Dec. 14, 2009 [DN 274]; George at 79–81, Dec. 16, 2009 [DN 272]; Trustee Exs. 76, 81, and 117.

received the receivables aging report in March. Up to then, all that she had were her spreadsheets.[172]

It is true that Kalb and others gave scant attention to what White had compiled. Her spreadsheets, though, were hardly remarkable, for they revealed only that the transfers Cyberco was receiving from Teleservices and the payments Cyberco was making to equipment finance companies were both growing as each month progressed. This, of course, seemed suspicious to White. However, White never established through her investigation that Teleservices was in fact defrauding the equipment financing companies. Nor is there any evidence that White communicated even a suspicion of such fraud to Kalb. To the contrary, White's focus was always on Cyberco and the possible overstatement of its receivables.[173]

Perhaps Kalb could have himself put two and two together had he heeded White's suspicions and pursued Cyberco more aggressively. Perhaps, though, is the operative word, for Watson was doing his best to mislead Huntington. Kalb may have had his doubts about him. However, as Kalb confessed to Witherow in early January, his efforts to learn more about Watson, including a background check undertaken only a month before, had come back clean.[174]

It is easy for Trustee to claim in hindsight that Kalb should have acted more decisively; that he and others at Huntington should have called the loan as early as January. Calling the loan, though, had its own risks, not least of which was the possibility of a lawsuit by Watson, a person who had already established himself early on as both smart and contentious. It appears, then, that Kalb and others at Huntington conducted themselves during this time frame just as the court would have expected under such circumstances. Huntington had a difficult customer about whom it had unproven suspicions. Therefore, it is not surprising that Huntington chose the middle ground of ending its relationship with Cyberco but also giving time for Cyberco to find a new lender.[175]

The court is just as satisfied that Kalb also continued to administer the Cyberco credit until the end of July without ever having substantial reason to suspect that the transfers from Teleservices were fraudulent. Granted, evidence continued to mount that something was amiss. For example, there was the news that spring that the FBI was investigating Cyberco and Watson. But there is also no evidence that Huntington ever turned a blind eye during this interval. Kalb, for instance, continued to express concern over the lack of audited financials. He also encouraged White to continue with her investigation. In fact, when White discovered enough to suggest that Cyberco was overstating its receivables, Kalb directed her to contact Rodriguez. He also added a receivables audit to the conditions Cyberco would have

172. White at 218–21, 223–24, 230–34, Nov. 5, 2009 [DN 290]; Trustee Ex. 94.

173. White at 218, 224, 230–36, Nov. 5, 2009 [DN 290]; White at 24–25, 30–33, 53, 55, 75–76, Nov. 6, 2009 [DN 291]; Kalb at 205–06, 267–70, Dec. 14. 2009 [DN 274]; Trustee Exs. 94, 209.

174. Kalb at 184–85, 192, 197, Dec. 14, 2009 [DN 274]; Kalb at 21, Dec. 15, 2009 [DN 271]; Hutchings at 123–24, Dec. 15, 2009 [DN 271]; Trustee Ex. 78.

175. Dunlap at 82, Irwin at 159–62, 231–33, Nov. 4, 2009 [DN 273]; Hekman at 146–47, Nov. 5, 2009 [DN 190]; Kalb at 198, Dec. 14, 2009 [DN 274]; Hutchings at 126, Dec. 15, 2009 [DN 271]; Dunten at 57–61, Dec. 16, 2009 [DN 272]; Trustee Ex. 44; Hunt. Ex. 180 at 00138.

to meet in order to obtain a further extension beyond April.[176]

White herself may have dismissed as "bogus" the written report that Grant Thornton issued in May after its audit.[177] On the other hand, Kalb and others certainly had reason, at least from a subjective point of view, to once again let their guard down. Huntington, at its request, now had in hand a report from a well respected accounting firm that Cyberco's receivables were exactly as Cyberco reported them to be. Consequently, the court finds nothing devious in Huntington's decision at that time to give Cyberco another ninety days to exit the lending relationship on amicable terms.[178]

However, Huntington's mood changed as the new deadline neared that summer. A quiet exit from the relationship was no longer likely. Huntington instead was facing a difficult and expensive recovery from a customer that it now knew was under an active criminal investigation.[179] And, if that was not enough, there was the distinct possibility that Huntington would suffer a substantial loss. An earlier estimate had the bank underwater by as much as $4.6 million.[180] George described the situation as "sticky" and Kalb was telling senior management to "keep your fingers crossed."[181] Huntington, without question, wanted its money back and, as Cross, a senior executive,[182] repeatedly testified, it really didn't matter to Huntington how Cyberco went about doing it.[183]

Moreover, there were now signs that the transfers Huntington continued to receive from Teleservices were not collected receivables as had always been assumed. Cyberco had abruptly begun in June to pay down the indebtedness and, as a consequence, it had managed through yet even more transfers from Teleservices to reduce its obligation by nearly half in less than two months. Indeed, Cyberco was promising by the end of July that the remaining balance of approximately $7 mil-

---

**176.** White at 237, Nov. 5, 2009 [DN 290]; White at 80–81, Nov. 6, 2009 [DN 291]; Kalb at 205–07, 211, 214–15, Dec. 14. 2009 [DN 274]; Hutchings at 136–38, Kalb at 40–42, 51–52, 55–56, 58–63, Dec. 15, 2009 [DN 271]; Trustee Exs. 96, 103, 107, 108, 109, 113.

**177.** White at 242, 244, Nov. 5.2009 [DN 290]; White at 77–78, 112, Nov. 6, 2009 [DN 291].

**178.** Kalb at 43–44, Hutchings at 138, 152, Dec. 15, 2009 [DN 271]; Trustee Ex. 121.

**179.** The FBI had already subpoenaed Huntington's records by the summer of 2004 and it was beginning to interview Huntington's employees.

**180.** Trustee Ex. 107.

**181.** Trustee Exs. 136, 137.

**182.** Again, Cross oversaw all of Huntington's special asset groups, including George's. Cross Depo., Trustee Ex. 263D at 9.

**183.** For example, Horton had advised Huntington in late July that it would soon be repaid in full because, among other things, a $3.5 million check from the Bank of the Philippines was expected. Horton provided this news at the same time he delivered the first of the Teleservices checks payable directly to Huntington. Trustee Ex. 136.

Cross was later cross-examined about his reaction to this news.

Q. Were you holding your breath because you understood that money coming in from the Philippines, pursuant to the bank's own policies, meant that this was an extremely risky transaction?
A. Not at all, sir.
Q. Why is that?
A. I was holding my breath, as a saying, because we were going to be paid off.
Q. And you didn't care from what source?

\* \* \*

A. That's correct.
Cross Depo., Trustee Ex. 263D at 52. *See also* Cross Depo., Trustee Ex. 263D at 30, 91–92, 162–63.

lion would be satisfied within a few more weeks. This turnabout at the very least should have raised questions at Huntington, for Cyberco was supposedly a growing company with attendant cash needs. Therefore, veteran lenders like Kalb and George must have wondered how Cyberco could free up enough funds to repay over $16 million to Huntington yet still manage to finance its extended global business. An obvious answer was that the huge transfers that continued to come from Teleservices were not Cyberco's collected receivables.[184]

George himself acknowledged this inconsistency during his testimony. Kalb had told George back in April when he first became involved that Cyberco was a growing company. In fact, it was this growth, coupled with the absence of any audited financials, that motivated Kalb and George to downgrade the loan to "9" so that George could get formally involved.[185]

George agreed that growing companies typically would not be able to use their receivables to paydown debt because they would need that capital to generate more sales. George, though, testified that Cyberco was an exception. He reached this conclusion based upon a telephone conversation that he himself had had with Watson while negotiating a forbearance agreement. That conversation would have taken place around the time when Huntington formally declared Cyberco in default, which was September 2, 2004.[186] Watson told him that Cyberco could af-

ford to both paydown the bank and grow because it was so profitable. And it wasn't just from existing customers. Watson also said that Cyberco was engaging in "new ventures in other areas." But George also acknowledged that he had nothing beyond Cyberco's own internally generated financials to go on in assessing Watson's claims. Huntington still had not received audited statements for either 2002 or 2003.[187]

Here, though, is the rub. Rodriguez had also told George at about the same time—"late summer . . . I believe August, September"—that Watson was a convicted felon.[188] Therefore, George must have realized during or shortly after his conversation with Watson that Watson's word could not necessarily be relied upon. Yet he shrugged off what he had learned from Rodriguez because he "didn't see any reason to change our approach."[189]

Indeed, there is little to suggest that George or anyone else at Huntington was believing anything Cyberco had to say by the summer of 2004. What Watson claimed was a vibrant company was still without a new lender even after being given six months to find one. Huntington was on the verge of declaring a default. The loan had already been downgraded to a "9." It had also been on the criticized asset list for months.[190] George, the workout officer, was now actively involved and Kalb in turn was expressing his doubts to

184. Trustee Exs. 134, 136.

185. George at 79–81, 192, Dec. 16, 2009 [DN 272].

186. George at 194–96, Dec. 16, 2009 [DN 272]; Trustee Ex. 140.

187. George at 194–97, Dec. 16, 2009 [DN 272].

188. George at 187, Dec. 16, 2009 [DN 272].

189. George at 188, Dec. 16, 2009 [DN 272].

190. Irwin at 159–62, 231–33, Nov. 4, 2009 [DN 273]; Hekman at 146–47, Nov. 5, 2009 [DN 290]; Kalb at 198, Dec. 14, 2009 [DN 274]; Hutchings at 126, Dec. 15, 2009 [DN 271]; George at 75–76, 80–82, 193, Dec. 16, 2009 [DN 272]; Trustee Ex. 140.

senior management in Columbus.[191] There was even speculation whether Huntington would be repaid before indictments were issued.[192]

Huntington itself had at the outset extolled its relationship with Cyberco as a "great fit from a values standpoint." [193] Yet George now had information that Watson, Cyberco's persona, was a con man, and a convicted one at that. George testified at one point that he was willing to give Watson the benefit of the doubt because so much time had passed since Watson's conviction. However, Watson had not been some youthful truant. Rather, Watson had a well documented history of fraudulent behavior that, among other things, had landed him in federal prison for three years.[194]

Therefore, the court does not accept this explanation for George's disregard of what he had learned. The court concludes instead that by the time George became aware of Watson's past he cared about little else other than getting the bank repaid. Like Cross, it really didn't matter where the money came from. It likewise didn't matter whether Watson was telling the truth or not. Indeed, the fact that Watson was now known to be a liar made the situation only more urgent.[195]

In summary, then, this court concludes that Huntington cannot maintain that the transfers, both direct and indirect, that Teleservices continued to make to it during this last interval—i.e., from the end of July through October 2004—were received

---

**191.** Trustee Ex. 136; Hoover Depo., Trustee Ex. 262D at 14–16; Cross Depo., Trustee Ex. 263D at 61–64, 68–70.

**192.** Trustee Ex. 108. In particular, Rodriguez advised Harp, his boss, that he believed it unlikely that indictments would issue before the then expected paydown date of August 1. There is no indication that Rodriguez actually had any inside information as to how the FBI investigation was progressing. Nonetheless, it is fair to infer that Rodriguez and Harp both expected indictments to issue, given that both knew at the time that Watson had a previous conviction for fraud. Rodriguez at 158–59, Dec. 14, 2009 [DN 274].

**193.** Huntington's 2002 Shareholder Report, Trustee Ex. 30. The report then went on to say that:

A recent CyberNET publication touches on the company's perspective on partnerships: "Real partners recognize the long-term value that is created and the shared philosophy and ethics that establish the foundation of the partnership. (Partners) forge a relationship built around the mutual trust and shared purpose that can only be achieved between strategic partners—and friends." "We want clients who share our values . . . and CyberNET is saying it right up front."

**194.** George at 100–01, 187–88, Dec. 16, 2009 [DN 272]; Trustee Exs. 220, 228B.

**195.** In fairness to George, it was actually Huntington's attorneys who characterized George as simply letting bygones be bygones.

In late summer of 2004, George also learned that Watson had a felony conviction from the 1980s. George explained that this did not cause him to close Cyberco's accounts because "this was something that had happened a long time in the past," and therefore "I did not see that it was influencing anything we were doing at present time."

Huntington Post–Tr. Memo., 22 n.8 (citation omitted).

But George supplemented his testimony later on.

I believe it [i.e., Watson's conviction] was several years prior, but, that, we didn't react to anything special with that because the program we were on to get the loan reduced, the loan was coming down. We were having cooperation. We didn't see any reason to change our approach.

George at 188, Dec. 16, 2009 [DN 272].

In other words, George hadn't discounted Watson's past. It just didn't make a difference. Huntington was getting its money back, which by then was all that really mattered. *See also* George at 100–01, Dec. 16, 2009.

in good faith. Or, to put it differently, Huntington cannot claim during this interval that the huge sums that were coming from Teleservices were nothing more than receivables being collected by Teleservices on Cyberco's behalf. This court believes Huntington when it says that it never actually knew of the massive fraud that Teleservices was perpetrating upon its creditors as a consequence of these transfers. However, this court is also well satisfied that Huntington by this point in time was turning a blind eye to information which, if pursued, would have quickly led it to that conclusion.

As Trustee points out, there was enough in Huntington's own records for it to have uncovered Watson's scam even in October 2003. Ironically, Huntington, through its leasing division in Cincinnati, had in 2002 acquired by assignment some of the sham equipment leases Cyberco had entered into. Those leases included documents identifying Teleservices as the seller of that equipment. Moreover, Kelly Hutchings, the Huntington loan officer assigned directly to the Cyberco account, was aware of these leases when she was conducting her own due diligence in 2002.

Hutchings could not recall whether she ever reviewed the leasing division's file or whether she otherwise ever became aware of Teleservices' involvement in those transactions.[196] However, it really didn't matter, because Hutchings had even before then come across the name when Watson himself identified Teleservices as a Cyberco vendor who Hutchings could contact for a reference. Hutchings' notes, which are included in the credit file, also indicate that she had a short telephone conversation with a Dan Roland at Teleservices and that Roland had spoken favorably about Cyberco as a customer.[197]

Huntington's credit file also reveals that Hutchings had overseen a release of a lien to Key Corporate Capital, another equipment lessor, in December 2002 and that Hutchings' letter to Key Capital identified Teleservices as the vendor of that equipment.[198] And finally, the credit file includes a May 2003 memo that Hutchings wrote. That memo identified a Teleservices' invoice as one of several equipment purchases that Huntington had agreed to add to its own term loan with Cyberco.[199]

Obviously, Teleservices could not be Cyberco's newly organized finance arm, which was what Watson was telling Hutchings and others at the October 2003 meeting, and also be an independent supplier of computer equipment. Coincidence was also ruled out because the two different Teleservices shared the same Park Avenue address in New York. Consequently, it would not have taken much after Huntington's meeting with Watson to figure out that (1) Teleservices, the "finance arm," and Teleservices, the "vendor," were one in the same; and (2) the equipment that

---

196. Irwin at 207–09, Nov. 4, 2009 [DN 273]; Hekman at 117, Nov. 5, 2009 [DN 290]; White at 29–30, Nov. 6, 2009 [DN 291]; Rodriguez at 72, Dec. 14, 2009 [DN 274]; George at 138, 172–73, Dec. 16, 2009 [DN 272]; Hutchings at 183, Dec. 15, 2009 [DN 271]; Trustee Exs. 19, 94.

197. Hutchings at 92–94, 180–82, 184, Dec. 15, 2009 [DN 271]; Trustee Ex. 207. What Hutchings did not know was that "Dan Roland" was in all likelihood Watson. Watson frequently pretended to be Roland as part of

the ruse. Horton at 96, Jan. 4, 2010 [DN 295].

198. Hutchings at 162–165, 182, 191, Dc. 15, 2009 [DN 271]; Trustee Ex. 29.

199. Irwin at 205–07, Nov. 4, 2009 [DN 273]; Hekman at 105, Nov. 5, 2009 [DN 290]; Hutchings at 111–13, 165–66, 172–77, 180, 182, 183, 188–190, 191, 194, 240, Dec. 15, 2009 [DN 271]; Trustee Ex. 52.

Cyberco was supposedly purchasing from Teleservices through financing furnished by Huntington and others did not exist.

Discovering this contradiction, though, depended upon either Hutchings recalling her previous encounters with Teleservices or someone else, most likely White or Rodriguez, reviewing the credit files in detail and finding the inconsistency in that manner. If, as *Bayou Group* and other courts have ruled, Huntington's good faith is to be decided objectively, then it would be worth considering further whether a more prudent lender would have conducted an immediate and thorough review of the credit files. Indeed, given the predilection of many courts to charge organizations with perfect knowledge of all their archived information,[200] it is fair to ask whether even this step would be necessary before finding Huntington in bad faith.

However, for the reasons already given, this court has determined that a subjective test is to be applied instead. Hutchings undoubtedly regrets not having recalled the prior references to Teleservices when White began making her inquiries. It is also possible that a more experienced investigator than White would have discovered the discrepancy in the files.[201] Or, as Trustee insists, the fraud might have been revealed even without a review of the files had only someone at Huntington called Cyberco's accountant to ask why it was

taking so long for the audited statements to be issued.

None of this, though, offsets what this court is satisfied was an honest attempt by Kalb and others at Huntington to learn more about Cyberco's relationship with Teleservices and to otherwise address a credit that was becoming more and more difficult to properly manage. After all, Hutchings almost immediately requested Cyberco to address a variety of issues, including lingering questions concerning Teleservices.[202] White, in turn, began her investigation and Kalb asked for a background check on Watson. Huntington even came to the conclusion that it was best for Cyberco to find a new lender despite the fact that Cyberco was not in default and "the people and the company always checked out." [203] And finally, when White approached Kalb with credible evidence that Cyberco might be misrepresenting its receivables, Kalb responded by demanding an audit and by directing White to meet with Rodriguez.[204]

Indeed, were it not for Rodriguez's own shortcomings, this court would conclude that Huntington had met its burden concerning good faith until the summer of 2004 when its desire to be repaid at all costs clearly got the better of it. But Rodriguez had earlier decided not to tell Kalb about Watson's well documented history of defrauding people. And the unfor-

---

**200.** *Nordic Village,* 915 F.2d at 1056; *Gold v. Deloitte Touche LLP (In re NM Holdings Co. LLC),* 622 F.3d 613, 620 (6th Cir.2010); *Upjohn Co. v. N.H. Ins. Co.,* 438 Mich. 197, 212–16, 476 N.W.2d 392, 400–02 (1991).

**201.** White actually managed operations and personnel in Huntington's West Michigan treasury services department. Unlike Rodriguez, she had no training as an investigator. Nor did she have Rodriguez's twenty-six years of experience in law enforcement. Rodriguez at 8, Dec. 14, 2009 [DN 274].

**202.** Trustee Ex. 72.

**203.** Trustee Ex. 78. White at 217, Nov. 5, 2009 [DN 290]; Kalb at 192, 195–96, 197, Dec. 14, 2009 [DN 274]; Hutchings at 123–24, Dec. 15, 2009 [DN 271].

**204.** White at 234–36, 237, Nov. 5, 2009 [DN 290]; White at 75–76, 80–81, Nov. 6, 2009 [DN 291]; Kalb at 205–07, Dec. 14, 2009 [DN 274]; Kalb at 40–42, Hutchings at 136–38, Dec. 15, 2009 [DN 271]; Trustee Exs. 96, 103.

tunate consequence of that fateful decision is that this court cannot find after April 30, 2004—the date Rodriguez made his discovery[205]—that Huntington continued in good faith to believe Watson's story about Teleservices' and Cyberco's receivables. Or, to put it differently, the defenses afforded by Sections 548(c) and 550(b)(1) are not available to Huntington beyond this point because Huntington simply has not met its burden.

It is incredible that Rodriguez withheld from Kalb what he had learned about Watson.[206] The court cannot emphasize enough how pivotal this one bit of information could have been. Remember, Kalb had only months before ordered a background check on Watson and that report had come back clean—that is, there was no indication that Watson had a criminal record or that judgments had entered against him for fraud. Therefore, while George may have later on been comfortable with the idea that Watson had reformed, this court is certain that Kalb never would have thought this.

Hell's furies are no less surpassed by a banker deceived than a woman scorned and Kalb clearly had been deceived. Kalb was already suspicious when he first requested the background check. Kalb would not, then, have explained away Watson's past as had Rodriguez and George. It is much more likely that he would have been livid, for Watson had actually conned him. As George himself testified, a bank will go along with a customer's explanations so long as they are plausible. However, once a bank becomes aware that its customer is misleading it, an entirely different approach is required.[207] Indeed, according to Dunlap,[208] the proper approach when fraud is suspected is to immediately terminate the relationship even if it means suffering a loss.[209]

Huntington has maintained throughout that Watson was an accomplished liar who took advantage of Huntington's trust along with the trust of so many others. Who could disagree? Watson was a superb liar. It is understandable, then, that Huntington was willing to give Watson the benefit of the doubt as he spun his stories about audited financial statements long overdue and far flung global operations with complicated inter-company financing. It is equally understandable that Huntington continued with this trusting approach even when the relationship began to sour and Cyberco was asked to leave.

Huntington's innocence, though, would have ended the instant it learned that Watson could not be trusted. All of his tales, including the one that Teleservices was merely the collector of Cyberco's receivables, would have immediately become suspect. As for Kalb, he would have had no choice but to respond vigorously. And that response might have included a more thorough review of the credit file or even the call to the accountant that had not yet

205. Rodriguez at 29–31, Dec. 14, 2009 [DN 274].

206. "Withheld" accurately describes Rodriguez's conduct, for Rodriguez did not just forget. Again, he understood the significance of what he had uncovered since he shared it immediately with the FBI. Nor can Rodriguez say that he never had the opportunity to tell Kalb. Kalb actually asked Rodriguez for more information after learning elsewhere that the FBI was involved. Rodriguez never adequately explained why he decided to keep Kalb in the dark. See infra n. 217. Nonetheless, keeping Kalb uninformed was clearly a choice that Rodriguez made.

207. George at 84–85, Dec. 16, 2009 [DN 272].

208. Jim Dunlap, Huntington's president for its West Michigan region.

209. Dunlap at 95–96, Nov. 4, 2009 [DN 273].

been made. In any event, the likelihood of Huntington discovering the fraud would have increased exponentially. As Dunlap agreed, Huntington would have been "all over it" if fraud was suspected.[210]

Of course, the court cannot say with absolute certainty that Huntington would have ever uncovered the truth. There is still the possibility that Kalb could have in good faith remained ignorant of Teleservices' fraud even after he had learned about Watson's past. But that is the point. No one will ever know for sure.

As already discussed, good faith, whether asserted under Sections 548(c) or 550(b)(1), is an affirmative defense. It is Huntington, then, that must prove its good faith, not the reverse. Unfortunately for Huntington, Rodriguez's lapse in judgment prevents it from meeting its burden. This court will not guess what Huntington might have done, especially when the circumstances so strongly suggest an outcome that would not in fact favor Huntington. Nor should Huntington complain that it is being held responsible for Rodriguez's decision. After all, it was Huntington that assigned Rodriguez the task of investigating Cyberco on its behalf. Consequently, Huntington must also bear the consequences of how Rodriguez performed his assignment.

In reaching this conclusion, the court is mindful of the general rule concerning the attribution of an employee's knowledge to the corporation itself. For example, it has been said in Michigan that:

When a person representing a corporation is doing a thing which is in connection with and pertinent to that part of the corporation business which he is employed, or authorized or selected to do, then that which is learned or done by that person pursuant thereto is in the knowledge of the corporation. The knowledge possessed by a corporation about a particular thing is the sum total of all the knowledge which its officers and agents, who are authorized and charged with the doing of the particular thing acquire, while acting under and within the scope of their authority.

*Upjohn Co. v. N.H. Ins. Co.*, 438 Mich. 197, 215, 476 N.W.2d 392, 401 (1991) (quoting *Copeman Labs. Co. v. Gen. Motors Corp.*, 36 F.Supp. 755, 762 (E.D.Mich. 1941)). *See also Gold v. Deloitte & Touche LLP (In re NM Holdings Co.)*, 622 F.3d 613, 620 (6th Cir.2010) (citing *Upjohn*).

As broad as this rule may seem, it must have its limits, for knowledge frequently requires more than simple awareness. Take, for instance, a situation where knowledge of $C$ is crucial but where that knowledge can arise only if $A$ and $B$ are known first (i.e., $A + B = C$). Attributing knowledge of $C$ to a corporation is easy, if, say, the corporation's president is aware of both $A$ and $B$ and that together they add up to $C$. However, it is not so apparent when an employee in New Delhi knows $A$, another employee in London knows $B$, and the only person who is able

---

**210.** Dunlap at 95–96, 104, Nov. 4, 2009 [DN 273]. It happened that Dunlap was another of Rodriguez's contacts on the Cyberco file and that Rodriguez had also withheld from Dunlap Watson's fraudulent past. While Dunlap never gave any details as to what "all over it" meant, it is fair to say that getting proof from Rodriguez that Watson "was not a trustworthy person" would have given substance to whatever suspicions Dunlap already had about Cyberco. It is hard, then, to imagine that Dunlap would not have wanted assurances from Rodriguez that he would also make Kalb, the team's risk officer, aware of Watson's past. After all, Dunlap himself had specifically asked Kalb to keep him informed about criminal activity of Cyberco. Dunlap at 123, Nov. 4, 2009 [DN 273]. *Cf.* Rodriguez at 30, 128, Dec. 14, 2009 [DN 274].

to put $A$ and $B$ together is in New York without a clue.

■■■■ With this said, though, the court does not subscribe to Huntington's contention that a corporation can be charged with knowledge only if the responsible decision-maker is actually aware of all of the facts required to come to the pertinent conclusion. Consider again the last example. If the New York, New Delhi, and London employees were all part of the same team, the corporation should be charged with knowledge of $C$ if the three employees' responsibilities included the sharing of $A$ and $B$ and either New Delhi or London had failed to pass on this crucial information to New York. Put simply, large corporate entities cannot function unless tasks are broken down and delegated among its various representatives. Therefore, while it may not be fair to charge a corporation with perfect knowledge of everything known by its constituent parts, a corporation cannot feign ignorance either when it has delegated responsibilities to a group of indi-

viduals and an inexcusable breakdown of communication then occurs within the group.

It is in this light, then, that Rodriguez's failure to inform Kalb of Watson's fraudulent past must be judged. Dunlap, the president of Huntington's West Michigan region, referred to the executives within his group as a team,[211] and both Kalb and Rodriguez were clearly members of the Cyberco team.[212] Moreover, each team member had his role. Kalb's job was to address risk;[213] Rodriguez's was to investigate and inform.[214] In fact, Kalb was specifically identified by Rodriguez as one of his contacts in connection with his investigation.[215]

Therefore, Rodriguez's decision not to share his discovery cannot be excused. Not only was it contrary to his own responsibilities within the team; it also deprived Kalb of information that he needed to fulfill his team responsibilities. Again, as George pointed out, banks react differ-

---

**211.** Dunlap at 106–07, Nov. 4, 2009 [DN 273]. It is also clear that Dunlap relied upon his team to operate without his direct supervision. For example, when Dunlap was asked how he could be sure that a large credit like Cyberco was being properly administered, he not only referred to his team but also expressed his confidence in them. "That's what they've always done; that's what they do." *Id.*

**212.** Dunlap at 72–74, Nov. 4, 2009 [DN 273]. According to Dunlap, Rodriguez was not a formal member of the commercial lending team. For instance, he did not regularly attend that team's weekly meetings. Nonetheless, Rodriguez became a team member whenever a credit required his particular skills and Cyberco was one of those credits. As for Rodriguez's responsibilities regarding the Cyberco investigation, Dunlap's expectations were the same as they were for any investigation assigned to Rodriguez—to "notify and include and involve the executives that he thought would be appropriate to be com-

municated with about any information he had on any relationship with the company." Dunlap at 145, Nov. 4, 2009 [DN 273]. *See also* Dunlap at 72, 74, 88, Nov. 4, 2009[273].

**213.** Dunlap described Kalb as his "chief risk officer." Kalb oversaw all credit relationships and risk management within the region. Kalb would also regularly attend meetings involving both business development and portfolio management. Moreover, Dunlap himself had specifically asked Kalb to keep him informed regarding any criminal activity at Cyberco. Dunlap at 72–74, 115, 123, Nov. 4, 2009 [DN 273].

**214.** "The handling of the account would not be something that I would have authority for. The investigation, that would be in my hands.... I mean that's a basic understanding that I would pass information on." Rodriguez at 125, 172, Dec. 14, 2009 [DN 274].

**215.** Rodriguez at 156, Dec. 14, 2009 [DN 274].

ently when they are not being told the truth. Moreover, Rodriguez had uncovered in connection with, of all things, **a fraud investigation,**[216] that Cyberco's chief executive officer had been convicted of fraud. How, then, could Rodriguez have come to the conclusion that it was okay to keep this information from the rest of the team?[217] Indeed, Huntington's argument that discovering Teleservices' fraud upon its creditors would have been futile because "Watson and Horton were accomplished fraudsters" intent upon deceiving it[218] holds up only so long as Huntington remained ignorant of Watson's status as an accomplished fraudster. Had Rodriguez only done his duty—that is, had Rodriguez shared his discovery about Watson with Kalb as he had with the FBI and Harp—Kalb would have recognized Watson for the liar he was and reacted accordingly.

Huntington states that its good faith should not be assessed "based upon the amalgamated knowledge of a Huntington 'super-agent' that never existed."[219] Huntington demands instead that

it should be judged on the merits of what the employees on the ground knew

and whether they did their jobs in good faith based on that knowledge.[220]

The court could not agree more. The court also concurs with Huntington's selection of Kalb as representative of its good faith.[221] Kalb was without question "central to the day to day administration of the Cyberco account . . . in 2004."[222] However, Huntington cannot hold up Kalb as the measure of its good faith yet not accept responsibility for Rodriguez withholding from Kalb information that would have truly put Kalb to the test.

As for Rodriguez, the court makes no determination whether he acted in good faith or not because Rodriguez's good faith is irrelevant. Again, Huntington is adamant that it not be judged by the amalgamated knowledge of its employees. But Huntington is also precluded from using its workforce as an excuse. Indeed, Kalb's good faith is relevant only because his crucial role in making decisions about the Cyberco loan symbolizes Huntington's own good faith. Rodriguez, on the other hand, had a much different role. His job was to investigate and to inform. Indeed, it is because Rodriguez chose to replace Kalb

---

**216.** Rodriguez himself had decided that Cyberco was to be a fraud investigation after his April 15 interview with White. He discovered the court records about two weeks later. Rodriguez at 69–70, 163, Dec. 14, 2009 [DN 274].

**217.** Rodriguez offered two explanations. First, Rodriguez had decided that he didn't need to pass on this information so long as the account was being paid down. Rodriguez's responsibility, though, was not to monitor the account. His job was to inform others on the team of whatever he had uncovered. Rodriguez at 31, 172, Dec. 14, 2009 [DN 274].

The other explanation was that Rodriguez's investigations often included sensitive information. Therefore, disclosure was to be made on only a need to know basis. Indeed, Dunlap acknowledged that Rodriguez had the discretion to determine the persons with

whom sensitive information was to be shared. But Rodriguez had specifically identified Kalb as one of those persons involved in the Cyberco credit who was to be kept informed. Rodriguez at 12, 29, 128, 156; Dunlap at 88, 145, Nov. 4, 2009 [DN 273]. Ironically, Dunlap was another of Rodriguez's contacts on the file and Rodriguez chose to keep Dunlap uninformed about Watson's criminal past as well.

**218.** Huntington Post–Tr. Memo., 78.

**219.** *Id.* at 3.

**220.** Huntington Post–Tr. Memo., 60.

**221.** *Id.* at 59.

**222.** Huntington Post–Tr. Memo., 59.

as the decision-maker—i.e., to decide for himself whether Watson's past was important to the loan's administration—that has eliminated any chance for Huntington to establish its good faith from May 1 on.

In summary, this court concludes that Huntington did not accept in good faith any of the $7,395,283.04 in checks it received directly from Teleservices because, by the summer of 2004, Huntington had turned a blind eye to the mounting evidence that the transfers from Teleservices were not the collected Cyberco receivables as it had been led to believe. The same holds true with respect to all indirect transfers Huntington received during this same interval—i.e., from July 30, 2004 to November 16, 2004. The amount of these indirect transfers totals another $25,524,051.68.[223]

The court further concludes that Huntington has not met its burden under Section 550(b)(1) as to its good faith receipt of any transfers it received from Teleservices after April 30, 2004, that being the date Rodriguez discovered Watson's past.[224] This adds another $17,811,998.82, for a total of $50,731,333.54.[225] However, the court concludes that Huntington's receipt of any transfer from Teleservices before April 30, 2004 was in good faith under Section 550(b)(1) because Huntington has met its burden through Kalb and others that it was at the very least making an honest effort during this period to address its growing suspicions about both Teleservices and Cyberco.

*Huntington's Section 550(b)(1) Knowledge*

Whether Huntington had "knowledge of the avoidability of the transfer avoided" under Section 550(b)(1) is irrelevant with respect to the nine checks Huntington received from Teleservices during Cyberco's waning months. Huntington's defense to the recovery of those direct transfers is limited to Section 548(c) and that section looks to only the exchange of value and the transferee's good faith. Consideration of Section 550(b)(1) "knowledge" is likewise unnecessary in determining whether Huntington must return the amounts it received indirectly from Teleservices through Cyberco to the extent they were received after Rodriguez became aware of Watson's past. As just discussed, Huntington has not established its good faith vis-a-vis the receipt of these transfers, which is also a necessary element of the Section 550(b)(1) defense.[226]

However, as also just discussed, Rodriguez did not make his discovery until April 30, 2004 and Trustee wishes to reach much

223. *See* Trustee Brief, May 26, 2010, Ex. A. However, Huntington reserves all remaining arguments regarding Trustee's actual recovery of this amount.

224. Although this court has found Huntington to have turned a blind eye with respect to the $32,919,334.72 of transfers received in the summer and fall of 2004, this court would still hold Huntington accountable for these transfers even if it had not. If Rodriguez's failure to disclose to Kalb Watson's past precludes a good faith finding during the interval leading up to Huntington's final push to recover from Cyberco (i.e., May 1 to July 30), it precludes a finding during this latter interval as well (i.e., August 1 to November 16).

225. The amount of the indirect transfers between May 1, 2004 and July 29, 2004 was $17,811,988.82 and the amount of indirect transfers between July 30, 2004 and November 16, 2004 was $25,524,051.68, for a total amount of indirect transfers from May 1, 2004 to November 16, 2004 of $43,336,050.50. This amount, when added to the $7,395,283.04 in Teleservices' checks, equals the $50,731,333.54 in total transfers made during the two intervals combined. *See* Trustee Brief, May 26, 2010, Ex. A. However, Huntington reserves all remaining arguments regarding Trustee's actual recovery of those amounts.

226. *See also supra* n. 224.

further back with respect to the indirect transfers Huntington was receiving. Therefore, Huntington's Section 550(b)(1) "knowledge" does come into play regarding these transfers since Huntington has established both value and its good faith for this earlier interval.[227] At issue is another $22,304,096.03.[228]

Were it left to this court, it would conclude that Huntington has established this third element as well. Courts have struggled to establish what constitutes "without knowledge," with some courts going even so far as to conclude that the Section 550(b)(1) "good faith" and "knowledge" requirements are redundant.[229] Of course, the law abhors redundancy as much as nature abhors a vacuum. Legislators are expected to choose words carefully when crafting the laws. Therefore, courts presume that every word in a statute is to

---

**227.** That is, the interval from October 3, 2003 to April 30, 2004.

**228.** Trustee's pending motion for summary judgment identifies as recoverable transfers $73,035,429.57. Trustee Brief, May 26, 2010, Ex. A. Of this amount, $22,304,096.03 is attributed to transfers that occurred on or before April 30, 2004. *Id.*

**229.** *Genova v. Gottlieb (In re Orange Co. Sanitation, Inc.),* 221 B.R. 323, 328 (Bankr. S.D.N.Y.) ("There is no meaningful distinction between the two remaining requirements of § 550(b), 'good faith' and 'without knowledge of the voidability of the transfer.' ") (citation omitted); *Holt v. FDIC (In re Instrument Sales & Serv., Inc.),* 99 B.R. 742, 745 (Bankr. W.D.Tex.1987) ("The requirement of § 550 that a transferee take "without knowledge of the voidability of the transfer" would appear to be redundant, as it adds nothing to the requirement that the transferee take in good faith.").

It is worth noting, though, that the redundancy arises only when an actually fraudulent transfer is involved. By way of comparison, consider a subsequent recipient of an avoided postpetition transfer. In that instance, the "without knowledge" element would focus upon whether the transferee was aware or not of the debtor's bankruptcy at the time of the transfer. In contrast, the "good faith" element would focus on whether the postpetition transfer also included an element of fraud and, if so, whether the subsequent transferee was aware of it. Similarly, a subsequent transferee's knowledge of the avoidability of a preference received would logically turn upon his awareness or not of all the elements associated with a preferential transfer whereas the good faith element would continue to focus upon whether the initial transfer also involved fraud, and, if so, was the recipient aware of it. Remember, preferences, and for that matter, unauthorized postpetition transfers and constructively fraudulent transfers, can all be actually fraudulent transfers as well. *Cf. Dean,* 242 U.S. at 444, 37 S.Ct. at 132.

However, when the initial transfer has been avoided because of the debtor's actual fraud, the "good faith" and the "without knowledge" elements of the subsequent transferee's Section 550(b)(1) defense necessarily turn on the same factors—the recipient's honesty and integrity vis-a-vis the fraud giving rise to the transfer. Therefore, the redundancy is inevitable. But it is also understandable given both (1) the one-size-fits-all nature of the Section 550(b)(1) defense; and (2) the drafters' apparent intent to make good faith and without knowledge somewhat redundant. *See infra.*

Indeed, one detects in Section 550(b)(1)'s distinction between "good faith" and "without knowledge" the same *malum per se/malum prohibitum* dichotomy identified much earlier in *Coder, Van Iderstine,* and *Dean.* In other words, no moral issue is raised by the transferee's knowledge that a transfer is avoidable any more than is a moral issue raised by whether the transferee gave value or not. These are merely factors chosen by Congress to determine when the transferee will be excused from returning what would otherwise contribute to a more equitable distribution among creditors. But if actual fraud were involved and the subsequent transferee were aware of it, value and ignorance of avoidability become irrelevant because the transfer is now *malum per se* and the recipient is in bad faith. Put simply, the Code is no more protective of a transferee, whether initial, immediate, or mediate, who takes in bad faith than was the former Act. A bad faith transferee under all circumstances must return the prop-

have meaning.[230]

But in the case of Section 550(b)(1), it appears that Congress actually intended to be redundant, at least in a sense. The Congressional record itself does not explain why this third requirement was included.[231] Nor was there any comparable provision under the former Act. Rather, the knowledge requirement simply appeared as part of the replacement legislation recommended by the Commission in its 1973 report to Congress.[232] The requirement then survived the many revisions that the Commission's recommendations underwent during the five years leading to the Bankruptcy Code's enactment in 1978.

The Commission chose language that is almost identical to what is currently Section 550(b)(1).

*(b) Liability of Subsequent Transferees.*

(1) The trustee may not recover property referred to in subdivision (a) from a subsequent transferee of the initial transferee who purchases for value in good faith without knowledge of the voidability of the initial transfer, or from a transferee of such a transferee.

Rep. of Comm'n on the Bankr.Laws of the U.S., H.R. Doc. No. 93–137, 93d Cong., 1st Sess., pt II, § 4–609 (1973) (hereinafter "Commission Rep.").[233]

The Commission also offered this explanation in the accompanying notes.

4. *Subdivision (b)* states the liability, if any, of subsequent transferees. If the subsequent transferee gives value in good faith, regardless of the amount or whether present or past consideration,

---

erty received (or its value) and also forfeit whatever was paid in exchange.

**230.** *See, e.g., Kawaauhau v. Geiger,* 523 U.S. 57, 62, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998) (" '[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.' ") (quoting *Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 837, 108 S.Ct. 2182, 2189, 100 L.Ed.2d 836 (1988)); *U.S. v. Nordic Village, Inc.,* 503 U.S. 30, 35–36, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992) ("[A] statute must, if possible, be construed in such fashion that every word has some operative effect.").

**231.** However, the legislative history does offer this puzzling example of what Section 550(b) good faith was intended to address:

The phrase "good faith" in this paragraph is intended to prevent a transferee from whom the trustee could recover from transferring the recoverable property to an innocent transferee, and receiving a retransfer from him, that is, "washing" the transaction through an innocent third party. In order for the transferee to be excepted from liability under this paragraph, he himself must be a good faith transferee.

H.R.Rep. No. 95–595, at 376 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6332; S.Rep. No.

95–989, at 90 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5876.

The problem with the example is that it is difficult to create a scenario where such a wash might occur without the launderer not already being liable as the initial transferee or as a subsequent transferee who took with knowledge of the transfer's avoidability.

**232.** In 1970, Congress created a commission to study the existing bankruptcy laws and to recommend changes. The Commission then issued its report in 1973. The report not only included the recommendation that the existing Bankruptcy Act be scrapped. It also included a proposed substitute, which the Commission optimistically entitled "The Bankruptcy Act of 1973." App. Pt. 4(c) *Collier on Bankruptcy* 4–219 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2009).

**233.** Although Congress ultimately chose different language, Section 550(b) incorporates the same concepts. The principal difference is that Section 550(b) divides subsequent transferees into two subgroups and then eliminates both the value and without knowledge requirements for the second group—i.e., those transferees who themselves took from a subsequent transferee who meets the Section 550(b)(1) requirements.

he is protected. Good faith is a familiar phrase, *e.g.*, § 67d(1)(e)(1), and no attempt has been made to define the term. It was felt best to leave this to the courts on a case-by-case construction. **However, good faith clearly would not be present if the transferee knew facts that would lead a reasonable person to believe that the property was recoverable.** The effect of subdivision (b) is probably the same as that of § 67a(3) as to purchasers at judicial sales and of § 70d(5) as to "purchasers" of currency or negotiable instruments. The protection is extended, however, to all subsequent transferees to avoid litigation and unfairness to innocent purchasers. See 1 G. Glenn, *Fraudulent Conveyances and Voidable Preferences* § 259a, at 444–45 (Rev. ed. 1940).

*Id.* at n. 4 (emphasis added).

Knowledge of the transfer's avoidability, then, was never intended to be an independent requirement; rather, its purpose was to simply illustrate what is meant by the much broader concept of good faith. Nor is the attempt to further define Section 550(b)(1) good faith in this fashion that unusual. There are many examples throughout the Code of Congress giving definition to an intentionally vague concept by means of example. For instance, Section 1112(b)(4) lists a number of events that would constitute "cause" for either converting or dismissing a Chapter 11 case. Nonetheless, what exactly is meant by that term is left undefined by Section 102(3)'s declaration that the "includes" that precedes the listing of these various events is "not limiting." Therefore, a court is still left with the discretion to determine under the particular circumstances presented whether some other cause not listed might also warrant the case's conversion or dismissal.[234]

Indeed, treating knowledge of the transfer's avoidability as a *per se* example of good faith is just another manifestation of the *malum per se/malum prohibitum* dichotomy that has always been part of avoidance powers under the bankruptcy laws. In other words, Section 550(b) preserves the general notion that a subsequent transferee is no more protected from recovery than an initial transferee if fraud is involved and the transferee has behaved inappropriately. Innocent is the word that appears in the Commission's notes. Honesty and integrity, though, could have just as easily been substituted.[235]

However, a trustee's avoidance powers under the Code are not confined to actually fraudulent transfers. A trustee may also avoid transfers that are merely *malum prohibitum*—i.e., preferences, unau-

---

**234.** The Code is equally vague but descriptive about what might constitute an administrative expense. *See* 11 U.S.C. § 503(b) ("[T]here shall be allowed administrative expenses ... including...").

**235.** The Commission report also sheds some light upon the otherwise inscrutable "washing" reference in the legislative history. Again, this passage is problematic because of the difficulty in conceiving how a transferee could wash an avoidable transfer without already being accountable under either Section 550(a)(1) or under the "without knowledge" element of Section 550(b)(1).

The court suggests that this reference to washing serves the same purpose as the Commission's adding of "without knowledge" to Section 550(b)(1) in the first place—i.e., to offer an example of when the subsequent transferee would be without doubt in bad faith. Neither the legislative history nor the Commission's comment should be construed as a restriction upon the otherwise flexible concept of good faith. Good faith, by necessity, must remain somewhat vague so that a court is able to assess a party's honesty and integrity in the many different ways the issue may arise.

thorized postpetition transfers, and constructively fraudulent transfers. What Section 550(b)(1)'s knowledge requirement ensures is that recipients of only *malum prohibitum* transfers must also return whatever they received if they were aware of the transfer's avoidability under one of these other powers. For example, a subsequent transferee of a preference enjoys a protection that the initial transferee of that same preference does not—he can keep it so long as he was ignorant of the preference being made. On the other hand, the subsequent transferee cannot keep it if he actually knew that the initial transfer was preferential. And the same is true for the subsequent transferee of an unauthorized postpetition transfer or constructively fraudulent transfer. In fact, the good faith and knowledge requirements of Section 550(b)(1) overlap only when actual fraud—i.e., *malum per se*—is involved and it arises only then because the drafters wanted to be equally sure that the recipient of, say, a preferential transfer who was ignorant of the preference would still have to return the transfer if he was otherwise aware of fraud on the debtor's part.[236]

However, recognizing that Section 550(b)(1) good faith and knowledge are related in this fashion leads inevitably to the further conclusion that the requisite knowledge under this subsection cannot include within it a duty to inquire. This should be evident simply from the common meaning of knowledge. As the Seventh Circuit said in *Bonded Financial:*

Imputed knowledge is an old idea, employed even in the criminal law. Venerable authority has it that the recipient of a voidable transfer may lack good faith if he possessed enough knowledge of the events to induce a reasonable person to investigate. No one supposes that "knowledge of voidability" means complete understanding of the facts and receipt of a lawyer's opinion that such a transfer is voidable; some lesser knowledge will do. Some facts strongly suggest the presence of others; a recipient that closes its eyes to the remaining facts may not deny knowledge. But this is not the same as a duty to investigate, to be a monitor for creditors' benefit when nothing known so far suggests that there is a fraudulent conveyance in the chain. "Knowledge" is a stronger term than "notice." A transferee that lacks the information necessary to support an inference of knowledge need not start investigating on his own.

*Bonded Fin.,* 838 F.2d at 897–98 (citations omitted).

Nor do the Commission's notes, which is the only explanation offered, contradict this conclusion. As the Commission stated "[G]ood faith clearly would not be present if the transferee **knew** facts that would lead a reasonable person to believe that the property was recoverable." Commission Rep. at n.4 (emphasis added). For example, if the recipient knew that the initial transfer entailed all the elements of a preference under Section 547(b) and the recipient had at least a passing understanding of the preference laws, then, as

236. But with this said, a transferee's honesty and integrity, or, perhaps more to the point, his lack of honesty and integrity, can manifest itself in many ways other than through actual awareness of the debtor's fraudulent intent. For instance, there is the bad faith associated with turning a blind eye to the obvious. There is also the bad faith associated with a transferee's abandonment of what had been up to that point an honest attempt to follow-up on suspicious information or activities. Therefore, it was indeed wise for Congress to have kept Section 550(b)(1) good faith intentionally vague while still giving it some definition with the complementary "with knowledge" requirement.

the Commission observed, he would clearly not have received the transfer in good faith. The converse, though, should also be true. That is, the recipient of a preference should be in good faith if he honestly was ignorant of the operative facts and their relevance to distinguishing between a preferential and a non-preferential transfer. The recipient should not be charged with responsibility to either educate himself as to the law or to diligently search out other elements if in fact only one element (e.g., insolvency) is present. Again, as the Seventh Circuit observed: "A transferee that lacks the information necessary to support an inference of knowledge need not start investigating on his own." *Bonded Fin.*, 838 F.2d at 898.

The same conclusion can also be reached by considering again what is the meaning of good faith both under this section and Section 548(c). If, as this court has concluded, good faith is a test of the transferee's honesty and integrity vis-a-vis the debtor's own effort to actually defraud his creditors, imposing a duty to inquire under Section 550(b)(1)'s knowledge requirement would not only render good faith meaningless under Section 550(b); it would also make the subsequent transferee of an actually fraudulent transfer more liable than the initial transferee himself. In other words, an initial transferee for value would have to prove only his good faith—i.e., his honest ignorance of the debtor's fraudulent purpose—whereas a subsequent transferee for value with the same good faith would also have to establish that he had made a

diligent investigation as well in order to meet the additional "without knowledge" element of the Section 550(b)(1) defense.[237]

In summary, this court concludes that the requirement under Section 550(b)(1) that the recipient also be ignorant of the initial transfer's avoidability simply complements the requirement that the subsequent transfer was otherwise received in good faith.[238] Applying, then, this interpretation to the case at hand, the court further concludes that Huntington could not have had the requisite knowledge under Section 550(b)(1) for any indirect transfer received before Rodriguez learned of Watson's past. Put simply, Huntington could not have known of the fraudulent nature of the transfers being received indirectly from Teleservices so long as it could establish that it was in good faith receiving the same on the belief that they merely represented the collected proceeds of its own collateral. If, then, this court had the discretion, it would limit Huntington's exposure as a subsequent transferee under Section 550(a)(2) to only what it received either indirectly from Teleservices after Rodriguez made his discovery on April 30, 2004. Again, this amount totals $50,731,323.54.[239]

*Nordic Village and First Independence*

█ Unfortunately for Huntington, this court is obligated to follow the decisions of the Sixth Circuit Court of Appeals. *Cf.* 6TH CIR. R. 206(c). *See also Nat'l Sign and Signal v. Livingston (In re Livingston)*, 379 B.R. 711, 725–27 (Bankr.

---

237. *See infra* n. 251.

238. CCEC Asset Mgmt. Corp. v. Chemical Bank (In re Consol. Capital Equities Corp.), 175 B.R. 629, 637–38 (Bankr.N.D.Tex.1994); Osherow v. First Republicbank San Antonio, N.A. (In re Linen Warehouse, Inc.), 100 B.R. 856, 860 (Bankr.W.D.Tex.1989); Eder v. Queen City Grain, Inc. (In re Queen City Grain, Inc.), 51 B.R. 722, 728 (Bankr.

S.D.Ohio 1985); *Smith v. Mixon*, 788 F.2d 229, 232, n. 2 (4th Cir.1986) (*dictum*) (quoting 4 *Collier on Bankruptcy* ¶ 550.03 at 550–10 (15th ed. 1985)).

239. *See* Trustee Brief, May 26, 2010, Ex. A. However, Huntington reserves all remaining arguments regarding Trustee's recovery of this amount.

W.D.Mich.2007) *rev'd on other grounds,* 422 B.R. 645 (W.D.Mich.2009). Therefore, particular consideration must be given to two Sixth Circuit decisions: *Nordic Village*[240] and *First Independence*.[241]

*Nordic Village* pitted the IRS against the Chapter 7 trustee in the estate's effort to avoid and recover a postpetition transfer previously made while Nordic Village was in Chapter 11. Joseph Lah, a shareholder, had written a counter-check on Nordic's debtor-in-possession account and the bank had in turn issued a number of cashiers checks to Lah, including one for $20,000 to the IRS on account of Lah's own tax liabilities. Lah delivered that check to the IRS and the IRS in turn credited the payment against Lah's debt.

The split Sixth Circuit panel affirmed the district court's determination that the IRS had to return the unauthorized transfer. In doing so, the majority agreed with both lower courts' determinations that the IRS "knew or should have known that the transfer was voidable." 915 F.2d at 1051.[242] As for its reason, the majority

focused on the fact that the check received from Lah included on its face the words "REMITTER: SWISS HAUS, INC." *Id.* at 1056. Swiss Haus was an assumed name used by Nordic Village. The IRS had also received some time before notice of Nordic Village's bankruptcy proceeding. However, there was no indication that anyone at the IRS directly involved with the check's receipt knew either of the bankruptcy filing or that Swiss Haus was a name that Nordic Village also used.[243] Nonetheless, the *Nordic Village* majority held against the IRS because an "inference of inquiry notice" had arisen. 915 F.2d at 1056. In particular, it concluded that the inclusion of Nordic Village's assumed name on the delivered check would have placed "a reasonable person on notice that the transfer was illegitimate, and by extension, that it was voidable." [244] *Id.*

*Nordic Village* is problematic for Huntington because Huntington, like the IRS, was put on notice of a potential irregularity when Teleservices was identified as the primary source for Cyberco's funds. If, as

**240.** *Nordic Village,* 915 F.2d 1049 (6th Cir. 1990). The *Nordic Village* majority had also affirmed the lower courts' determination that the IRS had waived its sovereign immunity vis-a-vis the estate's recovery of the avoided transfer. *Id.* at 1056. The IRS appealed and the Supreme Court, in turn, concluded that the bankruptcy court had had no authority to recover against the United States under the circumstances. *U.S. v. Nordic Village,* 503 U.S. 30, 39, 112 S.Ct. 1011, 1017, 117 L.Ed.2d 181 (1992). Therefore, the majority's separate ruling concerning the Section 550(b)(1) defense continues to control.

**241.** *First Independence,* 181 Fed.Appx. 524 (6th Cir.2006). Although *First Independence* is not a published decision, it was issued after *Nordic Village.* At the very least it reflects how a subsequent Sixth Circuit panel was able to distinguish *Nordic Village* so as to avoid the application of 6TH CIR. R. 206(c).

**242.** The parties stipulated that the IRS had given value. As for good faith, the majority

concluded that the IRS's lack of actual notice of the transfer's avoidability satisfied that requirement. 915 F.2d at 1056. The majority also sidestepped the question of whether the IRS's status as the alleged initial transferee made it ineligible for the Section 550(b)(1) defense. *Cf.* 11 U.S.C. § 550(a)(1) and (b)(1).

**243.** 915 F.2d at 1064 (Kennedy, J. dissenting).

**244.** It is not altogether clear that the majority took into account the IRS's notice of Nordic Village's Chapter 11 filing or the debtor-in-possession's use of the Swiss Haus name. However, the majority's rejection of the IRS's apparent argument along those lines—i.e., that the IRS should be excepted from being held accountable for such detail because it was a sizeable organization with complex procedures—certainly suggests that these facts did have an effect upon the majority's decision.

*Nordic Village* observed, "[i]t is not an ordinary business practice for corporate entities to pay one another's taxes," the same should hold true when one corporation pays any debt of another. 915 F.2d at 1056.[245] Of course, Watson had given Huntington an explanation—to wit, that Teleservices was simply collecting Cyberco receivables in which Huntington already held a security interest. But there was also information in Huntington's credit files that contradicted his explanation. In particular, those files disclosed that the same Teleservices had been held out by Watson as a vendor who supplied Cyberco with computer equipment. Indeed, the files in one instance revealed that Teleservices was the supplier of equipment in which Huntington itself claimed a security interest and revealed in another instance that Huntington was actually the owner of Teleservices equipment on lease to Cyberco.

Nor does *First Independence* offer Huntington relief.[246] *First Independence* also involved subsequent transferee liability under Section 550(b)(1). However, in that instance liability arose because of fraudulent transfers made by First Inde-

pendence to its shareholders, the Baumhafts. Five of the six relevant checks were First Independence checks made payable to Merrill Lynch and the other was a third-party check payable to First Independence that was then endorsed over to Merrill Lynch. In any event, all six checks were deposited in a brokerage account that the Baumhafts personally held with Merrill Lynch.

The bankruptcy court determined that each of the transfers to the brokerage account was a fraudulent transfer. Merrill Lynch also conceded the lower court's determination that it was a subsequent transferee of each transfer as a consequence of the deposits into the account. Nonetheless, Merrill Lynch avoided liability because of the bankruptcy court's further determination that Merrill Lynch had met all three requirements of the Section 550(b)(1) defense.

In affirming the bankruptcy court and the district court, the unanimous panel discussed Section 550(b)(1) "knowledge" in the context of the particular transfers made.[247] There was no question that Mer-

---

**245.** *See also* 70 C.J.S. *Payment* § 5 (2010) ("Generally, a person may not lawfully use the funds of another to pay his or her individual debts....") (citing *Newco Land Co. v. Martin*, 358 Mo. 99, 117, 213 S.W.2d 504, 516 (Mo.1948)). Granted, the transfers in this instance were between related companies and, as White said "we see that sort of thing all the time." *Cf.* Huntington Post–Tr. Memo., 84. White's comment, though, assumed that Cyberco and Teleservices came from a typical corporate family when in fact White and others at Huntington actually knew very little about Teleservices. Again, Watson's explanations about the two companies had always been vague and even contradictory. Indeed, Huntington's own explanation for asking Cyberco to leave was that Huntington could never quite understand Cyberco's business and its far-flung operations. *See* Irwin at 159–61, Nov. 4, 2009 [DN 273]; Kalb at 198, Dec. 14, 2009 [DN 274]; Hutchings at

126, Dec. 15, 2009 [DN 271]. Moreover, whatever basis Huntington did have for treating the transfers from Teleservices to Cyberco as normal would have been shattered had Huntington ever discovered that Watson's story about Teleservices collecting Cyberco's receivables was a lie.

**246.** As already mentioned, *First Independence* is not a published opinion and, as such, it does not have the same weight as a published decision like *Nordic Village*. *Cf.* 6TH CIR. R. 206(c). Nonetheless, *First Independence* figures prominently in Huntington's post-trial memorandum and Trustee mentions it as well in her brief.

**247.** Again, value was not an issue because of the debtor-creditor relationship arising from the brokerage account. *Cf.* 11 U.S.C. § 550(b)(1). As for good faith, the *First Inde-*

rill Lynch, through its account manager, knew that the Baumhafts were depositing monies from First Independence. However, the panel was able to distinguish the case at hand from *Nordic Village* in two important ways. First, it accepted the bankruptcy court's determination that there were any number of legitimate scenarios for the Baumhafts to be making these deposits from First Independence—for example, salary, repayment of an officer loan, or a corporate dividend. 181 Fed.Appx. at 529. Second, it also accepted the lower court's observation that "[t]here was no one other than the Baumhafts themselves to ask whether these funds were paid for a legitimate purpose." *Id.* at 529–30. These distinctions in turn satisfied the panel that the bankruptcy court had not clearly erred in its conclusion that Merrill Lynch had acted without knowledge of the transfers' avoidability. 181 Fed.Appx. at 530.

Neither of these distinctions, however, can be made in this instance. The account manager in *First Independence* may have legitimately assumed any number of things with respect to the deposits being made by the Baumhafts from their company. However, this court must start from the premise expressed in *Nordic Village* that "[i]t is not an ordinary business practice for corporate entities to pay one another's taxes" and the assumption that the same holds true for other debts as well. 915 F.2d at 1056.[248] Moreover, unlike the account manager in *First Independence,* Huntington was not left to speculate. Watson had told Huntington and, Huntington in turn believed, that the transfers from Teleser-

vices were nothing more than the collected proceeds of its own collateral. But Huntington also had within its own records the ability to test the veracity of what Watson had led it to believe. Therefore, while it was fair for the bankruptcy court in *First Independence* to conclude that any reasonable inquiry would have been futile vis-a-vis the Baumhafts, the same cannot be said here,

This last observation does beg the question of whether it is reasonable to expect Huntington to have examined its files so closely any time earlier than Rodriguez's discovery that Watson was a scoundrel. After all, Watson had given it a plausible explanation and Huntington was making at least a good faith effort to check it out. Moreover, the IRS in *Nordic Village* was fortunate that it had to contend with only one transfer. As such, it made no difference whether the due diligence needed to make the requisite connection between the cashier's check and Nordic Village's status took a few hours, a few days, or even a month. The IRS's liability was always limited to the amount of the single cashier's check it had received.

Consider, though, the situation at hand. *Nordic Village's* admonition to be suspicious of one corporation's payment of another's debt is applicable. Huntington, at least in the majority's view, clearly would have been placed on inquiry notice when it first learned of the Teleservices transfers in September 2003. Nor does it appear that Watson's explanation would have been enough to blunt the exhaustive investigation that *Nordic Village* seems to demand.[249] Remember, the *Nordic Village*

---

*pendence* panel seemed to conclude that Merrill Lynch had met this requirement under either an objective or a subjective test. 181 Fed.Appx. at 528.

**248.** *See also supra* n. 245.

**249.** This court's conclusion that Watson's explanation would have had no consequence upon the investigation otherwise required by *Nordic Village* is arrived at by comparing *Nordic Village* with *First Independence.* Again, the distinction in *First Independence* was that

majority's determination that the IRS had knowledge of the avoidable postpetition transfer from Nordic Village was based only upon (1) the name that appeared on Lah's check—Swiss Haus, Inc.—being also a name used by Nordic Village; and (2) the IRS also having received prior notice that Nordic Village was a Chapter 11 debtor. Making that connection, though, would not have been easy. At the very least, someone within the organization would have had to cross-reference the Swiss Haus name against countless IRS databases until both matches were made. Moreover, this assumes that such databases even existed. If not, then a physical search would have been required.

Moreover, the problem is compounded by the fact that Huntington, unlike the IRS, continued to receive transfer after transfer traceable to Teleservices that Huntington then relied upon to make new advances through Cyberco's revolving line of credit. Fairness would certainly suggest, then, that Huntington not be treated as having known about the avoidability of the transfers it was continuing to receive on a regular basis until it actually became aware of (or turned a blind eye to) the fraud that was discoverable in its records. However, *Nordic Village*, with the duties it imposes from such scant notice, seems to hold that whatever pertinent information is contained within the four corners of the organization will be eventually discovered and that once it has been, everything received in the interim must be returned. Therefore, it appears to make little difference under *Nordic Village* whether Huntington in good faith engaged in at least some activities to follow-up upon what Watson had told it about Teleservices. Indeed, the only real relief *Nordic Village* provides under Section 550(b)(1) is to the truly ignorant transferee—that is, a transferee whose employees and records are bereft of any information that, if discovered, would have led the transferee to conclude that the suspicious transfer was indeed avoidable.

The court does not agree with any of this. With all due respect, the majority in *Nordic Village* goes beyond what is plainly meant by the "without knowledge" requirement of Section 550(b)(1).[250] It also

---

(1) the fraudulent transfers that the Baumhafts were depositing with Merrill Lynch could have been legitimate; and (2) Merrill Lynch had no way of independently determining that the transfers were not legitimate. Therefore, Merrill Lynch's only alternative was to rely upon the Baumhafts. Substitute, then, the parties in *Nordic Village* for those in *First Independence*. In other words, suppose the IRS had contacted Lah after receiving the check and Lah had said that the cashier's check represented a dividend from Swiss Haus. If the IRS had had no means to verify Lah's statement, then the *First Independence* distinction would have applied in that instance as well. However, those are not the facts in *Nordic Village*, for the IRS in fact had independent information in its own files that would have established that the real remitter was Nordic Village, a Chapter 11 debtor with no authority to pay such dividends. Therefore, it stands to reason that the *First Independence* panel would not have distinguished

*Nordic Village* if Merrill Lynch had had something more to rely upon than just the Baumhafts' good word that the deposits being made were legitimate. For example, if Merrill Lynch's own files included information that would have permitted it to "connect the dots" in the same way as was expected of the IRS in *Nordic Village*, then *First Independence's* distinction that "there was no one other than the Baumhafts to ask" would not have applied. Rather, *First Independence* would have presumably concluded that Merrill Lynch in fact had knowledge of the deposits' avoidability if the deposits were otherwise suspicious and Merrill Lynch could have confirmed the same from its own records but did not.

**250.** *Cf. Bonded Fin.*, 838 F.2d at 898 ("'Knowledge' is a stronger term than 'notice'....") (citing *Smith v. Mixon*, 788 F.2d 229, 232 (4th Cir.1986)). *See also Nordic*

distorts reality by placing impossible expectations upon large corporate entities. And finally, *Nordic Village* undermines the protection afforded by the complementary requirement of good faith and the meaning given to that term early on by the Supreme Court in *Coder, Van Iderstine.* and *Dean.* In other words, what difference does it make whether the corporate transferee acted honestly and with integrity vis-a-vis its receipt of what only appeared to be a suspicious transfer if it is to be in any event charged with Section 550(b)(1) knowledge of its avoidability under a much more stringent standard?

Nevertheless, this court is unable to distinguish this case from the conclusions reached by the *Nordic Village* majority so as to avoid the outcome it seems to clearly dictate. If, as that decision concludes, Section 550(b)(1) knowledge can be established on so little as an assumed name and its connection with seemingly unrelated information maintained elsewhere within the vast confines of the IRS, this court sees no reason why the same majority would conclude otherwise here. White, Hutchings, and Kalb were all educated and experienced bankers. Kalb also had a law degree. Would not they have been expected, then, under *Nordic Village* to have immediately examined the very files Hutchings herself had created? And would *Nordic Village* not have also retroactively charged Huntington with knowledge of the obvious contradiction those files would have revealed about Teleservices and the transfers it was making? [251]

Therefore, *Nordic Village* compels the conclusion that the indirect transfers received between the time Huntington first learned of the Teleservices transfers and Rodriguez's discovery of Watson's past are also excepted from the Section 550(b)(1) defense. Again, based upon Trustee's pending motion for summary judgment, this amount is $22,304,096.03.[252] As a consequence, the total amount recoverable against Huntington could be as much as $73,035,429.57. However, as already indicated, this amount might be adjusted downward if Huntington prevails on one of the few arguments that still remain.

*Limiting Section 550(a) Liability to Huntington's Debt*

One of these remaining arguments is that Huntington's Section 550 exposure should be capped at the amount Huntington was owed when it stopped re-advancing on the line and began instead to use the collected Cyberco funds to repay itself. The indebtedness at that time would have been approximately $16.5 million, which, obviously, is much less than the $73 million just discussed. What Huntington claims is that it never was a transferee of any of the other Teleservices deposits because these other deposits simply passed through its accounts as part of the lending arrangement with Cyberco.

*Village,* 915 F.2d at 1064 (Kennedy, J., dissenting).

251. Indeed, the irony of Huntington's predicament should not be lost, for, in hindsight, Huntington would have been better off under *Nordic Village* if it had instead received all transfers directly from Teleservices by check or wire transfer. For instance, had Teleservices paid $2 million directly to Huntington in February of 2004 instead of indirectly through setoff of Cyberco's account, Huntington, as the initial transferee, would have had to establish only good faith and value under Section 548(c), which it has done. However, because Huntington at that time was only the subsequent recipient of the Teleservices' transfers to Cyberco, Huntington has no choice but to address Section 550(b)(1)'s additional "lack of knowledge" requirement and *Nordic Village's* unfavorable interpretation of the same.

252. Trustee Brief, May 26, 2010, Ex. A.

Huntington's argument is a variant of what is known as the conduit defense. This defense is not actually in the Code. Nonetheless, courts have relied upon it to exempt from Section 550's reach an entity who was a "transferee" in name only—e.g., an agent who had received an avoided transfer on his principal's behalf.[253]

The Sixth Circuit is among the courts that have recognized the defense. *See, e.g., Taunt v. Hurtado (In re Hurtado)*, 342 F.3d 528 (6th Cir.2003). *Hurtado* involved the trustee's attempted recovery of a fraudulent transfer. Prior to bankruptcy, the debtors had settled a large lawsuit. However, they did not have the settlement paid to them. Debtors instead had it deposited in Barbara Hurtado's bank account.[254] Hurtado kept the funds separate from her own. Moreover, she only wrote checks to the debtors' creditors and then only when the debtors directed her to do so.

There was no question that the debtors' deposit of the settlement with Hurtado was a fraudulent transfer. However, when the trustee demanded that Hurtado account for it, she claimed that she should not be considered a transferee because she had only been the debtors' agent. As such, she argued that the money had never belonged to her. The panel, though, rejected her argument. It observed that the issue turned on "the distinction between mere possession and ownership." *Id.* at

534. It recognized that in some instances an agent would be considered to have had only a possessory interest. But "Barbara Hurtado here *was* given legal title to the funds.... With that established, Barbara Hurtado had legal authority to do what she liked with the funds...." 342 F.3d at 535.

*First Independence* certainly suggests that Huntington was a subsequent transferee of whatever Cyberco deposited into its accounts simply because of the debtor/creditor relationship that exists between the account holder and the depository bank.[255] Moreover, Huntington had its own interest in whatever Cyberco deposited in any of the Huntington accounts by way of the security interest Cyberco had granted it at the outset of the lending relationship.[256] It also had the ability to control all deposits through the setoff rights the Cyberco indebtedness created. And finally, there was the cash management system that Huntington had actually marketed to Cyberco as an additional service.[257] It permitted Huntington to reconcile most of Cyberco's bank accounts at the end of each day.[258] If the reconciliation resulted in a negative balance, Huntington would advance sufficient funds into the accounts to compensate for whatever negative balances there might be. If, though, the reconciliation resulted in a positive balance, Huntington had Cyberco's permis-

---

**253.** Another more extreme example would be the armored truck service referenced in *Bonded Fin.*, 838 F.2d at 893.

**254.** Hurtado was the debtor husband's mother.

**255.** *See supra* n. 101.

**256.** Trustee Ex. 24. *See also In re Cyberco*, 382 B.R. 118, 134–36 (Bankr.W.D.Mich. 2008). Huntington itself describes its security interest as "contingent" and "never exer-

cised." Huntington Post–Tr. Brief, 102. However, Huntington does not explain why these distinctions are important.

**257.** Getschow at 9–10, 23–24, Dec. 16, 2009 [DN 272].

**258.** Cyberco maintained a separate payroll account with Huntington that was not reconciled with the other accounts. Cyberco instead would fund that account itself with transfers made presumably from one of its other Huntington accounts.

sion to immediately paydown the Cyberco indebtedness through a setoff.

Huntington, therefore, appears to have had a sufficient ownership interest in all of the Cyberco accounts, including whatever account was used to receive the Teleservices deposits.[259] Huntington also appears to have exercised dominion over these accounts every day that a positive net balance existed through the operation of the cash management program that it had established. The only exception to the exercise of such dominion might have been with respect to checks that had cleared the account on the same day as a deposit. And, of course, there is also the question of whether any of this matters at all given *First Independence.*

But these are all issues that go to the few matters that remain to be tried. Therefore, all parties will have the opportunity to present their respective positions at a later date. Suffice it to say here that the focus of any later inquiry will be only upon whether Huntington's association with the Teleservices transfers that Cyberco deposited into its Huntington accounts was enough to make Huntington a subsequent transferee within the meaning of Section 550(a)(2). As the majority pointed out in *Nordic Village,* the purpose of Section 550 is to unwind transfers that should not have been made in the first place. 915 F.2d at 1056. In the case at hand, Teleservices transferred huge amounts to the detriment of its creditors and Huntington in turn was the recipient of those transfers, both directly and indirectly. As such, Huntington must account to the extent that the Code requires.

That accounting, of course, includes the defenses available to it under both Section 548(c) and 550(b)(1). But that is where it ends. This court is not empowered to create other equitable defenses. Nor is this court inclined to do so even if it could. Apart from its impact upon Section 550(a)(2) and the related conduit defense, it should make no difference that Huntington re-advanced to Cyberco what it had received through the Teleservices deposits. The transfers in question defrauded Teleservices' creditors, not Cyberco's.

> When, as here, the transferee does not meet the burden of proving value given, good faith, or lack of knowledge, the unwinding of the situation by requiring the return of the money to the Trustee takes away from no one anything to which that person is entitled. Holding that the Trustee may recover simply places all the parties in the position where they were before the wrongful transfer took place.

*Nordic Village,* 915 F.2d at 1056.

Or, to put it differently, there is nothing special about Huntington to except it from Section 550's provisions. Like it or not, the proofs to date establish that Huntington received deposits traceable to a fraud perpetrated by Teleservices upon its creditors. Moreover, Section 550 is very clear that recipients of such unlawful transfers must account for the same. Therefore, unless something unforeseen occurs, Huntington should expect that a judgment much larger than $16.5 million will enter against it once all the remaining issues are adjudicated.[260]

---

**259.** White testified that the Teleservices' transfers were all deposited into a single Huntington account called the Controlled Disbursement Account. White at 263, Nov. 5, 2009 [DN 290].

**260.** Other lenders may be alarmed that Huntington's Section 550(a) exposure could be as much as four times what it lent simply because Cyberco also maintained its deposit accounts at Huntington. Indeed, the system Huntington used to manage Cyberco's cash is

## FINAL SUMMARY

The complexity of this case has been a bane because of the considerable effort its resolution has required. However, the same complexity has been a boon in the sense that it has compelled this court to consider more holistically the rationale for a trustee's avoidance powers and his rights of recovery associated with the same. That exercise in turn prompts these general observations:

1. While good faith may elude precise definition, its application under Sections 548(c), 549(c), and 550 involves the same concepts of honesty and integrity that have been always associated with the notion of good faith.

2. Assessing a person's good faith is inevitably a subjective exercise—i.e., good faith is to be determined based upon a more forgiving standard than one based upon an objective comparison to whatever is deemed normative.

3. This court is satisfied that good faith in the context of recovering avoidable transfers under the Bankruptcy Code retains the *malum per se* concept the Supreme Court long ago discussed in *Coder*, *Van Iderstine*, and *Dean*. That is, the focus remains on whether the transfer, no matter how avoided, includ-

ed elements of fraud and, if so, whether the recipient was aware of that fraud.

4. However, the equally well accepted prohibition against willful blindness injects at least some investigatory responsibility upon a transferee claiming ignorance of the debtor's fraudulent intent. But even here, the assessment is to be based upon a subjective, rather than an objective, standard—to wit, whether the transferee conducted himself honestly and with integrity (i.e., in good faith) as he reacted to his suspicions.

5. A transferee will not be found to have been in bad faith vis-a-vis his receipt of a particular transfer unless (1) he in fact had sufficient information (i.e., sufficient badges) to conclude that fraud was involved in the transfer; or (2) he had turned a blind eye to information that suggested fraud when an honest person would have investigated further.

6. Moreover, until one of these two thresholds has been met, the transferee will be deemed to have been in good faith for purposes of Sections 548(c), 549(c), and 550. This is not to say that a transferee, when confronted with a suspicious transfer, does not have an obligation to postpone receipt if doing otherwise would be in bad faith. However, once a transfer is received in good faith,

---

commonly used by many banks when revolving lines of credit have been extended. Therefore, "Am I next?" is a legitimate question to ask.

As odd as it may seem, Huntington's plight is comparable to a leper's. Leprosy is a horrible disease that is also very contagious. It is fortunate, then, that 95% of the world's population is naturally immune to its effects. Only a small fraction of those exposed actually suffer from its symptoms.

Section 550 liability is also highly contagious in the sense that virtually every commercial lender is exposed to the recovery of numerous avoidable transfers simply because the transfers were deposited in customer ac-

counts. The good news, though, is that Section 550(b)(1) immunizes the vast majority of such banks from this disease. That is, most banks who accept deposits that are later avoided not only had given value in exchange because of the account's debtor/creditor relationship, but had also taken in good faith and without knowledge of the deposits' avoidability. Huntington's problem is that Rodriguez's decision to withhold from Kalb information about Watson's past compromised its Section 550(b)(1) immunity from April 30, 2004 on. As such, Huntington finds itself among the small percentage of depository banks that can be afflicted by a Section 550(a) recovery of this type.

a later discovery that the transfer was fraudulent should not be retroactively applied so as to then deem the recipient no longer eligible for the defense.

## CONCLUSION

No order will enter as a consequence of this opinion because there remain a few unresolved matters that must be addressed. Therefore, the court will schedule a status conference as soon as practicable to discuss, among other things, whether the best course of action is to next consider Trustee's pending motion for summary judgment. In any event, the findings and conclusions contained in this opinion will constitute law of the case for purposes of any further proceeding.